**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**CLEVELAND DIVISION**

IN RE SOTERA HEALTH COMPANY SECURITIES LITIGATION,

Case No. 1:23-cv-143-CEF

CLASS ACTION

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS


THE EXCHANGE ACT CLAIMS ........ 2

I. INTRODUCTION ........ 2

II. JURISDICTION AND VENUE ........ 10

III. EXCHANGE ACT PARTIES ........ 10

A. Plaintiffs ........ 10

B. Corporate Defendant ........ 11

C. Officer Defendants ........ 11

D. Selling Shareholder Defendants ........ 12

IV. DEFENDANTS' SCHEME ........ 16

A. Corporate History And Background On Sotera ........ 16

B. Sotera And Sterigenics' Commercial EtO Sterilization Business ........ 21

C. EtO's Toxic Effects Create Risk For Sotera And Require Substantial Systems For Compliance ........ 24

1. Despite Defendants' Repeated Denials, Sotera Historical EtO Operations Created Significant Liability And Business Risks ........ 25

2. The Dangers Posed By EtO Were Known For Years Prior To Willowbrook's Opening, But Concealed From The Public ........ 28

D. The Willowbrook Facility Opens Without Consideration For The Health Of The Surrounding Community ........ 32

E. The Willowbrook Facility Failed To Control EtO Emissions ........ 35

1. Sotera's EtO Emissions Controls At Willowbrook Were Lacking Or Nonexistent ........ 35

2. The Company Failed To Control Back Vent Emissions Despite Being Required By Permit To Do So ........ 38

F. Multiple Sotera EtO Facilities Were Operated Without Regard For Safety Or Regulatory Compliance ........ 41

1. Zoetermeer, The Netherlands ..... 41

2. Ontario, California ..... 43

3. Former Employees Confirm That Sotera Operated Its EtO Facilities Without Regard To Emissions Controls Or Safety ..... 43

G. Sotera Endeavored To Stymie Studies On The Ill Effects Of EtO ..... 53

1. After The IRIS Report Was Published, Sotera Fought To Minimize Its Impact While Continuing To Breach Regulations At Its EtO Facilities ..... 55

H. Sotera's Disregard For Compliance And Safety Continue Following The Company's IPO ..... 58

V. MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS ..... 61

A. November 19-23, 2020 – IPO Offering Materials ..... 61

B. January 11, 2021 – J.P. Morgan 39th Annual Healthcare Virtual Conference ..... 64

C. February 24, 2021 – Citi 2021 Healthcare Services, Medtech Tools, & HCIT Virtual Conference ..... 66

D. March 9, 2021 – 2020 Form 10-K ..... 68

E. March 9, 2021 – Q4 2020 Earnings Call ..... 71

F. March 15-18, 2021 – SPO Offering Materials ..... 74

G. March 23, 2021 – KeyBanc Life Sciences & Medtech Investor Forum ..... 75

H. April 15, 2021 – 2021 Proxy Statement ..... 76

I. May 13, 2021 – Q1 2021 Form 10-Q ..... 78

J. June 1, 2021 – Jefferies 2021 Virtual Healthcare Conference ..... 79

K. June 8, 2021 – Goldman Sachs 42nd Annual Global Healthcare Virtual Conference ..... 80

L. August 12, 2021 – Q2 2021 Form 10-Q ..... 82

M. August 12, 2021 – Q2 2021 Earnings Call ........ 84

N. September 21, 2021 – Virtual JP Morgan 12th Annual U.S. All Stars Conference ........ 85

O. November 10, 2021 – Q3 2021 Form 10-Q ........ 86

P. November 11, 2021 – Credit Suisse 30th Annual Healthcare Conference ........ 87

Q. January 11, 2022 – Form 8-K Investor Presentation ........ 88

R. January 11, 2022 – J.P. Morgan 40th Annual Healthcare Conference ........ 89

S. March 1, 2022 – 2021 Form 10-K ........ 91

T. March 1, 2022 – Q4 2021 Earnings Call ........ 92

U. March 22, 2022 – KeyBanc Capital Markets Life Sciences &MedTech Forum ........ 94

V. April 14, 2022 – 2022 Proxy Statement ........ 95

W. May 5, 2022 – Q1 2022 Form 10-Q ........ 96

X. May 17, 2022 – RBC Capital Markets Healthcare Conference ........ 98

Y. June 14, 2022 – Goldman Sachs 43rd Annual Global Healthcare Conference ........ 99

Z. August 4, 2022 – Q2 2022 Form 10-Q ........ 101

AA. August 4, 2022 – Q2 2022 Earnings Call ........ 102

BB. Sotera Made Materially False And Misleading Statements On Its Website ........ 102

1. Sotera's "Ethylene Oxide (EO) Overview" Web Portal ........ 103

a. "EO & Sterigenics" ........ 103

b. "Building a World-Class Sterilization Facility" ........ 104

c. "Ethylene Oxide Overview – Regulatory Oversight" ........ 105

d. "EO Environmental Exposure Litigation" ........ 106

e. "Santa Teresa Fact Sheet" ........ 108

f. April 22, 2021 – Press Release: "Santa Teresa Statement and Q&A – UPDATED 4/22/21" ..... 109

g. June 30, 2021 – "Santa Teresa Statement 06/30/21" ..... 111

h. December 24, 2021 – Statement Regarding New Mexico Litigation ..... 112

i. August 4, 2022 – Statement Regarding EPA's Ethylene Oxide Commercial Sterilizers List ..... 113

j. "FAQs" ..... 113

k. "Environmental Responsibility" Statement ..... 114

l. Global Code of Conduct ..... 115

CC. Item 303 of Regulation S-K ..... 115

VI. THE TRUTH EMERGES ..... 121

VII. LOSS CAUSATION ..... 127

VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..... 130

A. Defendants Spoke Frequently And In Detail Concerning Sotera's Approach To Safety, Compliance And The Attendant Liability And Business Risks ..... 130

B. The *Kamuda* Action's Verdict Further Demonstrates That Defendants Have Long Known About The Harms Caused By The Company's Toxic EtO Emissions And The Related Risks ..... 132

C. The Criminal Prosecution Of Sterigenics Executives In The Hague Put Sotera On Notice Of Sterigenics' Pattern Of Ineffective EtO Emissions Controls ..... 134

D. The New Mexico Attorney General's Lawsuit Against Sotera Put The Company's Executives On Notice Of Its Release Of Toxic EtO Emissions ..... 135

E. Various Governmental Agencies Repeatedly Put Defendants On Notice Of Sotera's Pattern Of Ineffective EtO Emissions Controls ..... 136

F. Employees And Former Employees Confirm That Sotera's EtO Emissions Control Failures Were Pervasive And Widespread ..... 138

G. Effectively Controlling EtO Emissions And Complying With Regulations Are Core Operations of Sotera ........ 139

H. Petras' $21 Million In Insider Sales Support His Motive And Scienter ........ 142

I. The Selling Shareholders And Exchange Act Director Defendants Had Actual Knowledge ........ 143

J. The Scienter Of The Officer Defendants Is Imputed Against Sotera ........ 145

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE ........ 147

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........ 148

XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........ 149

COUNT I ........ 149

COUNT II ........ 152

COUNT III ........ 155

THE SECURITIES ACT CLAIMS ........ 158

XII. PRELIMINARY STATEMENT ........ 158

XIII. JURISDICTION AND VENUE ........ 160

XIV. THE SECURITIES ACT PARTIES ........ 160

A. Plaintiffs ........ 160

B. Corporate Defendant ........ 161

C. Securities Act Officer Defendants ........ 161

D. Director Defendants ........ 162

E. Selling Shareholder Defendants ........ 165

F. Underwriter Defendants ........ 166

XV. ACTIONABLE STATEMENTS AND OMISSIONS IN THE IPO OFFERING MATERIALS AND SPO OFFERING MATERIALS ........ 170

A. November 19-23, 2020 – IPO Offering Materials ........ 170

B. March 15-18, 2021 – SPO Offering Materials.................................................. 175

XVI. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................................ 180

COUNT IV.................................................................................................................. 180

COUNT V .................................................................................................................. 183

COUNT VI.................................................................................................................. 186

XVII. CLASS ACTION ALLEGATIONS (EXCHANGE ACT AND SECURITIES ACT CLAIMS) .................................................................................................... 189

XVIII. PRAYER FOR RELIEF (EXCHANGE ACT AND SECURITIES ACT CLAIMS) .................................................................................................... 191

XIX. JURY DEMAND .................................................................................................. 192

Court-appointed Lead Plaintiffs Oakland County Employees' Retirement System, Oakland County Voluntary Employees' Beneficiary Association, and Wayne County Employees' Retirement System (together, "Lead Plaintiffs"), along with Plaintiffs City of North Miami Beach General Employees' Retirement Plan, and City of North Miami Beach Police Officers and Firefighters' Retirement Plan (collectively, with Lead Plaintiffs, "Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Sotera Health Company ("Sotera" or the "Company")[1] with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company and its subsidiaries and affiliates; (iii) analyst and media reports concerning Sotera; (iv) lawsuits, regulatory inquiries, and proceedings against the Company; (v) information from former Sotera employees, industry professionals, and other knowledgeable persons; (vi) information obtained through Freedom of Information Act ("FOIA") and public record requests to the United States Environmental Protection Agency, the Illinois Environmental Protection Agency, the New Mexico Environmental Department, the South Coast Air Quality Management District, and the State of Georgia; and (vii) other public information regarding the Company.

[1] "Sotera" or the "Company" also refers to Sotera's predecessors in interest and subsidiaries.

## THE EXCHANGE ACT CLAIMS

## I. INTRODUCTION[2]

1. Sotera provides sterilization services to medical products through the use of high volumes and concentrations of ethylene oxide ("EtO" or "EO"), a dangerous and carcinogenic substance. EtO is heavily regulated, must be handled with care and its use requires substantial efforts to mitigate risks to people who are exposed to it. EtO also presents very serious issues for Sotera as its failure to prevent the release of EtO from its facilities would cause financial harm to the Company, business disruptions, regulatory intervention, reputational harm and public scrutiny. Before and after Sotera's November 19, 2020 Initial Public Offering (the "IPO"), Defendants made repeated, uniform representations that Sotera's use and treatment of EtO was compliant with and actually ***exceeded*** applicable requirements for decades. These statements satisfied investors that Sotera's conduct and use of EtO would not affect the Company's business or value. But those statements were contradicted by the true facts reflecting that Sotera had wantonly, knowingly, and recklessly released EtO from its facilities for years, while knowing of the severe risks such behavior created. Section IV, *infra*. When those true facts finally came to light—not through Defendants' release of that information, but as a result of injured individuals forcing those facts into the public sphere—Sotera's market capitalization was cut in half, with approximately $2 billion in shareholder value being wiped out over three consecutive trading days.

2. The truth concerning Defendants' handling of EtO and the ensuing risks was forced into public view beginning on September 19, 2022, when an Illinois jury found that a medical equipment sterilization facility operated by Sotera had given a woman named Susan Kamuda

[2] Unless otherwise indicated, all emphasis is added.

("Ms. Kamuda") breast cancer and awarded a ***staggering $325 million in punitive damages*** and $38 million in compensatory damages against Sotera and its medical equipment sterilization subsidiary, Sterigenics U.S., LLC ("Sterigenics"), for their "willful and wanton" conduct in causing Ms. Kamuda's cancer by releasing EtO into the atmosphere around its Willowbrook, Illinois facilities. The verdict in *Kamuda v. Sterigenics U.S., LLC*, No. 18 L 10475 (Ill. Cir. Ct.) ("*Kamuda*") confirmed a truth that Sotera, Sterigenics, and their predecessors had known for decades but that Defendants had carefully concealed from its investors. The truth was that Sotera had not handled EtO in a manner that was even remotely consistent with its representations to investors. The record subsequently revealed to the public years of corporate-level efforts to minimize EtO mitigation, fight regulations to control EtO, and fight the declaration that EtO was a harmful carcinogen. The evidence of Sotera's wanton disregard for safety—reflecting Defendants' knowing deceptions to investors—resulted in the massive punitive damage award designed to punish these same Defendants for their knowingly cynical conduct.

3. The Class Period begins with Sotera's IPO on November 19, 2020 and ends on September 19, 2022, inclusive (the "Class Period"), when information from the *Kamuda* verdict alerted investors to the truth about Sotera's EtO operations.

4. The years preceding the IPO had brought disturbing news about EtO. In December 2016, the Environmental Protection Agency ("EPA") reclassified EtO as a chemical carcinogenic to humans. In August 2018, National Air Toxics Assessment ("NATA")—a screening tool that estimates cancer risks based on emissions data in tens of thousands of census tracts across the United States—issued a report revealing that people living in communities near Sterigenics' facilities in Illinois, Georgia, and New Mexico had among the highest cancer rates in the country.

And beginning in September 2018, following those developments, people living in the shadow of Sotera's facilities who had developed cancer, or saw their home values destroyed, began filing suit against the Company.

5. At the time of the EPA's classification of EtO as a carcinogen, the NATA report, and the lawsuits, only a few select individuals at Sotera and Sterigenics knew the whole truth: for decades, Sotera and its predecessors had been involved in a fraudulent scheme, in which the Company cut costs by skimping on emissions controls, flouted its regulatory compliance while misrepresenting the truth about its EtO operations to regulators, and fought tooth and nail to keep the reality of EtO's carcinogenic nature, a reality it had known for decades, from reaching the general public. When Sotera became a public company, the scheme to defraud expanded to include a scheme to defraud investors, as the Company covered up the truth about EtO, and its own ongoing and past activities, by repeatedly insisting that its EtO operations were and always had been safe, and that Sotera's handling of EtO complied with applicable regulations and standards.

6. Throughout the Class Period, Defendants knowingly made a series of misrepresentations about Sotera's commitment to the safety of surrounding communities, its ability and willingness to meet and exceed regulatory requirements, and its potential liability from the EtO litigation.

7. Defendant Scott J. Leffler, then Sotera's Chief Financial Officer, laid out the Company's message to investors at a February 2021 virtual conference. He not only boasted of Sotera's "ability to comply with ***any regulatory requirement***," but went further, claiming that the company had "a successful track record of doing that, ***for many decades***." He continued by reminding attendees of the conference that Sotera's predecessors began sterilizing products using

EtO "literally back in the 1930s," and opining that, given this history, "***I think we've proven over the years our ability to comply with any new regulatory requirements***."

8. These statements were repeated throughout the Class Period. Defendants were unequivocal: "We consistently meet and ***outperform regulatory emissions control requirements***"; "Sterigenics' has ***consistently outperformed regulatory standards for decades***"; "just give us the rules and we will play and abide and ***far exceed*** any of the expectations from the regulators. ***We've done this for the history of our company***"; and "just tell us what the guidelines are [and we] will ***exceed*** them. That's what ***we've done for our history*** were [sic] complying with our laws and regs at the state, and the federal level . . . ."

9. Similarly, during a March 9, 2021 earnings call, Sotera's Chief Executive Officer, Defendant Michael B. Petras, Jr., claimed that the Company was "comfortable" with the state of the EtO litigation because regulatory compliance was "***built into [Sotera's] culture***." In the same call, Defendant Petras claimed that Sotera had "***always been on the forefront and a leader in operating these facilities and with the emission control systems that have been in place***."

10. These statements and others were false and misleading because they hid the reality about Sotera's long-standing failure to operate safely and in compliance. Rather, the Company knew about the risks EtO posed, but chose to put profits over its regulatory obligations and the safety of surrounding communities.

11. An inter-office memo at Griffith Laboratories USA ("Griffith"), which operated the business that would later become Sterigenics, revealed as early as ***1981*** that "manufacturers have suspected ***for years*** that Ethylene Oxide is a carcinogen," and lamented that the Centers for Disease Control's National Institute for Occupational Safety and Health ("NIOSH") would expose this

truth to the public. Despite this knowledge, Griffith opened an EtO sterilization plant in densely populated Willowbrook, Illinois, and Sotera continued to operate that and other facilities, despite the information it possessed on the dangers EtO posed.

12. Not only did Sotera operate these facilities in residential areas but it also, as part of its scheme to defraud, did so on the cheap, cutting corners and deciding not to install measures that could have safely curtailed emissions.

13. During the Class Period, Defendant Petras held up Defendant Kathleen A. Hoffman, Sotera's Senior Vice President of Global Environmental Health & Safety, as living proof of the Company's commitment to safety and compliance, reminding investors that she was a direct report to him. In fact, Defendant Hoffman played a key role in Sotera's scheme to defraud. In 2004, when discussing internally the fact that EtO sterilization plants that controlled a form of emissions known as back vent emissions, had far lower overall emissions than plants without such controls, she admitted that the Company only controlled back vent emissions when "required" to do so by applicable regulations, exposing the fallacy of Sotera's claim that it "outperformed" emissions requirements.

14. Moreover, also in 2004, Defendant Hoffman acknowledged that the previous statement (that the Company controlled back vent emissions when "required" to do so) was not actually true; the Company had, until recently, been out of compliance with a federal permit by not controlling back vent emissions at the Willowbrook facility. Her and the Company's reaction, once that failure to comply was remedied, was to attempt do away with the requirement altogether. She explained that once the Company found that the cost of the back vent emissions controls was higher than expected, it had turned to convincing regulators to excuse the Company from

controlling back vent emissions "in the name of safety." Falsely claiming that back vent emissions could not be safely controlled was part of Defendants' scheme to defraud.

15. Another element of the scheme, one in which Defendant Hoffman also played a key role, was keeping the EPA from publishing the truth. When the first draft of the EPA's report classifying EtO as a carcinogen appeared in December 2006, Defendant Hoffman signed on to a stern warning letter to the EPA claiming the agency had not "done its job either well or properly," and she later boasted that the industry "was very successful in getting the EPA to pull this study and re-evaluate the cancer data." When the study resurfaced nearly a decade later in 2013, since the truth about EtO's carcinogenic properties had not changed, the report's conclusions had not either. Rather than committing the Company to securing the safety of community residents, Defendant Hoffman vowed that the Company would "actively fight" the study's finalization.

16. Even after the 2016 classification of EtO as a carcinogen and the NATA report on cancer rates in areas where Sotera operated EtO sterilization facilities, correspondence from Defendant Hoffman, the direct report to Sotera's CEO, showed where the Company's priorities lay. Discussing proposed rule-making on EtO from the EPA, Defendant Hoffman represented that "Sterigenics' government relations attorneys have some ideas around ***how we can force the EPA to use an alternate risk assessment***." This continued pressure on the agency, despite Sotera's long-standing knowledge of EtO's carcinogenic properties, was another part of Defendants' scheme to defraud.

17. Former employees from Sotera's EtO facilities throughout the country confirm that Sotera did not operate safely or with concern for the surrounding communities. They reported that

facilities would often allow gas to escape through opened or improperly sealed doors, that Sotera declined to install or maintain the proper equipment, and that safety was lackadaisical."

18. Sotera had become a public company less than two years prior to the *Kamuda* verdict, with its IPO occurring on or around November 19, 2020. By the time of the IPO, EtO lawsuits had already been filed against the Company. The registration statement and prospectus issued as part of the IPO (the "IPO Offering Materials"), however, disclosed no financial reserve for the pending litigation and severely downplayed to investors the risks this litigation posed to the Company. The IPO Offering Materials represented that Sotera had historically, and was currently taking the safety of surrounding communities seriously, with a "proactive" environmental health and safety program and a "culture of safety and quality across all business units." Specifically, with regard to requirements put in place by the EPA and other regulators, the IPO Offering Materials claimed that Sotera "***consistently m[e]t and outperform[ed] regulatory emissions control requirements***." Given these assurances, it is no surprise that the IPO Offering Materials "den[ied] the allegations" in the EtO litigation, and vowed that the Company would "vigorously defend" the litigation. On or around March 18, 2021, Sotera conducted a secondary public offering (the "SPO"); the registration statement and prospectus in the SPO (the "SPO Offering Materials") repeated the same claims found in the IPO Offering Materials.

19. Only with the *Kamuda* verdict did investors learn that the representations Defendants had made during the Class Period were false: Sotera did not have a "culture" dedicated to safety and quality, it did not meet, let alone outperform, regulatory requirements, and the lawsuits whose allegations Sotera vigorously denied were all too meritorious. Defendants spoke

repeatedly about these subjects while knowing the true facts that informed the jury's verdict from well before the beginning of the Class Period.

20. The market reaction to the *Kamuda* verdict, which unraveled Sotera's misrepresentations, was swift and severe. The day of the *Kamuda* verdict, September 19, 2022, Sotera stock lost a third of its value from the previous trading day, declining by $4.90 a share from $14.73 to $9.83.

21. The next day, after a *Chicago Tribune* article on the verdict discussed how long Sotera had known the truth about EtO's dangerous properties, Sotera stock plummeted an additional ***16.6%***, declining to a closing price of $8.20 per share. On September 21, 2022, following additional news, Sotera share prices declined an additional ***10.7%***, to $7.32 per share.

22. In the three days following the *Kamuda* verdict, therefore, Sotera stock lost ***half*** its value. These losses amounted to a market capitalization loss of approximately ***$2 billion***. Investors were so concerned about the previously undisclosed issues and ensuing risks that the possibility of a bankruptcy was discussed, with a Barclays analyst reporting that Sotera's "[s]hares [were] trad[ing] close to net debt per share, ***implying the market is pricing in bankruptcy.***"

23. Measured from the IPO and the SPO, the losses are even more staggering. The $7.32 closing price on September 21, 2022 was more than 68% below the IPO price of $23.00 per share, and nearly 73% below the SPO price of $27.00 per share.

24. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiffs and other Class members have suffered significant damages.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

26. Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Sotera maintains its headquarters in Broadview Heights, Ohio, which is situated in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. EXCHANGE ACT PARTIES

### A. Plaintiffs

27. Lead Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association ("Oakland County Funds") are governmental employee benefit plans that provide retirement benefits to employees of Oakland County, Michigan. The Oakland County Funds manage approximately $1.5 billion in assets. As previously represented to the Court in the certifications filed with their motion for appointment as Lead Plaintiff, the Oakland County Funds purchased Sotera common stock at artificially inflated

prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

28. Lead Plaintiff Wayne County Employees' Retirement System ("Wayne County") is a governmental employee benefit plan that provides retirement benefits to employees of Wayne County, Michigan. Wayne County manages approximately $1.15 billion in assets. As previously represented to the Court in the certification filed with its motion for appointment as Lead Plaintiff, Wayne County purchased Sotera common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Corporate Defendant**

29. Defendant Sotera is incorporated in Delaware and maintains its corporate headquarters at 9100 South Hills Blvd, Suite 300, Broadview Heights, Ohio. The Company's common stock trades on NASDAQ under the ticker symbol "SHC." As of October 25, 2022, Sotera had over 282 million shares of common stock outstanding, owned by hundreds or thousands of investors.

**C. Officer Defendants**

30. Defendant Michael B. Petras, Jr. ("Petras") is, and was at all relevant times, Sotera's Chairman and CEO.

31. Defendant Scott J. Leffler ("Leffler") served as Sotera's Chief Financial Officer and Treasurer from April 2017 until July 20, 2022.

32. Defendant Kathleen A. Hoffman ("Hoffman") is, and was at all relevant times, Sotera's Senior Vice President of Global Environmental, Health & Safety.

33. Defendants Petras, Leffler, and Hoffman are collectively referred to herein as the "Officer Defendants." The Officer Defendants, because of their positions with Sotera, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

34. Through their positions at Sotera, the Officer Defendants orchestrated the fraudulent scheme by which the Company concealed from its investors, as well as regulators and the public, the truth about its ethylene oxide sterilization operations: these operations released a carcinogenic gas into surrounding communities and the Company had consistently failed to abide by regulations designed to minimize the risks innocent residents faced.

**D. Selling Shareholder Defendants**

35. Defendant Warburg Pincus LLC ("Warburg") is a New York City-based private equity firm. Investment funds and entities affiliated with Warburg sold Sotera shares offered in the SPO. Those investment funds and affiliated entities include: Warburg Pincus Private Equity XI, L.P., Warburg Pincus Private Equity XI-B, L.P., Warburg Pincus Private Equity XI-C, L.P., WP XI Partners, L.P., Warburg Pincus XI Partners, L.P., and Bull Co-Invest L.P. At the time of

the IPO, Warburg, though its investment funds and affiliated entities, beneficially owned approximately 42% of Sotera's outstanding common stock and was the largest shareholder of Sotera. Following the SPO, Warburg, though its investment funds and affiliated entities, beneficially owned approximately 37% of Sotera's outstanding common stock. Warburg had the power to control, and did control, Sotera throughout the Class Period. This control was a result of Sotera shares beneficially owned by Warburg's investment funds and affiliated entities, the directors it had the power to designate, the directors it placed on the board, the insider knowledge it possessed, and the shareholder agreement it entered into with Sotera.

36. Defendant GTCR LLC ("GTCR") is a Chicago-based private equity firm. Investment funds and entities affiliated with GTCR sold Sotera shares in the SPO. Those investment funds and affiliated entities include: GTCR Fund XI/A LP, GTCR Fund XI/C LP, and GTCR Co-Invest XI LP. Following the IPO, GTCR, through its investment funds and affiliated entities, beneficially owned approximately 28% of Sotera's outstanding common stock. Following the SPO, GTCR, through its investment funds and affiliated entities, beneficially owned approximately 25% of Sotera's outstanding common stock. GTCR had the power to control, and did control Sotera, throughout the Class Period. This control was a result of Sotera shares beneficially owned by GTCR's investment funds and affiliated entities, the directors it had the power to designate, the directors it placed on the board, the insider knowledge it possessed, its long history of demonstrating control of Sotera, and the shareholder agreement it entered into with Sotera.

37. Defendant Sean L. Cunningham ("Cunningham") is, and was at all relevant times, a Director of Sotera, as well as a managing director at GTCR. Cunningham reviewed the IPO

Registration Statement, the SPO Registration Statement, and the 2020 and 2021 Form 10-K Statements. Cunningham signed the SPO Registration Statement, the 2020 and 2021 Form 10-K Statements, and authorized Defendant Petras to sign the IPO Registration Statement on Cunningham's behalf as Attorney-in-Fact.

38. Defendant David A. Donnini ("Donnini") is, and was at all relevant times, a Director of Sotera, as well as a managing director at GTCR. Donnini reviewed the IPO Registration Statement, the SPO Registration Statement, and the 2020 and 2021 Form 10-K Statements. Donnini signed the SPO Registration Statement, the 2020 and 2021 Form 10-K Statements, and authorized Defendant Petras to sign the IPO Registration Statement on Donnini's behalf as Attorney-in-Fact.

39. Defendant Constantine S. Mihas ("Mihas") is, and was at all relevant times, a Director of Sotera, as well as a managing director at GTCR. Mihas reviewed the IPO Registration Statement, the SPO Registration Statement, and the 2020 and 2021 Form 10-K Statements. Mihas signed the SPO Registration Statement, the 2020 and 2021 Form 10-K Statements, and authorized Defendant Petras to sign the IPO Registration Statement on Mihas's behalf as Attorney-in-Fact.

40. Defendant Ruoxi Chen ("Chen") is, and was at all relevant times, a Director of Sotera, as well as a managing director at Warburg. Chen reviewed the IPO Registration Statement, SPO Registration Statement, and the 2020 and 2021 Form 10-K Statements. Chen signed the SPO Registration Statement, the 2020 and 2021 Form 10-K Statements, and authorized Defendant Petras to sign the IPO Registration Statement on Chen's behalf as Attorney-in-Fact.

41. Defendant Stephanie M. Geveda ("Geveda") served as a Director of Sotera from October 2020 until October 7, 2022, as well as a managing director of Warburg until September

2022. Geveda reviewed the IPO Registration Statement, the SPO Registration Statement, and the Form 2020 and 2021 10-K Statements. Geveda signed the SPO Registration Statement, the 2020 and 2021 Form 10-K Statement, and authorized Defendant Petras to sign the IPO Registration Statement on Geveda's behalf as Attorney-in-Fact.

42. Defendant James C. Neary ("Neary") is, and was at all relevant times, a Director of Sotera, as well as a managing director and partner at Warburg. Neary reviewed the IPO Registration Statement, the SPO Registration Statement, and the 2020 and 2021 Form 10-K Statements. Neary signed the SPO Registration Statement, the 2020 and 2021 Form 10-K Statements, and authorized Defendant Petras to sign the IPO Registration Statement on Neary's behalf as Attorney-in-Fact.

43. Defendants Warburg and GTCR are collectively referred to herein as the "Selling Shareholders." The Selling Shareholders, through Sotera shares beneficially owned by their investment funds and affiliated entities, controlled Sotera before, during and immediately after both the IPO and the SPO. Representatives of the Selling Shareholders comprise a majority of the members on Sotera's Board of Directors, and the Selling Shareholders exerted control and influence over the Company throughout the Class Period, including as described further below.

44. Defendants Cunningham, Donnini, Mihas, Chen, Geveda and Neary are collectively referred to herein as the "Exchange Act Director Defendants."

45. Sotera, the Officer Defendants, the Exchange Act Director Defendants and the Selling Shareholder Defendants are referred to collectively as the "Exchange Act Defendants," or in this Exchange Act section, simply as "Defendants."

## IV. DEFENDANTS' SCHEME

### A. Corporate History And Background On Sotera

46. Sotera is a global provider of sterilization solutions, lab testing, and advisory services for the healthcare and pharmaceutical industries. Sotera's principal business unit is Sterigenics, which in 2021, accounted for more than 60% of the Company's total net revenues.

47. In April 1984, Griffith Laboratories opened a commercial sterilization facility in Willowbrook, Illinois. Griffith Laboratories conducted ethylene oxide sterilization at that facility for the next 15 years.

48. In 1999, the division of Griffith Laboratories that conducted ethylene oxide sterilization at Willowbrook, Griffith Micro Science, was acquired by Ion Beam Applications ("IBA"). IBA also acquired Sterigenics International, a competitor of Griffith. IBA additionally owned a facility in Zoetermeer, a city in the western Netherlands, which conducted medical sterilizations. This facility was located in an area with residential housing and numerous small businesses. No later than 2002, the Zoertermeer facility began conducting EtO sterilization.

49. In 2004, Silverfleet Capital ("Silverfleet"), a British private equity firm, acquired the plants formerly owned by Griffith and Sterigenics from Ion Beam Applications, as well as IBA's Zoetermeer facility. Silverfleet collectively rebranded the plants as "Sterigenics International." The Zoetermeer facility was operated by a subsidiary titled Sterigenics Holland B.V.[3] ("Sterigenics HBV").

50. In March 2011, Defendant GTCR caused the funds it managed to acquire Sterigenics for an estimated $675 million from Silverfleet. Immediately upon acquiring

[3] Sterigenics HBV is known as DEROSS Holding B.V.

Sterigenics, GTCR selected and installed Michael Mulhern as the CEO. Mulhern had a long history with GTCR, acting as the CEO of at least two other companies owned by GTCR since 2002.

51. Defendant Cunningham, a managing director of GTCR and a director of Sotera, testified in the *Kamuda* litigation that GTCR performed an extensive due diligence investigation of Sterigenics. That investigation revealed that Sterigenics had a history of issues with regulatory compliance that posed a potential risk to GTCR and future owners of Sterigenics (Sotera). GTCR learned that EtO was a carcinogen. It also discovered that the risk of cancer was a function of the concentration and duration of the exposure; longer exposure to EtO meant a higher risk of cancer.

52. Cunningham testified that GTCR was aware of multiple regulatory or criminal issues alleged to have been caused by Sterigenics' lax safety protocols towards EtO. Cunningham confirmed that a memo GTCR reviewed during its due diligence process noted that "Sterigenics has historically lagged regulatory changes[.]"

53. Cunningham stated that by 2011, GTCR learned that Sterigenics was under criminal investigation in the Netherlands for releasing EtO into a residential community from the Zoetermeer facility. Cunningham also admitted GTCR was aware of the EtO gas explosion which had occurred in 2004 in a Sterigenics facility in Ontario, California.

54. Cunningham summarized GTCR's knowledge of these incidents in a deposition, stating that at the time GTCR was considering acquiring Sterigenics, they knew of "at least one explosion, two criminal investigations and a public prosecutor who had filed charges for safety violations in Belgium[.]"

55. Cunningham stated in the same deposition that regulatory consultants had identified that compliance with regulatory emissions standards was "an area for improvement," and that "management could do a better job in directing/enforcing the company's compliance efforts."

56. Despite learning this information, GTCR proceeded with its acquisition of Sterigenics.

57. Judge Marguerite A. Quinn, the judge in the *Kamuda* case, found that evidence supported the conclusion that GTCR was intimately involved in Sterigenics' release of EtO. In allowing the *Kamuda* plaintiffs to add a claim for punitive damages, Judge Quinn found there was a reasonable likelihood that the plaintiffs would be able to prove that GTCR was aware that Sterigenics had been emitting EtO into the Willowbrook community for decades; that GTCR set a 5-year strategy that was centered around the idea of boosting Sterigenics' profitability at all costs, then flipping it to a different fund; and that GTCR directed and funded the expansion of additional sterilization chambers, increasing Sterigenics' profits while also increasing the amount of EtO released into the air. Furthermore, Cunningham admitted in trial testimony that an impetus behind GTCR's acquisition of Sterigenics was its ability to add more EO chambers; GTCR noted that "Sterigenics has identified the ability to add new EO chambers at many of its EO facilities which provides a particularly attractive return on capital[.]"

58. In 2015, Sterigenics acquired Nordion, a supplier of Cobalt 60. Then-CEO Mulhern admitted on a since-deleted video formerly posted to GTCR's website that the acquisition was done at the behest of GTCR, stating: "[i]t came to our knowledge that a company was about to come to market to be sold. If that company got into the wrong hands, it would put at risk our source of supply. GTCR just kicked it into high gear and said we must own this asset, and today we're

the only vertically integrated sterilization company in the world and in large part because GTCR made the decision and committed the resources to get it done."

59. In May 2015, GTCR sold a majority stake in Sterigenics to entities owned and controlled by Defendant Warburg.

60. Similar to GTCR's approach to due diligence, Warburg stated in a brochure describing its services that it conducts an extensive due diligence process before making investments. This process entails "evaluation of important and complex business, financial, tax, accounting, environmental, and legal issues." Warburg stated that they selected companies for investment only "after conducting due diligence and developing a detailed investment thesis." Furthermore, Warburg would "typically take an active role on the boards of directors of [its] companies – either by designating our employees to such boards of directors or, as deemed appropriate, through non-Warburg Pincus designees[.]"

61. In the years following Warburg's acquisition of a majority interest in the Company, Sterigenics borrowed at least an additional $1.1 billion to fund cash dividends paid to the affiliates of GTCR and Warburg.

62. In 2017, Sterigenics International rebranded as Sotera. Sotera would continue to refer to its operating company that conducted ethylene oxide sterilization as Sterigenics.

63. In 2020, Sotera entered into a Stockholders Agreement with Warburg and GTCR. Among other provisions, the Agreement guaranteed that Sotera would recommend Warburg designated candidates for five director spots so long as it maintained holdings of at least 80% of the stock it owned at the time of the IPO, and GTCR designated candidates for three director spots so long as it maintained holdings of at least 70% of the stock it owned at the time of the IPO.

64. Additionally, Sotera's amended and restated certificate of incorporation, Stockholders Agreement, and bylaws provided that Sotera could not increase the number of directors to greater than 11 without the consent of Warburg or GTCR, that a quorum could not exist without both a Warburg-designated director and a GTCR-designated director present, that Warburg and GTCR designated nominees could be removed without cause only with both a majority vote of the holders of a majority of votes of stockholders that would be able to cast in an election of directors ***and*** the consent of GTCR or Warburg, and that Warburg could appoint the chairperson of the Company's compensation committee so long as it had the right to designate a director.

65. As a result of the foregoing provisions, at the time of the IPO, Warburg had designated Defendants Chen, a principal at Warburg, Geveda, a managing director at Warburg, and Neary, a managing director and partner at Warburg, to the Company's Board. GTCR had designated defendants Cunningham, a managing director at GTCR, Donnini, a managing director at GTCR, and Mihas, a managing director at GTCR, to Sotera's Board. As noted above these directors composed a supermajority of the Company's Board, and each such director signed the Company's Form 10-Ks during the Class Period. Warburg retained the right to designate an additional two directors.

66. On November 19, 2020, Sotera conducted an IPO, ultimately selling 53,590,000 shares of its common stock at a public offering price of $23.00 per share, for gross proceeds of approximately $1.2 billion before underwriting discounts, commissions, and offering expenses.

67. On March 17, 2021, Sotera conducted an SPO, through which selling shareholders, including affiliates of Warburg and GTCR, as well as Sotera's CEO, sold 25 million shares of Sotera common stock at $27.00 a share for gross proceeds of approximately $675 million.

68. During the Class Period, Sotera's Board of Directors was controlled by directors who were the employees or designees of the Selling Shareholders. Specifically, at the time of the IPO, 67% of Sotera's total board members were associated with GTCR or Warburg.

**B. Sotera And Sterigenics' Commercial EtO Sterilization Business**

69. As its predecessor entities did, Sterigenics primarily operates as a commercial terminal sterilizer. Terminal sterilization is the process of sterilizing a product in its final packaging, which is an essential, and often government-mandated, last step in the manufacturing process of healthcare products before they are shipped to end-users. Among other forms of sterilization, Sterigenics operates multiple facilities which perform EtO processing.

70. The Company currently conducts EtO processing at least at eight locations in the United States. These locations include Los Angeles, California; Ontario, California; Vernon, California; Atlanta, Georgia; Charlotte, North Carolina; Santa Teresa, New Mexico; Queensberry, New York; and Grand Prairie, Texas.

71. The Company previously conducted ethylene oxide processing at a facility in Willowbrook, Illinois, which was shut down in 2019.

72. These facilities are often located in densely populated areas. For example, the Willowbrook facility operated in a residential neighborhood and near multiple schools. The vicinity of many unsuspecting children and residents to these facilities exposed them to the risks

posed by the dispersion of EtO. Concomitantly, that exposed Sotera and its shareholders to the liability and compliance risks that Defendants concealed from investors.

73. EtO is a toxic and carcinogenic gas used primarily in chemical manufacturing. Less commonly, EtO is used as a fumigant and a sterilant for certain types of medical equipment.

74. EtO processing is a gas sterilization process in which pallets of packaged goods are loaded into a chamber that is vacuum-sealed and then injected with significant concentrations of EtO gas to penetrate the packaging. The process results in large amounts of excess EtO, which must be safely disposed of to avoid releasing it into the environment.

75. Given its highly toxic and dangerous nature, U.S. and international regulations, as well as various state regulations, require extensive filtering of EtO to ensure only a minimal amount is released into the environment.

76. To comply with these regulations and according to the Company, to "outperform [them,]" Sotera purportedly designed emission controls that included a three-step process to prevent dispersion of unmitigated EtO from the sterilization chambers at its EtO facilities.

77. First, once the objects that were exposed to EtO have been sufficiently sterilized, an inert gas is injected into the vacuumed-sealed chambers, mixing with the EtO fumes, and then this mixture is suctioned out and passed through an acid scrubber. The acid scrubbers convert the EtO gas into ethylene glycol. While the first step in the process removes most EtO from the vacuum chamber, it does not remove and mitigate all of the EtO, some of which remains in the pallets of material that has been sterilized and also in the air remaining in that chamber. The next two steps in the process are designed to mitigate the remaining EtO.

78. Second, the door to the vacuum chamber is unsealed roughly six inches, and a combination of a fan and the air flowing from the other parts of the facility into the chamber forces the remaining EtO out of the chamber through chamber exhaust vents, commonly called back vents. In many instances, the Company released those fumes directly into the atmosphere without any capture or remediation by the facility.

79. For example, despite having technology to capture EtO through back vent emissions (by using either catalytic oxidizers or acid scrubbers on the fumes being pushed out through the back vents), Sterigenics chose to not control those emissions at the Willowbrook facility for most of the time it was operating. At one building, emissions were only controlled for roughly two out of 34 years, while at the other, back vent emissions were only controlled for roughly six out of 20 years. Between 2006 and 2018, Sterigenics elected to not have any emission controls on back vents. Sterigenics knew how to and did operate back vent emission controls in certain other locations, but it elected not to do so in Willowbrook in an attempt to reduce costs.

80. Third, following the release of the gases in the vacuum chamber through the back vents the products that had been impregnated with EtO for sterilization are moved to a separate aeration chamber to "off-gas," which is the process by which the products continue to emit EtO over the next several days. Former employees report that the Company would often release those off-gassed emissions directly into the atmosphere, despite EPA regulations requiring the Company to control those emissions.

81. The Company also releases EtO into the atmosphere though inadvertent or non-controlled sources. Those emissions are referred to as "fugitive emissions." The Company has

released fugitive emissions both unintentionally and intentionally (such as by leaving shipping or receiving docks open to vent facilities), including as part of company-wide policy.

82. Intentionally bypassing emission controls violates governmental regulations.

### C. EtO's Toxic Effects Create Risk For Sotera And Require Substantial Systems For Compliance

83. EtO's toxic and carcinogenic effects have been known for over 50 years. Starting in 1994, the EPA adopted regulations sharply curtailing the amount of EtO sterilization companies such as Sotera were permitted to release into the atmosphere. In August 2006, the EPA published an assessment concluding that EtO was significantly more likely to cause cancer than previously known.

84. Despite the known toxic and carcinogenic effects of EtO, the Company has allowed EtO to be emitted in large volumes from its facilities, exposing those coming into contact with those emissions to grave, known health risks. In turn, those emissions also created business, reputational, regulatory and liability risks to Sotera. Sotera's non-compliance with applicable policies and regulations, and exposure to risk from its disregard for safety, were misrepresented and concealed from investors throughout the Class Period.

85. Fully knowing of these risks, and rather than reducing risks through additional mitigation efforts and procedures (which would affect Sotera's profit margins), the Company and the Selling Shareholders regularly lobbied regulatory agencies to lower or curtail emission standards. For example, the Company successfully lobbied the U.S. EPA and the Illinois Environmental Protection Agency ("IEPA") to remove back vent emission controls, allowing it to release EtO directly into the atmosphere.

86. The failure to control EtO emissions when combined with Sotera's lobbying and regulatory evasion efforts, make clear that Defendants were well aware of the risks associated with its release of EtO. In fact, as described below, the Company actively took steps to conceal its non-compliance with regulations and policies designed to lower the risk of EtO release. These concealment efforts were part of the Exchange Act Defendants' scheme to defraud.

### 1. Despite Defendants' Repeated Denials, Sotera Historical EtO Operations Created Significant Liability And Business Risks

87. Beginning in 2018, hundreds of lawsuits were filed against Sotera by former employees, residents who lived in the vicinity of Sotera facilities, and state entities. In Sotera's first Form 10-K following the IPO, the Company referenced: 1) "tort lawsuits alleging personal injury by purported exposure to emissions and releases of EO from [Sotera's] facilities in Willowbrook and Atlanta"; 2) "a lawsuit by certain employees of a contract sterilization customer in Georgia who allege personal injury by purported workplace exposure to EO"; 3) "lawsuits alleging that [Sotera's] Atlanta facility has devalued and harmed plaintiffs' use of real properties they own in Smyrna, Georgia and caused other damages"; and 4) "a lawsuit brought by the State of New Mexico . . . alleging that emissions of EO from our Santa Teresa facility constitute a public nuisance, have materially contributed to increased health risks suffered by residents in the area, and that injunctive relief should be awarded requiring us to cease any and all uncontrolled emissions or releases of EO from the Santa Teresa facility[.]"

88. In response to these lawsuits, the Company repeatedly publicly assured investors that it was not the cause of the severe harm that had befallen so many in the surrounding communities to its facilities and therefore, that its liability risk was limited.

89. For example, on September 21, 2021 at the Virtual JP Morgan 12th Annual U.S. All Stars Conference, Defendant Petras stated

> ***I feel pretty confident and our organization feels confident that these facilities did not generate enough EO to cause cancer in these plaintiffs***, okay? That's ultimately, what has got to be proven in the court . . . . There's been ***no material awards on a chemicals this low level, particularly ethylene oxide***, where people have got the material win from this. And ***we don't see that changing*** here either.

90. Similarly, in a motion for a temporary restraining order against a seal order that the IEPA obtained in February 2019 for all storage containers of EtO at Sotera's Willowbrook, Illinois facility, the Company stridently wrote:

> There is ***absolutely no evidence whatsoever***, either in the Seal Order or anywhere else, to suggest that the ethylene oxide storage containers at the Willowbrook facility present an "imminent and substantial endangerment to public health or welfare" . . . Indeed, the reverse is true—***the ethylene oxide storage containers at the Willowbrook facility are fully compliant with every applicable law and regulation***[.] (emphasis in original).

91. Indeed, throughout the Class Period, Defendants assured investors that the Company had nothing to fear from the multi-faceted EtO litigation and regulatory scrutiny, because of Sotera's long-established record as an upstanding corporate citizen. In the words of Defendant Petras, the "***culture***" of Sotera was "***all about safety, quality, accountability, and excellence***," further claiming that these qualities were the "***foundation for us as an organization***."

92. To explain to investors why Sotera was "comfortable [with] where [it was] in" the *Kamuda* litigation, Defendant Petras asserted that compliance with regulatory requirements was "***built into our culture***[.]"

93. To support their claims about the Company's culture, Defendants pointed to Sotera's history. Defendant Leffler told attendees at a conference run by Citigroup Healthcare Services in February 2021 that Sotera not only had the "ability to comply with any regulatory

requirement," but that it had a "successful record of doing that for ***many decades***." Leffler made it clear he was discussing the Company's entire history of EtO sterilization, saying: "just bear in mind, when you think about the history of the company, Sterigenics' predecessor began sterilizing products using ethylene oxide "***literally back in the 1930s***." And so, whether you're talking about different political administrations or any other moving pieces out there in the regulatory or other landscape, I think we've proven over the years our ability to comply with any new regulatory requirements."

94. At a November 11, 2021 conference hosted by Credit Suisse, Defendant Leffler also directed investors to a website portal where Sotera had compiled "a bunch of information[ ] including background and our views on the ethylene oxide situation." Through that portal, Defendants continued to boast of Sotera's "track record" of complying with regulatory requirements, and claimed that it had "been ***safely using EO for sterilization for more than 70 years. Safety is the top priority at Sterigenics***."

95. Far from safety being a "top priority" or regulatory compliance being Sotera's cultural touchstone, the evidence informing the *Kamuda* verdict revealed for the first time that Defendants' Class Period statements and omissions about the Company's safety and regulatory compliance were false and misleading, as were its statements and financial assessments of the risks posed by the litigation relating to EtO dispersion at its sterilization centers.

96. The true "culture" at Sotera and Sterigenics, predating the opening of the Willowbrook plant and continuing over "many decades," was one focused entirely on profits. Sotera and its predecessors opened plants near densely populated residential areas without regard for how its EtO operations would impact the lives of its neighbors. The Company then, to save on

costs, systematically (1) chose not to install proven safety features that could have safely limited emissions, ***even when required to do so under applicable regulations;*** (2) underpaid, overworked, and provided substandard training and working conditions for the staff responsible for handling EtO in a safe and compliant manner; and (3) sought to undermine or discourage concerned workers. Sotera and the other Defendants also misled regulators and, in collaboration with other players in the EtO industry, engaged in a decades-long fight to keep the public from learning what they knew all along: EtO is a dangerous, cancer-causing substance. Sotera's longstanding efforts to suppress any information regarding the risks posed by EtO sterilization activities, and its Class Period assurances to investors that the Company's history was one of safety and compliance with applicable regulations, were part of Defendants' scheme to defraud.

97. Shortly before the *Kamuda* verdict, on August 31, 2022, Terrence Hammons, the Company's General Counsel, resigned.

98. Ultimately, the *Kamuda* verdict exposed Defendants' whitewashing of the Company's history. When the jury found Sotera liable, and awarded hundreds of millions in punitive damages, investors learned what Defendants knew all-along: a reckoning was only a matter of time.

#### 2. The Dangers Posed By EtO Were Known For Years Prior To Willowbrook's Opening, But Concealed From The Public

99. As documents produced by Defendants during discovery in the *Kamuda* case and publicly revealed in connection with the jury's verdict show, for over 40 years prior to the *Kamuda* verdict Sotera and its predecessors waited for the proverbial other shoe to drop on EtO.

100. While Defendants, as part of their fraudulent scheme, minimized the risk posed by the lawsuits and assured investors and financial analysts that the plaintiffs in the EtO lawsuits

would not be able, in the words of Defendant Petras, to "show causation," the truth about EtO's cancer-causing potential was well known to Defendants. On May 22, 1981, NIOSH, a federal agency under the umbrella of the Centers for Disease Control & Prevention (the "CDC"), published a bulletin entitled "Ethylene Oxide (EtO): Evidence of Carcinogenicity." In the bulletin, NIOSH, "based primarily on an industry-sponsored study demonstrating that ethylene oxide is carcinogenic in experimental mammals," recommended that "ethylene oxide be regarded in the workplace as a potential occupational carcinogen, and that appropriate controls be used to reduce worker exposure." The bulletin reported that "[t]here has been widespread recognition of the mutagenic potential of ethylene oxide," that "recent evidence demonstrates adverse reproductive effects in mammals," and that "limited epidemiologic investigations at two worksites provide evidence that excess risk of cancer mortality may exist for the ethylene oxide workers studied."

101. In less than a month, news of the bulletin reached personnel at Griffith; Micro-Biotrol, which was later sold off and eventually became Sterigenics, was a business unit owned by Griffith. Griffith reacted to this alarming bulletin with great concern–for its bottom line. On June 11, 1981, Griffith employee Jon Panella sent a memo to Joe O'Neill, then VP of manufacturing for Griffith's food business, copying various other individuals, including Don Alguire, President of Micro-Biotrol, attaching the bulletin.

102. As this communication showed, Griffith and Panella were not worried about the impact their actions would have on human lives, but about whether the news would boost a competing method of "spice" sterilization. "The evidence of carcinogenicity coming at this point in time is not good," Panella complained, because "[i]t just gives E.P.A., FDA and the irradiation lobby more ammunition to approve irradiation for spices without proper testing."

103. Notably, the bulletin apparently came as no great shock to the people at Griffith. Panella continued his lamentation by remarking that "users and manufacturers have suspected ***for years*** that Ethylene Oxide is a carcinogen," but predicting that "the publicity which Dr. Welt of Radiation Technology will give this will be news ***to the public***." Panella closed his memo with his fear that the news would lead to EtO being phased out entirely, "[u]nfortunately, this is another nail in Ethylene Oxide's coffin." The fact that Sotera's predecessor contemplated EtO being phased out, partially due to safety concerns, as early as 1981 belies Sotera's later assertion on its website that it had been "safely using EO for sterilization for more than 70 years." *See* Section V.BB, *supra*.

104. Unfortunately for the people living near Willowbrook and Sotera's other facilities releasing EtO, however, Panella's prediction failed to materialize, as Griffith and later Sterigenics and Sotera fought to keep EtO alive at all costs to the surrounding community, while minimizing costs to the Company.

105. Hoping to prevent any further nails in EtO's coffin, Griffith/Micro-Biotrol and other industry participants endeavored to convince NIOSH not to investigate the issue any further and to frustrate any investigation that did occur. In August of 1982, as NIOSH considered a follow-up study to further understand the carcinogenic properties of EtO, the Health Industry Manufacturers' Association ("HIMA"), of which Griffith was a member, put together a letter to the deputy director of NIOSH. In a letter distributed to several personnel at Griffith and Micro-Biotrol, HIMA urged NIOSH ***not*** to conduct the study.

106. When the industry participants in HIMA were unable to dissuade NIOSH from conducting the study, HIMA provided a series of guidelines to its members, circulated in January

1983, to thwart the study's information collection efforts and present an industry-friendly set of facts and data to the regulator. Specifically, these guidelines were designed to ensure that the facility being inspected would tightly control the flow of information to NIOSH, and included the following admonitions, among others:

- "Have a senior person with the NIOSH official at all times."
- "Do not allow NIOSH officials to interview or engage in significant conversation with plant employees."
- "Only show the NIOSH official records you want them to see."
- "Do not show or give NIOSH officials the names of any potentially exposed employees."
- "Carefully select and brief others who will meet with NIOSH officials."
- "Select the sites that NIOSH should visit as opposed to their selecting them."

107. Despite concerted efforts by industry participants to hide the truth about EtO risks, regulators continued to make efforts to mitigate the risks attendant to EtO sterilization. On October 4 and 5, 1982, HIMA held a seminar on "Ethylene Oxide Worker Safety" that Griffith personnel attended. Don Alguire, president of Micro-Biotrol, circulated a presentation from that seminar to others at Micro-Biotrol. That presentation discussed a device called the DEOXX, which can remove over 99% of ethylene oxide before it goes into the environment. The presentation, given to industry insiders, also reported that "[d]ue to the highly toxic nature of ethylene oxide and its classification as a suspect carcinogen, special precautions must be taken to ensure safe exposure levels to human receptors" and warned "[u]nfortunately, ethylene oxide has also been found to pose a serious health risk."

108. In contrast to Defendants' public statements decades later that Sotera's facility "did not generate enough [EtO] to cause cancer in" individuals who were exposed to emissions from the Company, HIMA's October 1982 presentation acknowledged that possibility, saying of certain environmental controls: "Unfortunately, such controls are not entirely satisfactory from an environmental protection standpoint, because there is still the possibility that human receptors ***outside the building*** may unknowingly come into contact with ethylene oxide before it has been sufficiently dispersed in the ambient atmosphere." The presentation therefore both warned of the threat that EtO posed and pointed to DEOXX pollution control as the most effective way to address it.

**D. The Willowbrook Facility Opens Without Consideration For The Health Of The Surrounding Community**

109. Despite the ample information in their possession about the dangers posed by EtO, Griffith and Micro-Biotrol determined in the mid-1980s that they wanted to expand their EtO sterilization capabilities; as a Griffith board member testified during the *Kamuda* trial, they determined that the facility they were using for sterilization at the time "wasn't sufficient and they wanted to be able to have more expansion capabilities."

110. Eventually, Griffith and Micro-Biotrol settled on Willowbrook as a potential location. Joe Maslick, a longtime Griffith employee, board member, and corporate representative, testified that it was his understanding that the Willowbrook location was attractive because it was

centrally located close to multiple highways, which would make it more economical to ship the sterilized products.

111. On or about June 1, 1984, Griffith submitted a permit to the IEPA for the planned Willowbrook facility. As a map attached to the permit application showed, the proposed facility was in a densely populated metropolitan area. Indeed, the Willowbrook facility had close to 20,000 people living within one mile. Griffith chose this location without regard to its proximity to numerous schools, a daycare, parks, and the town center, as illustrated by the below map created by the U.S. Agency for Toxic Substances and Disease Registry–needlessly exposing its residents to excess exposure to EtO. Despite that fact, neither Griffith nor Micro-Biotrol conducted any testing or analysis to determine the level of EtO exposure faced by residents and children attending the nearby schools.



112. The IEPA responded, in part, via a letter on July 6, 1984. Examining estimated emissions from the facility, the agency acknowledged that it "does not have established standards for [ethylene oxide] at this time" but warned that "the [EtO] emissions from the Micro Biotrol facility appear to be ***several magnitudes*** higher than desirable."

113. To assuage these concerns, personnel from Griffith and Micro-Biotrol met with IEPA officials on July 18, 1984. At this meeting, Griffith committed to performing certain testing to determine what EtO levels were actually being emitted by the facility. Following those commitments, Griffith ultimately received the permit to operate the facility from IEPA on July 30, 1984.

114. Operations at the Willowbrook facility began in March of 1985. Despite the fact that Griffith and Micro-Biotrol had warnings of EtO's carcinogenic potential for years, in contrast to Defendants' later claim that "safety, quality, accountability, and excellence," were at the "foundation of [Sotera] as an organization," there were "no emission controls when the plant opened." As discussed below, the plant also had no emissions controls at all in 1986, and in 1987, of the nine retorts (chambers used in the sterilization process) at Willowbrook, only ***one*** had any kind of emissions controls.

115. As a result of its lack of controls, the plant's EtO emissions were massively higher than the estimates that so concerned the IEPA. That agency's July 6, 1984 letter warning about emissions from the plant assumed that it would produce 40 tons, or 80,000 pounds, of EtO emissions. In fact, the plant produced more than twice that amount. These failures, undisclosed by Defendants, led to and directly created the risk of adverse liability rulings, regulatory action, reputation harm and business interruptions.

### E. The Willowbrook Facility Failed To Control EtO Emissions

116. In its 2020 Form 10-K, Sotera would boast to investors that it possessed a "proactive environmental health and safety ("EH&S") program and a culture of safety and quality across all business units." The history of emissions controls, or lack thereof, at the Willowbrook facility tells a different story.

#### 1. Sotera's EtO Emissions Controls At Willowbrook Were Lacking Or Nonexistent

117. The evidence of emissions at Willowbrook was egregious and shocking and led to a massive judgment for the plaintiff reflecting the jury's view—in the form of a punitive damages award of $325 million—that Defendants' conduct was wanton, knowing, and egregious. The evidence informing that conclusion, which Defendants all knew about for many years preceding the IPO, cannot be squared with their Class Period public statements.

118. As explained above, the plant had no emissions controls at all until 1987, when it installed controls on only one of nine retorts. For the first several years of Willowbrook's operation, there were no controls at ***any*** stage of the three-step sterilization process described above in Section IV.B. And these initial efforts simply meant that the Company's process was no longer predicated on the uncontrolled release of EtO into the community. Key elements of the EtO sterilization process continued to allow the gas to escape into the community virtually unchecked.

119. Ms. Kamuda's expert on air pollution and permit requirements, Dr. Ranajit Sahu, explained that the Company did not install any controls on emissions from EtO that dispersed from the aeration rooms from the time the plant was opened until 1999, a span of nearly a decade-and-a-half.

120. According to calculations by Dr. Sahu, using figures that Sotera and the other defendants never challenged, in its first three years the Willowbrook facility actually emitted between 144,000 (in 1985) and 179,500 (in 1987) pounds of EtO emissions, ultimately ***more than twice*** the amount (80,000 pounds) that the IEPA deemed "several magnitudes higher than desirable."

121. One reason that these emissions numbers did not draw scrutiny was that Griffith and Micro-Biotrol simply did not comply with the terms of their permit, which they agreed to in order to obtain permission to open the facility. Joseph Maslick, Griffith's corporate representative, acknowledged at the *Kamuda* trial that the permit required a bevy of tests to be performed over its initial two-year period, but admitted that Griffith could not find any indication that ***any*** of the required testing had actually been performed. Griffith and Micro-Biotrol allowed emissions to proceed unchecked, and ignored the requirements of the permit they had obtained to operate the facility. Over the lifetime of the Willowbrook facility, similar actions would prove to be a consistent practice by them, and, following Micro-Biotrol's sale, by Sterigenics and Sotera. The Company's choice to not comply with the requirements imposed by permits which were necessary for the plant to operate were part of Defendants' scheme to defraud. To this point, documents from the *Kamuda* litigation informed the jury that the Company had the option of lowering emissions but chose not to do so. A few months after the plant opened, an expenditure request at the company proposed adding DEOXX emissions controls, but ***the request was denied***. To save itself $200,000, Griffith let a long-suspected carcinogen flow unimpeded into Willowbrook.

122. Similarly, Dr. Sahu also concluded the Company made no effort to minimize fugitive emissions (*see* Section IV.B) at the facility. In fact, former Sterigenics CEO and Sotera

Executive Chairman Michael Mulhern testified that technology that would have minimized fugitive emissions existed no later than 2001. Had the Company installed those pollution controls then, Willowbrook would have cut emissions from the facility by a total of 183,000 pounds between 2001 and 2019.

123. Former workers at the Willowbrook facility confirmed that Sotera allowed EtO gas to leak into the community as a regular part of the sterilization process, explaining that supervisors told them to "[j]ust leave the doors open and it'll clear out."

124. Former Employee[4] 1 ("FE 1"), a General Manager at Willowbrook from January through August 2012, was responsible for overseeing operations at Willowbrook and all departments at the facility. From this role, FE 1 explained various lapses at the facility. FE 1 described an incident where he directed that the facility be evacuated when alarms, reflecting unacceptable levels of EtO, went off, only to be "chewed out for evacuating the building," based on what his supervisors, including the Director of Engineering John Green, characterized as a false alarm. However, FE 1 was correct to order an evacuation, as the cause of the alarm was later determined to be a leak in the facility's EtO system. FE 1 explained that while he followed the rules and OSHA requirements, this incident was indicative of Sotera's lack of care and attitude about safety issues.

125. Further, FE 1 said that there were two incidents where was told "you don't have to worry about that. It doesn't apply to us," when following standard safety policies handed down by

[4] The terms "Former Employees" and "FE" refer to the former Sotera employees whose reports are discussed in this Complaint. In order to preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he" and "his" in connection with all the Former Employees, regardless of their actual gender.

OSHA. FE 1 communicated this to his manager Sandra Haissig, who was onsite at Willowbrook, as well as Mr. Green who worked in the Company's headquarters.

126. FE 1 acknowledged that he was provided with training and reading material discussing the danger of ethylene oxide, but then senior management seemed to disregard it. Their attitude towards safety was "really lackadaisical. It didn't seem to be very strong and certainly wasn't consistent."

### 2. The Company Failed To Control Back Vent Emissions Despite Being Required By Permit To Do So

127. During the *Kamuda* trial, Dr. Sahu testified that the Company failed to control back vent emissions (described above) for the vast majority of the time Willowbrook was in operation: at one building, there were back vent controls for six out of 20 years, and at the original Willowbrook building, controls were in place for ***two out of 34 years***. This was an egregious violation and exposed the Company and its neighbors to grave risk, in the interest of increasing profits in the short term.

128. Dr. Sahu found that back vent controls, which would prevent unmitigated EtO from being released, were not installed in the original Willowbrook building until 2004, when personnel at Sterigenics realized that they would need to show back vent emissions were being controlled to renew a permit first obtained in 2000. As Dr. Sahu explained, the facility had been out of compliance for ***four years*** before the Company tried to fix the issue.

129. The *Kamuda* trial record revealed that Defendants were aware of back vent emissions as a serious source of pollution. A March 10, 2004 memo from Defendant Hoffman to the U.S. ethylene oxide general managers at the company that became Sterigenics acknowledged

that "[t]he ***plants that do not control back vent emissions have significantly higher emissions than those plants that capture and treat the back vent emissions***."

130. The Company's actual rationale for the lack of back vent controls, contrary to its later claim to have made "proactive, voluntary investments to enhance emissions controls," was a desire to avoid spending money on pollution controls whenever the Company could get away with it. In another 2004 email chain, David E. Meyer, then President and CEO of Sterigenics, questioned Defendant Hoffman why Sterigenics controlled back-event emissions in some plants and not others, and Defendant Hoffman frankly explained: "[t]he real reason is that we ***only*** control back vents in plants that are 'required' to control them for state regulations."

131. A December 2004 email chain demonstrates the Company's commitment to saving money on emissions controls while hiding behind a veneer of concern that emissions controls, rather than emissions themselves, posed the real safety risk. In the chain, which included Defendant Hoffman as well as Sterigenics personnel John Gilbert and Don Currey, Defendant Hoffman revealed a troubling discovery by Sterigenics employee Stephen Morris (still a Director, Environmental Health & Safety at Sterigenics). She explained that "[a]s Steve was preparing the required Title V permit application to be submitted, he found that the back vents ***are supposed to be controlled*** at Willowbrook 1." A Title V permit is a federal operating permit issued to facilities with larger emissions; Willowbrook would not have been able to operate without this permit.

132. As Defendant Hoffman detailed on the chain, Mr. Morris initially "said that the changes needed to control back vents are rather cheap, roughly $20,000, and we decided to proceed with these changes." However, when the Company learned that "the actual price [appeared]

higher," Hoffman requested the team reviewing the regulations read them again and asked whether the Company could craft an argument for "disconnecting back vents ***in the name of safety.***"

133. The Company's efforts to disconnect the back vents at Willowbrook continued through to the end of 2005 and start of 2006, when the Company convinced regulators that it should be able to do so. The Company was uninterested in how its successful lobbying efforts would impact the community. In a January 2006 email chain, Mr. Morris offered to "run a dispersion model and see if the stack height and/or flow rate improves the levels that we emit." Defendant Hoffman responded: "I do not see the need for formal dispersion modeling for the back vent discharges." The Company chose ***not*** to discover the fruits of its labor with regulators.

134. The Company's ultimate approval for disconnecting the back vents came because regulators accepted its arguments that controls were unsafe and that emissions from the back vents were minimal. As demonstrated above, neither contention was true. The Company had violated its Title V permit by operating the Willowbrook plant ***without*** the required back vent emissions controls for four years despite the Company's awareness that a lack of such controls greatly increased emissions. It belatedly decided to comply with its obligations under the belief doing so would be "cheap," and when it realized the so-called error, immediately set about trying to remove the requirement, falsely claiming that there was a safety issue when, in reality, the only harm was to the plant's bottom line.

135. The Company's claims of safety issues with back vent emission controls are completely undermined by the U.S. Chemical Safety and Hazard Investigation Board ("CSB") investigation of the 2004 back vent explosion at Sterigenics' Ontario, California plant. As discussed further below, *see* Sections IV.F and VIII.E, *infra*, that investigation concluded that the

back vent explosion occurred because of structural issues with the management of the Company, not any inherent risk with back vent emission controls. Further exposing the pretextual nature of Sotera's safety concerns, in 2018, when Sotera was concerned about the plant shutting down, it hooked the back vents up to pollution controls again, acknowledging that it had been in violation of both proper emissions controls and the applicable regulations. Sotera's successful efforts to convince regulators that the Company did not need to utilize expensive back vent emissions controls were part of Defendants' scheme to defraud.

136. The Company's actions with regard to the back vents accord with Dr. Sahu's conclusion that Sotera and Sterigenics "did not comply with their permits, they misrepresented critical information to regulators, they were not entirely transparent with the regulators so the regulators could do their job." The Company's consistent pattern of failing to abide by permit requirements, and to misrepresent and obscure the truth from regulators, were part of Defendants' scheme to defraud.

### F. Multiple Sotera EtO Facilities Were Operated Without Regard For Safety Or Regulatory Compliance

137. Beyond the clear record of wanton disregard for compliance and safety that was revealed as a result of the *Kamuda* verdict, several other of Sotera's EtO facilities were operated in the same manner. This evidence is clear from regulatory actions, criminal charges, violations, injuries, and statements from former Sotera employees.

#### 1. Zoetermeer, The Netherlands

138. In early 2002, the mayor and aldermen of Zoetermeer, Netherlands, granted the Company a license under the Environmental Management Act to operate an EtO sterilization

facility in Zoetermeer. The license regulations required the Company to follow certain safety procedures to limit the emissions of EtO. The Company failed to abide those regulations.

139. In response to the Company's violations, in 2009, a criminal investigation was launched leading to criminal charges against Sterigenics HBV for knowingly exceeding the permitted emissions of EtO laid down in the license regulations, and for failing to take timely measures when EtO was emitted directly into the outside air.

140. In early 2010, the Dutch Public Prosecution Service started criminal proceedings against Sterigenics HBV in relation to license violations for EtO emissions in the period from 2004 to 2009.

141. According to the Public Prosecutor in Zoetermeer, Sterigenics knew of the unauthorized emissions, but failed to act and did not warn local residents about the emissions or the dangers associated therewith.

142. The criminal court concluded that Sterigenics had knowledge of "the excess of the maximum permitted emission of ethylene oxide from the washing plant" and that the "court is therefore of the opinion that it has been legally and convincingly proven that Sterigenics ***intentionally*** violated" one of the regulations. The court also concluded "that it has been legally and convincingly proven that Sterigenics ***deliberately*** acted in violation of regulation 4.1, namely that the emission of ethylene oxide from the sterilisers [sic] did not take place via the afterburner."

143. The Zoetermeer facility was later shut down and moved.

144. The litigation involving the Zoetermeer facility and its appeal process has lingered for over a decade. According to Sotera's May 3, 2023 Form 10-Q, the appeal process is still

ongoing and Sterigenics may be subject to civil suits from individuals living in the vicinity of the former Zoetermeer facility.

**2. Ontario, California**

145. In 2004, Sterigenics' Ontario, California facility experienced an EtO-related explosion that injured four employees, forced the evacuation of the plant, and rendered the facility unusable.[5]

146. The CSB concluded that Sterigenics had failed to properly train employees, which resulted in employees manually overriding safety devices, resulting in the explosion.

147. The CSB further concluded that Sterigenics management failed to implement "company-wide engineering control recommendations that could have prevented this explosion."

148. The investigation by the CSB of the 2004 explosion at the Ontario facility also faulted Sterigenics for failing to follow recommendations on EtO concentrations disseminated by NIOSH. As discussed below, the Ontario facility would be subject to scrutiny again in 2022 and 2023, ultimately resulting in a shutdown.

**3. Former Employees Confirm That Sotera Operated Its EtO Facilities Without Regard To Emissions Controls Or Safety**

149. In addition to the facts discussed above revealing Sotera's failure to control emissions at Willowbrook and its other facilities, former employees confirm that similar problems existed for years at virtually all of Sotera's EtO facilities. These former employee statements further evidence corporate actions reflecting (1) an unwillingness to install, maintain, or update proven safety features that could have safely limited emissions and to operate the EtO facilities

[5] *See* https://www.csb.gov/sterigenics-ethylene-oxide-explosion/#:~:text=At%20approximately%203%3A00%20p.m.,the%20facility%20was%20rendered%20unusable.

with controls and procedures designed for safety; (2) policies that underpaid, overworked, and provided substandard training and working conditions for staff tasked with operating the Company's EtO facilities; and (3) practices that undermined or discouraged concerned workers from addressing safety concerns.

150. Former Employee 2 ("FE 2"), an Ethylene Oxide Operator at Sterigenics' plant in Smyrna, Georgia from January 2018 to January 2019, confirmed that Sotera operated that facility in a similar manner as Willowbrook. FE 2, as part of his duties, moved product into the sterilization rooms, where EtO was used to sterilize it. FE 2 had safety concerns, including his view that while he was hired to transport materials within the facility by operating a forklift, his job required him to be a "low-rate scientist." FE 2 observed employees who were not wearing protective equipment when going into vacuum chambers with EtO present and other situations where employees were pushing the sterilized loads through a hallway before the pallets had been fully "off-gassed" in a controlled environment.

151. FE 2 also indicated that there were specific issues with the vacuum chambers, including that they were not monitored properly or safely maintained. As a result, FE 2 was aware of an incident that occurred between 2017 and 2019 where a forklift operator was blown out of the chamber when a spark ignited EtO. The forklift operator was severely burned, needed to use a wheelchair and was on dialysis. The chamber was supposed to be free of EtO, and there was no alert or alarm indicating otherwise—the existing systems at the time of this incident failed to detect the EtO, which was unsurprising as, FE 2 reported that Sotera was "not in the business of making repairs." This incident did not stop operations at the facility.

152. FE 2 explained further he was aware that inside the vacuum chambers there were valves providing for the chambers to be cooled, but the handles to those valves were broken, and, as a result, the chambers constantly overheated. FE 2 asked the maintenance workers why they were not fixing the valves–but the overall attitude was that nothing would change or be replaced or fixed. FE 2 reported that, given the high heat levels in the facility, workers would open garage doors to the east and south in order to provide fresh air ventilation, which also allowed EtO to escape. FE 2 indicated that his boss, the EO Supervisor, Elbert Sabb, interacted with him and others while the doors were open and was aware of this practice.

153. FE 2 confirmed that Sotera's operations were primarily driven by profit not safety: "it was just about money." For example, while FE 2 was paid \$16 to \$17 per hour to place himself at risk, he could go drive a truck for UPS, with less risk, and get paid \$21 an hour. For his relatively low-level of pay, FE 2 was in a "science position" and had to learn how to place testing samples on the products in a certain way. Moreover, FE 2 reported that Sotera had a few office managers and department heads in Georgia who were "making the money and getting bonuses."

154. Former Employee 3 ("FE 3") confirmed other safety lapses at the New Mexico facility. FE 3 was a shipping clerk at the facility from October 2008 through February 2012. FE 3 loaded trucks with the product after it had gone through the sterilization cycle and aeration. He also offloaded products from the conveyors before they had been completely aerated, and still contained EtO.

155. FE 3 explained that the air conditioner at the facility did not work well, and workers opened the doors on the docks all the time to try to vent out the warehouse. FE 3 explained that

even with the dock doors closed, there was a gap where the door connected to the wall, and the gas leaked through the gaps or open dock doors.

156. FE 3's indicated that the Company was more concerned with business than safety. For example, FE 3 reported that employees were told that a mask was sufficient for safety purposes but there was no discussion about the residual getting on your skin and handling the product with their bare hands.

157. FE 3 confirmed that the conveyors that moved product from the vacuum chambers to the dock doors were about 25 to 30 feet long, and that the products would be placed on the conveyors while still impregnated with EtO gas. For example, FE 3 reported that products for a division of Cardinal Health would "popcorn" in the chamber – meaning that the plastic packaging or boxes had inflated with gas, which remained trapped in the packaging. FE 3 said that the popcorning would cause these packages to fall onto the floor in the chamber and he had to pick them up so that they could be moved onto the conveyors.

158. Former Employee 4 ("FE 4"), also a maintenance technician at the Santa Teresa facility, said that "the entire facility was a hazard itself. Protocols were bypassed and doors were open." FE 4, who worked at the facility for over a year in the 2016-2017 time frame, explained that management at the plant "pushed him out every time he tried to do something the right way or do preventative maintenance." He was told "we don't do that here."

159. FE 4 explained that he observed that air-pressure release valves in the vacuum chambers did not work for the most part. FE 4 explained that the failure on the air release valves, which connect the blower motors to the vacuum pumps, affected the supply to the vacuum pumps and would result in opening the chamber when the EtO remaining was higher than it should have

been. FE 4 explained that repairs to these valves required the chambers to be taken off-line and out of use. Former Employee 4 would tell his supervisor the valves needed to be changed out, but would get a lot of backlash from his supervisor, and was told to just put the chamber back online because the Company was behind on production. Management would tell FE 4 they are behind schedule and say, "Can we do this another time?" FE 4 reported this happened plenty of times.

160. Similarly, FE 4 reported that the facility was vented every weekend by opening the doors to the warehouse. This was because the warehouse was not vented properly and the air conditioning units were "old and rusted."

161. FE 4 also reported that the stacked warning lights that were used to indicate whether there was EtO present in the facility would go out and due to the lack of replacement bulbs on hand, would not be replaced for two to three days, or sometimes a week.

162. Former Employee 5 ("FE 5") was an Operator at the Company's Atlanta warehouse from October 2010 to July 2015. In his role, FE 5 was responsible for starting the sterilization cycles via a computer system, as well as loading and unloading products from the sterilization chambers and into the aeration room.

163. FE 5 was well aware of the dangers of EtO, and it was why he left the Company. FE 5 reported that the big garage doors where product is loaded and unloaded were opened to aerate the facility. FE 5 said the facility would also be ventilated by opening doors at the back of the facility where the canisters of EtO gas were kept. FE 5 estimated that this occurred at least weekly, if not almost all the time.

164. FE 5 reported that leaks of EtO occurred "very often," and that leaks occurred over the entire facility, including from the chambers and from the aeration rooms. FE 5 reported that

certain of the chambers were old, made of carbon steel, and were rusted, requiring a lot of maintenance.

165. The safety issues represented by leaks and improper aeration were consistent with FE 5's view that costs and profit drove the Company's decisions on operations and safety. This extended to how employees were paid. When FE 5 started at the Company he was a temp making $14 per hour, but over time, the Company lowered the starting hourly rate to $12 per hour, and the quality of workers went down.

166. FE 5 also indicated that working at the Company was a dangerous job and that the working conditions and quality of employees added to the risks. FE 5 tied worker quality, training and supervision to those safety issues: the door to the aeration room had been knocked off because a worker fell asleep; employees were sleepy or management thought they had enough people to do the work, but the facility was understaffed. FE 5 said "the hours were too much to handle." FE 5 indicated that the GM, Darryl Mosby, was aware of the safety issues but the Company "wanted their products out" and "needed to keep everything running . . . there was always a rush."

167. Former Employee 6 ("FE 6") worked at the Company's Ontario, California facility from February 2006 through June 2015. FE 6 worked as an EtO Operator and was eventually promoted to Lead Operator. In those roles, FE 6 was responsible for running the sterilization cycles. At the time FE 6 separated from the Company, he was one of the longest-tenured employees at the Ontario facility. FE 6 noted that the EtO chambers used in Ontario were the same ones that were in use during the 2004 explosion there. While repairs were done, certain doors in the chambers never lined up properly; both the doors themselves and the gaskets used to seal the chambers required frequent maintenance.

168. FE 6 also noted that there was a rolling back door near one of the EtO chambers at the Ontario facility. This door was opened daily by staff at the facility to ventilate it and lower the level of EtO. FE 6 confirmed that this door was opened every day to allow high levels of EtO to be vented out. FE 6 reported that no one at Ontario was told not to open this door by management.

169. Sotera's woeful approach to safety affected both the general public and its own employees, especially those who were tasked with the Company's limited efforts to address safety. For example, on May 2, 2023, the EPA conducted a hearing concerning EtO. During that hearing, former Sotera employee David Marsh recounted his experience working as a Corporate Maintenance Engineer, where he was responsible for addressing EtO leaks across Sotera's operations. Marsh received "cancer maps" from the Company in 2012, presumably reflecting the high rates of cancer around Sotera's facilities. He soon was himself diagnosed with leukemia, which led to his dismissal by the Company:

> My name is David Marsh. I would like to address two issues. One is the timeline. I went to work for Sterigenics Corporation. ***I was hired as their corporate maintenance engineer, EO engineer was my official title in June of 2012***. The Corporate engineering staff that I worked with ***handed me a stack of cancer maps by July of 2012. They asked me to go into their plants, audit the plants and find out, I believe their exact words were "what kind of stuff are we leaking, if we are or what we are being blamed for leaking.***" I'm going to refrain from exact names. ***I went into these plants*** including Illinois, Carolina, Smyrna, Georgia, Queensbury, NY, Santa Teresa and others. ***I walked into their leaks to label them and try to get them fixed.*** We fixed Texas because they had a good maintenance team. ***When we fixed Texas and I put my nose in these leaks, it took two months for me to show a definitive cognitive decline. Bones that hurt from the inside out. In six months, I was diagnosed with Leukemia. It was just before New Year's, 2013.*** Nobody wanted to work New Year's to go supervise a welding job in Santa Teresa, so they sent me after I told them I was diagnosed with Leukemia. ***When I came back from Santa Teresa, I went into the corporate office, told the HR I guess you hear I have Leukemia. Her exact words to me were, "Yes I know. I have to fire you for it now."*** Here's the thing about the timeline, I had those cancer maps in 2012. How much more time do they think they need? ***And why has it been covered up since I had those maps and discussed them with plant managers and maintenance***

> ***managers. And took the hit of their cancer, had them throw me away like a used lab rat.*** When I went in for that entrance physical, they took excessive amounts of vials of blood. The phlebotomist commented on it. The clinic was in Burns Harbor Indiana, my hometown. For some reason when I got some of the stuff I asked for when I found out about all of this in 2019/20. Just by googling their name and seeing the nightmare that was now titled Sterigenics cancer maps, the ones I realized I had ten years ago, I could have started this fight then. They have had plenty of time. These monitors should be on their fences and tied to the internet or YouTube where we can see it in real time how they are behaving. Even though I've been through this, I agree that this chemical does the job well. It will be killing me for the rest of my life. It does its job well. We need this chemical. I will acknowledge that. ***But it can only be done, if it's done at a stop line. And we say it's this much coming out of your stack and around your perimeters and when you go over that line, you stop. You fix it and you start it back up.*** Nobody is telling anybody to endure shortages here. No one. We understand it's a wicked problem and we need this chemical. And if you don't understand it, you don't. ***The background argument is the same model that Phillip Morris corporation used in the last half of the 20th Century. Find something you can use as an excuse, pay your executives high salaries, just toe your line, whisper in the ears of politicians, lie under oath that this does not cause cancer.***

170. Numerous other Sotera employees have voiced their concerns about the Company's prioritization of costs and profit over safety, noting that employees with critical roles involving safety were underpaid, undertrained, and poorly managed.

171. On June 25, 2013, a Sterigenics employee wrote on the company's Glassdoor webpage that "[t]here is a ***minimum attention to quality & safety*** which will backfire eventually."[6] On February 25, 2015, an "EtO A Operator" in the Charlotte, North Carolina facility wrote that "***[s]afety is an issue sometimes regarding procedures***" and that "[t]he maintenance team ***cuts a lot of corners***." The Charlotte employee advised Sterigenics to "[l]ock out the overrides for equipment" and to "[f]ire any maintenance manager that shows operators how to manually operate

[6] *See* https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm.

equipment without it showing on the computer system."[7] Notably, the Charlotte employee's statements on maintenance management routinely overriding safety features came over a decade after the Ontario, California facility explosion in which a government investigation concluded that the explosion occurred because Sterigenics employees had manually overridden EtO safety systems.[8]

172. Reports by current or former employees on the *Indeed*[9] website provide similar accounts confirming the view that Sotera failed to manage its EtO facilities in a manner consistent with the Defendants' Class Period disclosures:

---

[7] *See* https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW8236300.htm.

[8] *See* https://www.csb.gov/sterigenics-ethylene-oxide-explosion/.

[9] *See* Working at sterigenics: 115 reviews | indeed.com, Indeed.com, https://www.indeed.com/cmp/Sterigenics/reviews?fcountry=ALL&sort=rating_asc (last visited Jun 1, 2023).

| Date of Post | Employee Title | Sotera Facility Location | Statement |
|---|---|---|---|
| November 25, 2019 | Unknown | Willowbrook, IL | The office setting was that much of a small business, even though it was a corporate business. **Training needs improvement as well as new hire screening.** |
| November 23, 2019 | Production Scheduler | Gurnee, IL | No room to advance. No leadership. No future. **Management spends most of the time putting out fires rather than trying to prevent them. Training doesn't exist. Poor pay and over worked full time employees**. |
| March 18, 2022 | Maintenance Supervisor | Grand Prairie, TX | Management is horrible. It's a very cover your on back mentality. **they work the minimum amount of people and push them to the max.** Non stop fireworks going on throughout the corporation |
| October 27, 2017 | Production Supervisor | Westerville, OH | I worked for the company for almost 30 years, it was hard to get promoted unless you had a degree, I did have a Supervisor position but the upper management did not let you make the decision that needed to be make. It was a dangerous place to work if the employees did not take the time and do their job right. We worked with radiation alot. **Management not backing you up or just sitting in their office and not caring what was going on out on the floor.** |
| February 12, 2020 | Ethylene Oxide Chemical Operator | Smyrna, GA | **Money 💰 1st, your safety WHENEVER!!!**<br><br>**They skimp on everything, valves are broken and lines that are critical aren't labeled** INLET/OUTLET... they latch up everything, **maintenance on their equipment isn't reinforced**. Check and double check everything. **You can get hurt or worse there. Not worth the money they pay for the risk you put yourself in** |

173. On February 4, 2019, *CBS Chicago* published a news report in which former employees at Sterigenics' Willowbrook, Illinois facility spoke anonymously and signed sworn declarations. These former employees reported that ***Sterigenics told them "to just open the doors and let the gas out***" and to "just leave the doors open and it'll clear out"; and ***Sterigenics***

***"knowingly" put the chemicals into the atmosphere . . . year after year***." The former employees also reported that ***Sterigenics intentionally "manipulated alarm systems meant to warn workers when they were overexposed" to EtO***, and that "even ***when the warning monitors alarms did go off***, they [said] work still didn't stop" and, instead, the facility's ***managers told their employees to "ignore" it***, "not talk" about it, and "just deal with it or don't work there."[10]

174. Sotera's failure to control several key sources of EtO emissions and its prioritization of profits over safety are in contrast with Defendants' decision to nonetheless assure investors during the Class Period that it had a "proactive environmental health and safety . . . program" as well as a "culture of safety and quality across all business units," constituting a part of Defendants' scheme to defraud.

**G. Sotera Endeavored To Stymie Studies On The Ill Effects Of EtO**

175. As Defendant Hoffman acknowledged during the *Kamuda* trial, it was "[a]bsolutely" Sotera's responsibility, as a company using EtO, to understand the risks that EtO posed to the surrounding community. And during the Class Period, Defendants claimed that Sotera's culture was "all about safety, quality, accountability, and excellence" and pledged that the Company would make sure "the communities are safe." In reality, however, Sotera was "all about" keeping the communities it operated plants in, and the public at large, in the dark about the damages caused by EtO. These efforts to prevent the truth about EtO sterilization from reaching the public were part of Defendants' scheme to defraud.

176. As explained above, Sotera's predecessor had received warnings of EtO's carcinogenic properties as early as 1981, and manufacturers apparently suspected that fact for

---

[10] *See* https://www.youtube.com/watch?v=FULeLmIQVFk.

"years" before that. *See* Section IV.C, *supra*. However, instead of trying to control EtO emissions, as part of its scheme to defraud, Sotera tried to control the EPA.

177. In December 2016, the EPA classified EtO as a carcinogen in its IRIS report. However, the report dated back a decade, with an initial draft appearing in 2006. Part of the reason the public did not learn the truth at that time, as Defendant Hoffman admitted during the *Kamuda* trial, is that once that initial draft appeared, the Company and other industry participants worked to prevent the draft from seeing the light of day.

178. In a December 8, 2006 letter that Defendant Hoffman signed, the Ethylene Oxide Sterilization Association drafted a letter harshly critiquing the EPA's work. The letter claimed that the EPA had not "done its job either well or properly," asserting that "[t]he 'evaluation' is clearly unnecessarily conservative and ***employs way too many safety factors***." As Defendant Hoffman told then-Sterigenics CEO Michael Mulhern, as a result of its lobbying "the EO industry was very successful in getting the EPA to pull this study and reevaluate the cancer data." the Company and its compatriots succeeded in burying the truth about EtO for ten years. the Company's successful effort to suppress the 2006 draft was part of Defendants' scheme to defraud.

179. However, no fraudulent scheme on Defendants' part, and no amount of reevaluation on the EPA's part, could change the fact that EtO is a carcinogen; and so, by August 2013, another draft of the IRIS report emerged. In an email that month from Defendant Hoffman to Mulhern, she lamented that efforts to delay the report had been unsuccessful, saying "[w]e thought we had delayed this report to 2014[.]" Hoffman then reported that, seven years after the initial draft that the industry had succeeded in suppressing, the EPA's conclusion had not changed, and the agency had put together a "negative report with respect to the carcinogenicity of ethylene oxide[.]"

Hoffman followed up this summary, and her account of past efforts to prevent the EPA's assessment from seeing the light of day, with a renewed commitment to keep the truth from the public, saying: "We will ***actively fight*** the finalization of this report." the Company's attempts to prevent the EPA's report from being finalized comprised yet another part of Defendants' scheme to defraud.

180. In the aftermath of the draft report, the Company hired toxicologists—not to study what impact its activities were having on the people of Willowbrook, but to contest the EPA's conclusions.

181. An October 2013 email sheds further light on the Company's efforts to "actively fight" the EPA's conclusions. Corresponding with EtO manufacturer, ARC, Hoffman noted that the IRIS assessment "indicates a much higher carcinogenicity link than the previous studies." Instead of trying to determine the truth of what the Company's emissions were doing to the community, Hoffman "anticipate[d] trying to educate EPA again on our process to try to eliminate some of these studies."

182. Defendant Hoffman again acknowledged the upcoming IRIS report in November 2014, reporting to various Sterigenics personnel that "[w]e are doing what we can to fight the EPA on this study."

**1. After The IRIS Report Was Published, Sotera Fought To Minimize Its Impact While Continuing To Breach Regulations At Its EtO Facilities**

183. Sotera and other industry participants' efforts at suppressing the report were ultimately unsuccessful. In December 2016, the EPA classified EtO as a known carcinogen and significantly increased the chemical's estimated cancer potency. The EPA has found that the

cancer risks posed by EtO exposure are greatest among children "because ethylene oxide can damage DNA."

184. The risks continued to increase for Sotera. In August 2018, the EPA issued a report revealing that, based on EtO emissions around the United States, people living in communities near Sterigenics' EtO sterilization facilities in Illinois, Georgia, and New Mexico had among the highest cancer rates in the country. Emailing about the report shortly before its issuance, Defendant Hoffman's mind was not on whether the Company's actions had put lives at risks; instead, she hoped for a minimal impact on the Company, stating: "Let's hope the announcement to repeal the Clean Power Plan takes all the press."

185. Defendant Hoffman's hopes that news of the Company's emissions caused cancer in area residents would pass unnoticed did not come to fruition. In September 2018, shortly after the release of the EPA's report, cancer-stricken plaintiffs filed a surge of lawsuits in Illinois state court, alleging that EtO emissions from the Company's sterilization facility had caused their cancer.

186. Sotera's efforts remained focused on avoiding negative scrutiny from the EPA. In December 2018, Defendant Hoffman corresponded with other industry participants about proposed rule-making from the agency on EtO. As one of them reported, "Sterigenics' government relations attorneys have some ideas around how we can force the EPA to use an alternate risk assessment." Hoffman did not disagree, but instead explained what attorneys she would be bringing to the meeting. The Company's plans to use lobbyists to convince the EPA to develop an alternative risk assessment were part of Defendants' scheme to defraud.

187. On February 1, 2019, in the wake of the first lawsuits filed against Sotera, the Company issued a response to questions from a reporter from *CBS Chicago* regarding Sterigenics' operations. In the statement, Sotera touted its "safe use of ethylene oxide" as well as its significant investments purportedly "to upgrade . . . and install state-of-the-art systems that allow the company's employees to safely monitor, capture and control more than 99.9% of the [EtO] used in the sterilization process – exceeding regulatory requirements." The Company also denied claims made by plaintiffs who had sued Sterigenics, characterizing those claims as "misleading and untrue distortions of the facts regarding Sterigenics' operations." Defendants' denials of the allegations in the EtO litigation despite Defendants' own longstanding knowledge of EtO's carcinogenic properties were part of Defendants' scheme to defraud.

188. On September 30, 2019, after significant backlash from the public and action by Illinois regulators, Sotera announced that the Willowbrook facility would be closed. In a press release announcing the closure, Sotera repeatedly claimed that the closure of the Willowbrook facility ***was unrelated to the veracity of the litigation claims***, labeling allegations of wrongdoing against it as "***inaccurate and unfounded claims***" and claiming that the Company had a "***longstanding commitment to go beyond regulatory requirements***." Rather than admitting to wrongdoing, the press release blamed the "present environment" for its inability to renew the lease, and claimed it could not open a second Willowbrook facility due to the "unstable legislative and regulatory landscape in Illinois."

189. Beginning in August 2020, cancer-stricken plaintiffs filed lawsuits against Sotera in Georgia alleging claims similar to those filed against the Company in Illinois. Sotera is currently

involved in resolving lawsuits from more than 800 plaintiffs in Illinois and faces approximately 300 plaintiffs in Georgia, all concerning the Company's EtO emissions.

### H. Sotera's Disregard For Compliance And Safety Continue Following The Company's IPO

190. Despite Sotera's long history of wantonly placing profits over safety, regulatory violations, and the closing of its Illinois facility–from the date of the IPO, Defendants continually assured investors of the Company's purportedly effective safeguards to limit EtO emissions and its compliance with applicable regulations. Yet throughout the Class Period, Sotera continued to emit dangerous levels of EtO from its facilities while prioritizing profit over safety and disregarding attendant liability, business, and reputational risks.

191. For example, on December 22, 2020, one month after Sotera's IPO, the Attorney General for the State of New Mexico filed a lawsuit against the Company alleging that decades of EtO emissions from Sterigenics' New Mexico sterilization facility had significantly deteriorated air quality in Santa Teresa and surrounding communities, and had materially contributed to increased health risks suffered by residents of those communities. Beyond the cancer risk identified by data released by the EPA, the New Mexico Attorney General's Office conducted a pre-suit investigation that included a sampling of air within a four-mile radius of the plant for EtO levels, which confirmed the substantial risk to New Mexico residents based on Sterigenics' EtO emissions. Specifically, air samples collected contained concentrations of EtO far exceeding the EPA's threshold level (an IUR of .03 ug/m3) above which cancer risk is considered increased, with one sample finding EtO concentrations close to a ***thousand times*** the EPA's carcinogenetic inhalation unit risk estimate for adult-based exposures.

192. Multiple employees of that facility described common practices of opening warehouse doors to intentionally allow excess amounts of EtO gas to exit the facility. As noted above by several former employees, Sotera's warehouses in New Mexico, like its other facilities, had monitoring systems that would turn on an alarm light when there was a dangerous amount of EtO leaking from the sterilization chambers. When the EtO reached a certain level in the warehouse, the sterilization process would be forced to shut off. Rather than allow that shut-off, Sotera would instruct employees to open large shipping bay and facility doors for hours or days, releasing excess EtO into the atmosphere in an uncontrolled and unfiltered manner, which allow the facility to continue operating.

193. Uncontrolled EtO emissions also escaped the Santa Teresa facility from the sterilization back vents at the facility, and through other means, which may include emissions released during mechanical failures or breakdowns impacting the Plant's emission control systems.

194. During regular cleaning and maintenance operations, Defendants caused EtO and ethylene glycol residues built up within the sterilization chambers to be removed from sterilization equipment using a hose and released through an ordinary drain. Sotera's decision not to utilize established emissions controls was part of Defendants' scheme to defraud and reflected their clear prioritization of profits over safety.

195. In assisting other Sterigenics facilities in sterilization operations, the Santa Teresa facility was off-gassing EtO during the shipping, receiving, and loading phases, further contributing to the uncontrolled release of EtO in the State.

196. Sotera also regularly flouted regulatory compliance in its California facilities. For example, in May 2022, the South Coast Air Quality Management District ("South Coast AQMD"),

the regulatory agency responsible for improving air quality for large areas of southern California, issued a notice of violations to Sterigenics' facility in Vernon, California. The South Coast AQMD identified a substantial release of EtO from the facility and found that Sterigenics had failed to maintain its air pollution equipment in good working order and other permit issues.

197. On June 30, 2022, investigators for the South Coast AQMD issued notices of violation to Sterigenics for installing control equipment at buildings without first obtaining air quality permits.

198. Also on June 30, 2022, investigators for the South Coast AQMD issued Notices of Violations to Sterigenics for failing to maintain its equipment in its Ontario, California facility. After an investigation of the facility, the South Coast AQMD determined that Sterigenics failed to maintain its equipment in proper working condition, did not report equipment breakdowns in a timely manner, and submitted incomplete breakdown reports.

199. Based on samples of the air outside Sterigenics' Vernon, California facility from April 22, 2022 to July 2, 2022, the South Coast AQMD detected levels of EtO that were many times above the allowable cancer risk limit. Based on that data, in September 2022, the South Coast AQMD issued an order to Sterigenics requiring it to immediately reduce the toxic EtO emissions levels from that facility. Specifically, the order required Sterigenics to immediately upgrade its air pollution control systems, install temporary enclosures—and permanent enclosures within two years—as well as conduct regular air monitoring and an enhanced leak detection and repair system.

200. As also noted below, on April 7, 2023, South Coast AQMD approved an Early Action Reduction plan for Sterigenics' Ontario, California facility, which required the Company

to immediately address and reduce health risks from its EtO sterilization operations at the facility. The plan set interim thresholds to curtail operations upon persistent elevated EtO levels. Repeatedly exceeding EtO threshold levels would result in a temporary shutdown. Throughout April, monitoring data showed EtO levels "***well above***" the threshold.

201. Then, on April 28, 2023, the South Coast AQMD ordered Sterigenics to immediately shut down operations at its Ontario, California facility due to elevated levels of ethylene oxide outside the facility. On three separate occasions that month, investigators had found that EtO levels outside the facility far exceeded the threshold previously agreed to by Sterigenics. Previously, the South Coast AQMD had allowed Sterigenics to operate in Ontario while Sterigenics constructed a Permanent Total Enclosure (PTE) around the building to further lower the amount of EtO it released into the atmosphere. However, faced with Sterigenics' inability or unwillingness to control emissions, the South Coast AQMD required Sterigenics to construct the PTE before it could resume operations in Ontario.

202. Sotera's decision not to control emissions from its Ontario, California facility was another part of Defendants' scheme to defraud.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

### A. November 19-23, 2020 – IPO Offering Materials

203. The Registration Statement was originally filed with the SEC on October 23, 2020, and which, after four amendments—filed on Form S-1/A on November 2, 12, 13, and 18—was declared effective by the SEC after the market closed on November 19, 2020 (the "IPO Registration Statement"). The Class Period begins on November 19, 2020, the effective date of Sotera's IPO. On November 23, 2020, Sotera filed a final prospectus for the IPO with the SEC on

Form 424B4 (the "IPO Prospectus"), which formed part of the Registration Statement (together, the "IPO Offering Materials").[11] By means of the IPO Offering Materials, Sotera offered and sold 53.59 million shares of common stock (which included the underwriters' exercise in full of their option to purchase an additional 6.99 million shares of common stock) at $23.00 per share, generating more than $1.2 billion in gross proceeds for the Company.[12]

204. The IPO Prospectus contains the following false and misleading statement regarding its perceived risk of liability related to the EtO emissions cases and Willowbrook in particular:

> ***We establish reserves for specific liabilities in connection with regulatory and legal actions that we determine to be probable*** and reasonably estimable . . . . While it is not possible to determine the ultimate disposition of each of these matters, ***we do not expect that the ultimate resolution of pending regulatory and legal matters in future periods, including the matters described below, will have a material effect on our financial condition or results of operations***.
>
> * * *
>
> ***We have not provided for a contingency reserve in connection with these claims.*** While we intend to vigorously defend the Willowbrook proceedings, there can be no assurance that we will be successful.

205. As set forth in ¶204, the IPO Prospectus statements were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Sotera failed to disclose the true extent of its litigation risks by withholding information from investors regarding

---

[11] Each of the alleged false and misleading statements made in the Registration Statement were also made—and appeared word-for-word—in the Prospectus (and vice versa).

[12] As noted above, each of the Exchange Act Director Defendants signed the IPO Registration Statement and was named as a "Director" in both the IPO Registration Statement and the Prospectus.

the inadequacy and subversion of its EtO emissions control systems, which allowed dangerous amounts of toxic EtO fumes to pollute the air surrounding the Company's facilities and exposed people living in the adjacent communities to significantly increased cancer risks, and the fact that Sotera has long been aware of these risks. Given Sotera's awareness of these facts and the substantial record of its highly cynical approach to health and safety, it was misleading to fail to account for potential litigation losses in the Company's financial statements and to represent to investors that a loss was not deemed probable to the Company. *See* Section IV.C-H, *supra*.

206. The IPO Offering Materials similarly made misstatements regarding the hundreds of EtO emissions lawsuits filed against the Company. Specifically, Sotera downplayed the liability risk it faced from "lawsuits alleging that purported EO emissions from certain of [Sotera's] current and former facilities have resulted in toxicological or health-related impact on the environment, the communities that surround [Sotera's] facility and a customer[']s employees," repeatedly (and unequivocally) stating that ***"[w]e deny these allegations and are vigorously defending against these claims***."

207. Sotera's above statements that it "den[ied] th[e] allegations" in the "Ethylene Oxide Tort Litigation" were materially false and misleading and/or omitted material facts required to be stated in order to make the statements contained therein not misleading because as detailed in ¶¶87-202, the "allegations" in the "Ethylene Oxide Tort Litigation" concerned the underlying facts that Sotera was aware of the carcinogenic properties of EtO, but chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to

significantly increased cancer risks and the Company to an increased risk of regulatory scrutiny and liability from hundreds of EtO related lawsuits. Thus, it was materially false and misleading for the IPO Offering Materials to deny that Sotera's EtO emissions control systems were inadequate and ineffective and had been subverted by denying those same allegations as made in the EtO related lawsuits.

208. The falsely positive image of the Company's risk profile and adherence to regulatory and safety standards portrayed by Defendants in the IPO Offering Materials worked. The IPO raised over a billion dollars with its shares priced at $23.00 per share at the time of the IPO. The price of Sotera jumped shortly after the IPO, with the Company's stock trading at above $28.00 per share on November 23, 2020.

**B. January 11, 2021 – J.P. Morgan 39th Annual Healthcare Virtual Conference**

209. On January 11, 2021, Petras and Leffler represented Sotera at the J.P. Morgan 39th Annual Healthcare Virtual Conference.

210. During the conference, an analyst asked "what are the risks involved" from the EtO litigation that Sotera faced in New Mexico; Atlanta, Georgia; and Willowbrook, Illinois. Petras answered, in part, by stating that "[w]e continue to comply with all permits," and "[w]e're going to make sure our employees are safe, the communities are safe and the patients get sterile product, okay, and we'll defend these lawsuits very aggressively:"

> [**Analyst:**] . . . And any updates on the recent New Mexico litigation? You are vigorously defending and have flagged risks to this site along with Willowbrook and Atlanta and S1 [ph] as the only three sites with potential issues and it looks like the EPA did not join the lawsuit. So what are the risks involved?
>
> [**Petras:**] Well, first of all, it's unfortunate that New Mexico attorney general has initiated a lawsuit to interfere with the facility operations that have been licensed and authorized by the U.S. EPA and the state of New Mexico Emissions

> Department. So it's disappointing that -- I can't get into a lot of details on this, but I will tell you that they have not seek [sic] the closure of this facility.
>
> They have asked for improvements to the process of what's occurring in that facility and sterilization process. And as I've told many of our investors, we are aggressively pursuing facility enhancements across all of our EO facilities in United States and sanitary is just part of that plan and has been part of that plan from the beginning. ***We continue to comply with all the permits.*** All our facilities are up and operating. We're going to continue to take care of our customers. ***We're going to make sure our employees are safe, the communities are safe and the patients get sterile product, okay, and we'll defend these lawsuits very aggressively***.

211. The analyst next asked Petras whether the EPA's forthcoming "revised EPA guidelines . . . . could . . . impact [Sotera's] ongoing lawsuits and any future lawsuits"—to which Petras responded:

> [**Petras:**] Yes. So we are anxiously awaiting new regulations. ***We have said since 2018 just give us the rules and we will play and abide and far exceed any of the expectations from the regulators***. ***We've done this for the history of our company*** and we are waiting for the rules. As you referenced, (inaudible) '19 which are they going to come and 20 which are they going to come and now we're hearing early 2021. With the new administration coming, I'm not exactly sure when that's going to occur. We don't control that.
>
> ***All I can tell you is that we have put in our enhancements and our facilities, we're working aggressively to get those rolled out. We put them in Atlanta. And today in Atlanta, we captured 99.99% of the emissions coming out of that facility. But of the EO used, it was 99.99% of the EO used. We're capturing it to make sure it doesn't get out in emissions***. And we are going to use that as our guiding principle in our practice and protocols as we look at all of our facilities around the United States and we're pursuing that across each of them. I feel very confident that what the regulators come out in new regards and new rules and regs are going to be very closely resembling what we've done in Atlanta and it will further demonstrate our leadership position in this area. So what we want are the rules. Tell us the rules and we'll go right now. We're solving form as best we can without clarity from the government officials on the new NESHAP regulations. ***I feel we're well positioned.***

212. As set forth in ¶¶210-11, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera

often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. It was also false and misleading to claim that the company would "continue to comply with all permits" when over the life of the Willowbrook facility, Sotera also failed to comply with requirements in multiple permits designed to limit and monitor EtO emissions. *See* Section IV.D-H, *supra*.

### C. February 24, 2021 – Citi 2021 Healthcare Services, Medtech Tools, & HCIT Virtual Conference

213. On February 24, 2021, Defendant Leffler represented Sotera at the Citi 2021 Healthcare Services, Medtech, Tools, & HCIT Virtual Conference.

214. During the conference, an analyst asked Leffler for an "update" on "the EO regulations in the US"—to which Leffler answered that "we have a high degree of confidence in our ability to comply with any regulatory requirement. We have a successful record of doing that for many decades," and that "we've proven over the years our ability to comply with any new regulatory requirements. We believe that we're an industry leader and have a competitive advantage in that area:"

> [**Analyst:**] . . . And then, when we get a [decent amount,] [it's] just on the EO regulations in the US, obviously, a new administration in place. Any update from your end in terms of the new landscape, any changes, and how you guys are thinking about that?
>
> [**Leffler**:] No, we like I think many players in the industry are anxious to kind of get across the finish line. ***I think one of the things that we've always said is that we have a high degree of confidence in our ability to comply with any regulatory requirement. We have a successful record of doing that, for many decades***.
>
> I mean, just bear in mind, when you think about the history of the company, Sterigenics' predecessor entity began sterilizing products using ethylene oxide, literally back in the 1930s. And so, whether you're talking about different political

> administrations or any other moving pieces out there in the regulatory or other landscape***, I think we've proven over the years our ability to comply with any new regulatory requirements. We believe that we're an industry leader and have a competitive advantage in that area***.

215. Following the conference, Sotera's stock traded above $27.00 per share on February 24, 2021, and securities analysts were encouraged by Leffler's positive statements. Indeed, that same day, on February 24, 2021, Citi Research analysts reported, "[w]e hosted Sotera CFO Scott Leffler at our conference earlier today," and noted that "[Sotera] feels confident in [its] ability to comply with new regulations, which could provide an additional tailwind due to increased outsourcing as well."

216. As set forth in ¶214, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. It was also false or misleading to claim that Sotera had "many decades" of complying with regulatory requirements when over the life of the Willowbrook facility, Sotera also failed to comply with requirements in multiple permits designed to limit and monitor EtO emissions. Even after Sotera's closure of its Illinois EtO processing plant, the Company failed to adequately enhance emissions controls and continued to operate multiple sterilization facilities that emitted dangerous levels of EtO during the Class Period and beyond. Sotera actively sought to prevent regulators and the public from learning about the carcinogenic properties of EtO. *See* Section IV.D-H, *supra*.

**D. March 9, 2021 – 2020 Form 10-K**

217. On March 9, 2021, Sotera filed its annual report for 2020 on Form 10-K (the "2020 Form 10-K"), which was signed by Defendants Petras, Leffler and the Exchange Act Director Defendants.

218. The 2020 Form 10-K told investors that Sotera "***drive[s] operational excellence across our network of facilities in order to achieve high levels of safety, quality, operating efficiency and customer satisfaction*** . . . ."

219. Furthermore, related to the Company's actions to comply with regulatory requirements and its alleged efforts to mitigate its regulatory risk, the Company stated that:

> To reduce the risk of noncompliance, we employ engineering and procedural controls and pollution control equipment, and undertake internal and external regulatory compliance audits at our facilities. ***We have a proactive environmental health and safety ("EH&S") program and a culture of safety and quality across all business units, and employ a Senior Vice President of Environmental, Health and Safety that reports directly to the Chief Executive Officer and has a team of more than 30 employees***.

220. The Company further belabored that point and downplayed any prior EtO emissions violations by stating that:

> ***We consistently meet and outperform regulatory emissions control requirements***, ***although we have experienced instances of emissions exceeding applicable standards, none of which we believe were material***. We expect to be able to satisfy any changes to applicable regulatory requirements as they evolve.

221. Sotera further discussed the "EO Regulatory Overview," stating that:

> ***We are investing in additional voluntary controls on EO emissions at our facilities to outperform current and expected future regulatory requirements and further reduce facility emissions***. . . . Each of our EO sterilization facilities utilizes a variety of control technologies (including wet scrubbers, catalytic oxidizers and dry bed scrubbers) to control these emissions, and we are investing in additional control features to further reduce emissions . . . . ***We consistently meet and outperform regulatory emissions control requirements, although we have***

> ***experienced instances of emissions exceeding applicable standards, none of which we believe were material.***

222. In mentioning that Sotera had taken part in some initiatives sponsored by the FDA to develop sterilization alternatives to EtO processing, the Company stated that:

> [C]ertain regulators, including the FDA, have started initiatives to encourage development of sterilization alternatives to EO processing. We have taken part in some of these initiatives. ***We have made proactive, voluntary investments to enhance emissions controls.***

223. In the 2020 Form 10-K, Sotera also referenced the EtO emissions litigation against the Company, repeatedly (and unequivocally) stating that "***[w]e deny these allegations***":

> We are currently the subject of lawsuits alleging that purported EO emissions from certain of our current and former facilities have resulted in toxicological or health-related impacts on the environment, the communities that surround our facility and a customer's employees. ***We deny these allegations*** and intend to vigorously defend against these claims.
>
> * * *
>
> Additionally, our ability to increase pollution liability insurance limits or replace any policies upon their expiration without exclusions for claims related to alleged EO exposure may be adversely impacted by claims against us, including current claims alleging that purported EO emissions from certain of our facilities have resulted in toxicological or health-related impact on the environment, the communities that surround our facility and a customer's employees. ***We deny these allegations*** and are vigorously defending against these claims.
>
> * * *
>
> We are currently the subject of tort lawsuits alleging personal injury by purported exposure to emissions and releases of EO from our facilities in Willowbrook and Atlanta . . . . We are also defendants in a lawsuit brought by the State of New Mexico, ex rel. Hector Balderas, Attorney General alleging that emissions of EO from our Santa Teresa facility constitute a public nuisance, have materially contributed to increased health risks suffered by residents in the area, and that injunctive relief should be awarded requiring us to cease any and all uncontrolled emissions or releases of EO from the Santa Teresa facility, including by making certain modifications to sterilization processes at the facility. ***We deny the allegations*** and are vigorously defending these claims . . . .

* * *

***Ethylene Oxide Tort Litigation - Illinois***

> . . . ***Sterigenics denies these allegations*** and intends to vigorously defend against these claims.

224. Analysts responded positively to the 2020 Form 10-K, satisfied with the Company's purported efforts to downplay the EtO emissions litigation risks. For example, on March 9, 2021 analysts at Jefferies wrote that "[t]hough SHC has seen EO-related business disruption in recent years, we believe regulation can be a tailwind over the [long-term] . . . . SHC's emission control upgrades are showing what is technically achievable (99.99% recapture)." On March 9, 2021, RBC Capital Markets rated Sotera stock as "Outperform," and in its analysis included an entire section titled "EO Litigation Unlikely to Impact 2021" in which it stated "mgmt feels '***very comfortable***' it continues to operate in a safe and compliant manner."

225. As set forth in ¶¶218-23, Sotera's 2020 Form 10-K made a number of statements representing (i) that the Company had a "proactive environmental health and safety ("EH&S") program and a culture of safety and quality" and was going above and beyond the EtO emissions requirements demanded by regulators; and (ii) that Sotera denied the allegations in the EtO emissions lawsuits against it (related to the harmful exposure of toxic EtO emissions) and was vigorously defending itself against these allegations, thereby downplaying the Company's risk of liability in the lawsuits. These statements were materially false and misleading because Sotera's executives and controlling shareholders knew of the significant health risks associated with exposure to elevated levels of EtO. Despite that knowledge, Sotera chose not to employ adequate and effective emissions control systems at its sterilization facilities, and often subverted whatever

control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. Over the life of the Willowbrook facility, Sotera also failed to comply with requirements in multiple permits designed to limit and monitor EtO emissions. Even after Sotera's closure of its Illinois EtO processing plant, the Company failed to adequately enhance emissions controls and continued to operate multiple sterilization facilities that emitted dangerous levels of EtO during the Class Period and beyond. Far from a "proactive" culture of safety, Sotera actively sought to prevent regulators and the public from learning about the carcinogenic properties of EtO. Sotera failed to disclose this material information, necessary to make its statements not false or misleading, to investors. Therefore, Sotera failed to disclose the potential significant risk of an adverse outcome at trial, given the evidence presented to the *Kamuda* jury and long known to the Company. *See* Section IV.D-H, *supra*.

### E. March 9, 2021 – Q4 2020 Earnings Call

226. On March 9, 2021, Sotera held its Q4 2020 quarterly call attended by Defendants Petras and Leffler.

227. During the question-and-answer session, an analyst asked Petras "what we should expect" regarding "the EO litigation." Petras responded that "[w]e have very compliant systems. It's built into our culture, and we continue to operate with high regard for the regulatory requirements:"

> [**Analyst:**] . . . Michael, maybe just a quick one for you. We've gotten a bunch of investor questions just on the EO litigation, the timelines, the expectation. Can you maybe just talk through that, and what we should expect as we go through the year here and your guidance expectations?

> [**Petras:**] Yeah. Patrick, thanks for the question. Obviously, we're in litigation so I can't get into a lot of details on this. ***But what I can tell you is we feel very comfortable about where we are in that litigation and the work that our teams are putting together in our defense***. Ultimately, though, it's going to go in front of a trial jury, and there's risk that come associated with that. But right now, it looks like the timing was initially planning here for late this year for some of those trials to partake . . . . ***We have very compliant systems. It's built into our culture, and we continue to operate with high regard for the regulatory requirements***. And really proud of what the team's done, and we're going to continue to move forward and run these businesses like we have for years.

228. Later during the call, the same analyst followed by asking Petras for an "update regarding EO regulations in the US" Petras responded by stating that "in Atlanta, where we're capturing 99.99% of the EO that we use. My engineers would tell me it's 99.9999%":

> [**Analyst:**] Okay. That's helpful. And then on the back of that, I guess, have you had any update regarding EO regulations in the US with the new administration in place?
>
> [**Petras:**] . . . . ***We also feel very confident around the solutions that we've started to deploy in our facilities***. If I represent, ***an example would be in Atlanta, where we're capturing 99.99% of the EO that we use. My engineers would tell me it's 99.9999% that we use in that facility***. I think a lot of the improvements that we put in place there are going to be kind of the key benchmarks and baselines that NESHAP uses for their longer-term regs, but we don't know that until we see it come out.

229. Another analyst continued by asking Petras to comment on "the 99.99%" and Sotera's "investment in all of those facilities" to control EtO emissions. Petras responded, "we've always been on the forefront and a leader in operating these facilities and with the emission control systems that have been in place, and we continue to feel confident on where we are:"

> [**Analyst:**] . . . . You mentioned, Michael, the Atlanta facility . . . . Are you comfortable continuing to make that investment in all of those facilities ahead of the regulations if they continue to be delayed? Thanks.
>
> [**Petras:**] Yeah. David, ***we're -- we've always been on the forefront and a leader in operating these facilities and with the emission control systems that have been in place, and we continue to feel confident on where we are.*** Atlanta is up and

> running. We've already put improvements into another couple of facilities that are near completion and then others that are falling behind in that same path. Some of the big improvements we're putting in place would be negative pressure, double scrubbing and then centralized discharge points. So we're moving along those paths across some of our facilities . . . . and I feel pretty good about how situated we are around some of those.

230. Following the Q4 2020 earnings call, Sotera's stock traded above $27.00 per share on March 9, 2021, and securities analysts were buoyed by Petras's positive EtO messaging. For example, on that same day, March 9, 2021, Jefferies analysts wrote, "Risks Surrounding EO are overblown; ***potential litigation likely in the $50-400M range***; new EPA regs may actually benefit Sterigenics' market position and increase outsourcing over the LT." That same day, analysts at RBC Capital Markets wrote, "with the upgrades it has/is making to its facilities, ***[management] feels 'very comfortable' it continues to operate in a safe and compliant manner***." Also, that same day, Citi Research analysts commented, "[i]nvestor interest and risk around EO litigation is likely to remain a mild overhang on the stock in the medium term," reiterated their "Buy" rating, and assigned the stock a $32.00 price target.

231. As set forth in ¶¶227-29, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks; and (iii) Sotera failed to disclose the true extent of its liability risks from the EtO related lawsuits. *See* Section IV.D-H, *supra*.

**F. March 15-18, 2021 – SPO Offering Materials**

232. On March 18, 2021, Sotera conducted the SPO, where Warburg Pincus and GTCR, as well as Sotera's CEO, sold 25 million shares of Sotera common stock at $27.00 per share for $675 million in gross proceeds. Sotera conducted the SPO pursuant to a registration statement that the Company filed with the SEC on March 15, 2021 and which the SEC declared effective on March 17, 2021 (the "SPO Registration Statement"). On March 18, 2021, Sotera filed a prospectus for the SPO on Form 424B4 (the "SPO Prospectus"), which incorporated and formed part of the SPO Registration Statement (collectively, the "SPO Offering Materials").[13]

233. The SPO Offering Materials contained nearly identical statements to those referenced in ¶¶204-06, regarding Sotera's liability risk, safety and emissions control systems.

234. The SPO Offering Materials also incorporated by reference Sotera's representations in its 2020 Form 10-K regarding the Company's compliance, safety and emissions control systems, which included the same representations set forth in ¶¶218-22.

235. The SPO Offering Materials further incorporated by reference Sotera's representations in its 2020 Form 10-K regarding the hundreds of EtO emissions lawsuits filed against the Company, which included the same representations set forth in ¶223.

236. The statements referenced in ¶¶233-35 above were materially untrue when made and/or omitted material information. It was false or misleading to state that Sotera had "significant technical expertise," "[e]xpertise and [a] strong track record in highly regulated markets," that it "consistently me[t] and outperform[ed] regulatory emissions control requirements," that it had "a

[13] As noted above, each of the Exchange Act Director Defendants signed the SPO Registration Statement and was named as a "Director" in both the SPO Registration Statement and the Prospectus

proactive environmental health and safety ("EH&S") program and a culture of safety and quality across all business units," that its employees were universally "dedicated to safety and quality," and that it "made proactive, voluntary investments to enhance emissions controls." In truth, Sotera and its predecessors were aware of the carcinogenic risk that EtO posed to the surrounding communities since at least the early 1980s, yet chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks and the Company to an increased headline risk, risk of regulatory scrutiny, and liability from hundreds of EtO related lawsuits. Sotera also failed to comply with the terms of several of the permits it received from state and federal regulators designed to monitor and decrease emissions, and instead of being "proactive" regarding environmental safety actively sought to suppress regulator and public knowledge of EtO's carcinogenic properties. Finally, rather than focusing on compliance, health, or safety, for years prior to and throughout the Class Period Defendants actively engaged in efforts to minimize, reduce and evade the regulation and regulatory impact of EtO. *See* Section IV.C-H, *supra*.

### G. March 23, 2021 – KeyBanc Life Sciences & Medtech Investor Forum

237. On March 23, 2021, Defendant Leffler represented Sotera at the KeyBanc Life Sciences & Medtech Investor Forum.

238. During the conference, an analyst asked about the EtO emissions at Sotera's facilities:

> [**Analyst:**] Let's switching over the EO. And just provide us start, this is the question on history. Now why did Willowbrook, Atlanta, the New Mexico facilities fall into that data assessment versus the other 50 facilities in the country?
>
> [**Leffler:**] Yeah, well, so, bear in mind, ***Sterigenics -- throughout the company, including its predecessor entities has been sterilizing using EO going back literally from the 1930s and so we have always been very comfortable in our ability to understand and comply with the regulatory environment. And we're very proud of our track record of compliance***.
>
> ***So proud in fact that even -- there are even in instances where we are not required to publish our emission information. There have been instances where we have done so on a voluntary basis because we've been so proud of our ability to go above and beyond the -- better than the regulatory requirements in terms of emission control***.
>
> And so what that meant has been that there is actually ***more of our data that has been available*** in some instances that -- than is required. And I think that is something that ***out of desire to do good and to show our successful track record***[.]

239. As set forth in ¶238, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. It was also false or misleading for Sotera to boast about its "track record of compliance" when over the life of the Willowbrook facility, Sotera also failed to comply with requirements in multiple permits designed to limit and monitor EtO emissions. *See* Section IV.D-H, *supra*.

**H. April 15, 2021 – 2021 Proxy Statement**

240. On April 15, 2021, Sotera filed its annual Form DEF 14A Proxy and Notice of Annual Meeting of Stockholders (the "2021 Proxy").

241. The 2021 Proxy stated that "Our Values" include "Safety" and "Integrity" and that Sotera is "uncompromising in [its] commitment to health and well-being" as well as "honest, reliable and accountable in everything [it] do[es]":

## Our Values

**Safety**
We are uncompromising in our commitment to health and well-being.

* * *

**Integrity**
We are honest, reliable and accountable in everything we do.

242. As set forth in ¶241, the 2021 Proxy made a number of misstatements. These statements were materially false and misleading because Sotera's executives and controlling shareholders knew of the significant health risks associated with exposure to elevated levels of EtO. Despite that knowledge, Sotera chose not to employ adequate and effective emissions control systems at its sterilization facilities, and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. Over the life of the Willowbrook facility, Sotera also failed to comply with requirements in multiple permits designed to limit and monitor EtO emissions. Even after Sotera's closure of its

Illinois EtO processing plant, the Company failed to adequately enhance emissions controls and continued to operate multiple sterilization facilities that emitted dangerous levels of EtO during the Class Period and beyond. Sotera actively sought to prevent regulators and the public from learning about the carcinogenic properties of EtO. *See* Section IV.D-F, *supra*.

**I. May 13, 2021 – Q1 2021 Form 10-Q**

243. On May 13, 2021, Sotera filed with the SEC its Form 10-Q for the quarter ended March 31, 2021 ("Q1 2021 Form 10-Q"), which was signed by Defendants Petras and Leffler .

244. The Q1 2021 Form 10-Q was materially false and misleading, stating the following related to its litigation risk from EtO emissions cases:

> Ethylene Oxide Tort Litigation – Illinois.
>
> Since September 2018, tort lawsuits on behalf of approximately 835 personal injury plaintiffs. . . have been filed in Illinois state courts . . . . those plaintiffs allege that they suffered personal injuries including cancer and other diseases, or wrongful death, resulting from *purported emissions and releases of EO from the Willowbrook facility* . . . . ***Sterigenics denies these allegations and intends to vigorously defend against these claims***.
>
> * * *
>
> Additional personal injury, property devaluation or other lawsuits may be filed in the future against us or our subsidiaries relating to Sterigenics' Willowbrook, Atlanta, Santa Teresa or other EO sterilization facilities. ***The Company, Sterigenics U.S., LLC and other Company subsidiaries intend to defend themselves vigorously in all such current or future EO litigation.***
>
> ***While an adverse outcome in one or more of the proceedings could have a material adverse effect on our business, financial condition and results of operations, no contingency reserve has been reflected in our consolidated financial statements as a loss is not deemed probable, nor is a loss or range of losses reasonably estimable.***

245. Sotera also made the following false and misleading statements related to its risk of exposure in the EtO litigation:

> ***We establish reserves for specific liabilities in connection with regulatory and legal actions that we determine to be both probable*** and reasonably estimable. ***No material amounts have been accrued in our consolidated financial statements with respect to any loss contingencies***. In certain of the matters described below, we are not able to make a reasonable estimate of any liability because of the uncertainties related to the outcome and/or the amount or range of loss. While it is not possible to determine the ultimate disposition of each of these matters, ***we do not expect that the ultimate resolution of pending regulatory and legal matters in future periods, including the matters described below, will have a material effect on our financial condition or results of operations***…

246. As set forth in ¶¶244-45, the Q1 2021 Form 10-Q made a number of misstatements. These statements were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Sotera failed to disclose the true extent of its litigation risks by withholding information from investors regarding the inadequacy and subversion of its EtO emissions control systems, which allowed dangerous amounts of toxic EtO fumes to pollute the air surrounding the Company's facilities and exposed people living in the adjacent communities to significantly increased cancer risks, to which Sotera has long been aware of. Given Sotera's awareness of these facts and the substantial record of its highly cynical approach to health and safety, it was misleading to fail to account for potential litigation losses in the Company's financial statements and to represent to investors that "***a loss is not deemed probable.***" *See* Section IV.C-H, *supra*.

**J. June 1, 2021 – Jefferies 2021 Virtual Healthcare Conference**

247. On June 1, 2021, Defendant Leffler presented at the Jefferies 2021 Virtual Healthcare Conference.

248. During the conference, an analyst asked about Sotera's emissions control systems:

> [**Analyst:**] You're investing quite a bit of capital in a campaign to improve the EO emission recapture capabilities at your facilities, the proven concept in Atlanta and now expanding that beyond that. Can you give us a status update on that?
>
> [**Leffler:**] Yes. Well, first of all, I'll say that more broadly we've always been very proud of our performance in terms of our emission control systems and more broadly our environmental health and safety programs. We believe it's always been a differentiator for us and I think that ***what we've accomplished in Atlanta truly is a gold standard for the industry in terms of taking innovative approach to emission control and rolling it out with a very high level of efficacy in terms of the performance there***.

249. As set forth in ¶248, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.C, F-H, *supra*.

### K. June 8, 2021 – Goldman Sachs 42nd Annual Global Healthcare Virtual Conference

250. On June 8, 2021, Defendants Petras and Leffler presented at the Goldman Sachs 42nd Annual Global Healthcare Virtual Conference.

251. During the conference, an analyst asked about "the risk side" of EtO litigation:

> [**Analyst:**] So let's talk about another side of it kind of more the risk side . . .
>
> [**Petras:**] . . . EO's not going anywhere soon. All right, it's going to be here what I think you're going to see here is increased regulation around this, particularly around emission control systems and the facilities. ***We have made a practice for many, many years [*sic*] have continued to get better***.
>
> *     *     *
>
> We want the new rules just tell us what the guidelines are in ***will [sic] exceed them. That's what we've done for our history were complying with our laws and regs at***

> ***the state, and the federal level and I'm pretty confident, the improvements were putting in our facilities***.
>
> * * *
>
> And United States is just the way it's tough work. I've got a team that focuses on working capital today, our teams that work on pricing I have teams at work on customer activation it network installation I have team to work on the litigation aspect it's unfortunate, but it's just the nature this is a highly regulated business. ***And what I could tell you were [*****sic*****] compliant with the rules, both at a local level and the federal level***. And it's a critical service that we bring.
>
> I can go many places in that I would just say that at a high level. ***We don't believe that if we were to lose cases here in this we don't think it's a material long-term impact to the company based on the low level of ethylene oxide that's coming out of these facilities***. Remember 1% of all the ethylene oxide use United States is used with sterilization less than 1% of ethylene oxide. That is used in the United States is used for sterilization and then take that 1 % and we're capturing over 99% of it in our operations, 99.5% in every facility in Atlanta. ***We're capturing 99.9999, this is really low levels of ethylene oxide getting admitted here and be able to show causation that this is causing cancer for somebody. I think it's a pretty tough -- for the -- Decide that though*** **[sic]** . . . [.]

252. In a June 8, 2021 report, analysts at Goldman Sachs seemed to accept Sotera's characterization that it "exceed[s]" regulatory requirements, noting that "Sotera says it would welcome new [EtO] regulation . . . as [the] Company works to consistently not just meet but exceed EPA standards."

253. As set forth in ¶251, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks; and (iii) Sotera failed to disclose the true extent of its liability risks from the EtO related lawsuits. It was also misleading for Sotera to claim

it would "exceed" the regulatory requirements when over the life of the Willowbrook facility, Sotera failed to comply with requirements in multiple permits designed to limit and monitor EtO emissions. Even after Sotera's closure of its Illinois EtO processing plant, the Company failed to adequately enhance emissions controls and continued to operate multiple sterilization facilities that emitted dangerous levels of EtO during the Class Period and beyond. *See* Section IV.C-H, *supra*.

### L. August 12, 2021 – Q2 2021 Form 10-Q

254. On August 12, 2021, Sotera filed with the SEC its Form 10-Q for the quarter ended June 30, 2021 ("Q2 2021 Form 10-Q"), which was signed by Defendants Petras and Leffler .

255. The Q2 2021 Form 10-Q contained statements substantially similar to those in the Q1 2021 Form 10-Q above, at ¶244-45, related to its litigation risk from EtO emissions cases.

256. In discussing the New Mexico AG Litigation, Sotera added the following statements related to the New Mexico EtO litigation:

> Ethylene Oxide Litigation – New Mexico.
>
> On December 22, 2020, the New Mexico Attorney General filed a lawsuit . . . alleging that emissions of EO from Sterigenics' sterilization facility in Santa Teresa, New Mexico constitute a public nuisance and have deteriorated the air quality in Santa Teresa and surrounding communities and materially contributed to increased health risks suffered by residents of those communities.
>
> On June 29, 2021, the Court entered an Order Granting Preliminary Injunction (the "Order") The Order does not require closure of the facility, but prohibits Sterigenics from allowing any uncontrolled emission or release of EO from the facility, including prohibitions on leaving doors open when not in use and allowing EO to escape through point sources prior to filtration or processing through emission controls. ***Sterigenics promptly took steps to monitor its compliance with the Order.***

* * *

> ***Before this lawsuit was filed, Sterigenics was working to implement additional emission control enhancements at the Santa Teresa facility to further reduce EO emissions beyond permitted levels. On June 11, 2021, Sterigenics received a permit from the New Mexico Environment Department, clearing the way for the next steps in Sterigenics' implementation of these additional emission control enhancements.***

257. Analysts seemed to accept Sotera's characterization of its litigation risks. On August 13, 2021, Credit Suisse stated that "[w]hile uncertainty [related to litigation risks] remains, we see reasons to be increasingly bullish regarding these risks, particularly after the terms of the preliminary injunction were announced in June." Furthermore, on August 16, 2021, the same Credit Suisse analysts stated "[a]s uncertainty eases regarding the litigation overhang, we expect SHC's performance to improve. Reiterate Outperform."

258. As set forth in ¶¶255-56, the Q2 2021 Form 10-Q made a number of misrepresentations. These statements were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Sotera failed to disclose the true extent of its litigation risks by withholding information from investors regarding the inadequacy and subversion of its EtO emissions control systems, which allowed dangerous amounts of toxic EtO fumes to pollute the air surrounding the Company's facilities and exposed people living in the adjacent communities to significantly increased cancer risks, and the fact that Sotera has long been aware of these risks. Given Sotera's awareness of these facts, it was misleading to make representations concerning its efforts to comply with various regulatory and permitting regimes and to fail to account for potential litigation losses in the Company's financial statements and to represent to investors that "***a loss is not deemed probable***." *See* Section IV.C-H, *supra*.

### M. August 12, 2021 – Q2 2021 Earnings Call

259. On August 12, 2021, before the market opened, Sotera hosted its Q2 2021 quarterly earnings call, attended by Defendants Petras and Leffler.

260. During the question-and-answer session, an analyst asked about "the EO regulatory environment" and whether Sotera had seen "increased regulatory requirements on the EO." Petras responded by stating, "I can't predict some of the irrational activity that's happened in the past . . . . [W]hat I can tell you is, we're in compliance with our permits and the regs," and "we feel very comfortable with the improvements we're putting in our facilities that they're going to be able to exceed the expectations of new regulations that are out there":

> [**Analyst:**] Have you seen any other states increased regulatory requirements on the EO that you would call out or kind of copycat type of actions? Do you see risk of those similar actions in other states where you have your facilities?
>
> [**Petras:**] As far as new regs and new restrictions being put on by other facilities around the country, we're not seeing that. Obviously, we have facilities in multiple states. We work with the regulators on an ongoing basis, and we continue to operate in those facilities. I can't tell you about something else showing up.
>
> ***I mean, I can't predict some of the irrational activity that's happened in the past. What that means for forward, but what I can tell you is, we're in compliance with our permits and the regs***. And we continue to provide a critical service, if you will to all the customers in the supply chain. As far as, our facilities are all up and running here in the United States and they had been for quite some time.
>
> * * *
>
> But again, we feel very comfortable with the improvements we're putting in our facilities that they're going to be able to exceed the expectations of new regulations that are out there. ***Did I answer all your questions Amit, because I know it's an important topic to you and others. I want to make sure I answered your question appropriately***.

261. Following the Q2 2021 earnings call, Sotera's stock traded above $25.00 per share on August 12, 2021, and securities analysts remained positive regarding Sotera's potential EtO

liability. For example, on August 29, 2021, Jefferies analysts published a report stating that "EO remains a lightning rod, but will those clouds really rain large liabilities on [Sotera]? We think the risk is small. Reiterate Buy."

262. As set forth in ¶260, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.C-F, H, *supra*.

### N. September 21, 2021 – Virtual JP Morgan 12th Annual U.S. All Stars Conference

263. On September 21, 2021, Defendant Petras represented Sotera at the Virtual JP Morgan 12th Annual U.S. All Stars Conference.

264. During the conference an analyst asked for clarification on the strength of the *Kamuda* litigation:

> [**Analyst:**] I guess on the jury trial, there's not a lot in terms of updates here, but can you maybe just remind investors kind of the [crux] of your argument as to why you think there's not really a meaningful case here?
>
> [**Petras:**] Yes. So first, the three trials that are -- you referenced earlier, July, September and November 2022, that's the first three cases that are going out there. This is not a class action case. So I want to make sure people understand that these are individual cases.
>
> ***Listen, we feel very good about our position here. And this is a very low amount of yield. There's no violation of our permits or the laws around EO usage, that's being claimed against us here***. People have to show causation. They have to show and demonstrate that this very small amount of EO cause a person's cancer. I don't want you to think we're callous organization. All of us have had cancer touch our

> family members in some way, shape or form. It's a very serious illness and we have empathy for people that have cancer, okay?
>
> We do not -- and lots of people have cancer . . . . ***I feel pretty confident and our organization feels confident that these facilities did not generate enough EO to cause cancer in these plaintiffs, okay?*** That's ultimately, what has got to be proven in the court. You're going to gone [sic] to a jury trial in Illinois. ***We're not settling, we're moving forward here and going forward with the trials. And that's the plan and we think there's a tall task here. There's been no material awards on a chemicals this low level, particularly ethylene oxide, where people have got the material win from this. And we don't see that changing here either***.

265. As set forth in ¶264, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera had violated its permits at the Willowbrook facility (*see* ¶¶121-22, 127-36); (ii) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; (iii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks; and (iv) Sotera failed to disclose the true extent of its liability risks from the EtO related lawsuits. *See* Section IV.C-H, *supra*.

**O. November 10, 2021 – Q3 2021 Form 10-Q**

266. On November 10, 2021, Sotera filed with the SEC its Form 10-Q for the quarter ended September 30, 2021 ("Q3 2021 Form 10-Q"), which was signed by Defendants Petras and Leffler .

267. The Q3 2021 Form 10-Q contained statements substantially similar to those in the Q1 and Q2 2021 Form 10-Qs above, at ¶¶244-45, 256, related to its litigation risk from EtO emissions cases.

268. As set forth in ¶258, the Q3 2021 Form 10-Q made a number of misrepresentations. These statements were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Sotera failed to disclose the true extent of its litigation risks by withholding information from investors regarding the inadequacy and subversion of its EtO emissions control systems, which allowed dangerous amounts of toxic EtO fumes to pollute the air surrounding the company's facilities and exposed people living in the adjacent communities to significantly increased cancer risks, and the fact that Sotera has long been aware of these risks. *See* Section IV.C-F, *supra*.

**P. November 11, 2021 – Credit Suisse 30th Annual Healthcare Conference**

269. On November 11, 2021, Defendant Leffler represented Sotera at the Credit Suisse 30th Annual Healthcare Conference.

270. During the conference, an analyst asked Leffler to "talk a little bit about" Sotera's "competitive barriers to entry mode if you will." Leffler responded that "***we have[,] we believe a competitive advantage when it comes to understanding and complying with complex and burdensome regulations***."

271. Finally, while declining to provide "any meaningful update on those [cases] until the trial actually begins," Leffler volunteered to discuss Sotera's "disclosure associated with emission levels:"

> And then I think the last specific thing you were asking about a moment ago related to the letters that had gone out, which really are primarily ***relating to disclosure associated with emission levels***.
>
> ***And this is something that, honestly, we are not especially sensitive to, in large part, because we have always just been so proud of our track record of***

> ***compliance going back many, many years across our facility network. But in many cases, we've gone above and beyond the emission disclosure requirements, and voluntarily disclosed emission information that wasn't even required under the regulatory regime.*** And so the fact that letters like this are going out there, as far as we're concerned, is fine as long as it's a level playing field, but in many ways, we think it's asking others in the industry to do something that we feel we have been doing, in many cases, on a voluntary basis already.

272. As set forth in ¶271, during the Credit Suisse 30th Annual Healthcare Conference, Leffler made a number of statements (i) touting the effectiveness of Sotera's EtO emissions control systems and (ii) touting Sotera's historical compliance and ability to comply with environmental regulations. These statements were materially false and misleading when made and/or omitted material information because, in truth, Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.C-F, H, *supra*.

**Q. January 11, 2022 – Form 8-K Investor Presentation**

273. On January 11, 2022, Sotera filed with the SEC a Form 8-K (the "January 11, 2022 Form 8-K"). Among other things, the January 11, 2022 Form 8-K contained a slideshow presentation given by Defendant Petras to investors at the 40th Annual J.P. Morgan Annual Healthcare Conference (the "Conference Presentation").

274. Also on the "[e]nvironmental highlights & roadmap" slide of the Conference Presentation, Sotera endorses its "[s]tewardship to secure the future of healthcare needs," stating that "***Sterigenics [is] investing in enhanced EO emissions controls, well beyond regulatory requirements***[.]"

275. Analysts responded positively to the Company's assurances at the 40th Annual J.P. Morgan Annual Healthcare Conference as reported in the January 11, 2022 Form 8-K. For example, on the same day, analysts at J.P. Morgan shared "key takeaways" from the conference which included that "Management [is] confident despite litigation uncertainty" and that "in New Mexico, management claimed courts progressed in their favor, and they are moving forward in 2022 in an aggressive fashion to enhance facilities." Hence, J.P. Morgan rated Sotera's stock as "Overweight" and assigned a price target of $35.00.

276. The above statements in ¶274 were materially false and misleading when made and/or omitted material information because, in truth, Sotera chose not to employ adequate and effective emissions control systems at its sterilization facilities, and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks and the Company to an increased risk of regulatory scrutiny and liability from hundreds of EtO related lawsuits. Indeed, even after Sotera's closure of its Illinois EtO processing plant, the Company continued to operate multiple sterilization facilities that emitted dangerous levels of EtO during the Class Period and after, including its Ontario, California facility which was required on April 28, 2023, by the South Coast AQMD, to temporarily shut down due to "[e]levated Ethylene Oxide Readings" in order "to take steps to immediately reduce health risks from its EtO operations." *See* ¶¶196-201, *supra*.

**R. January 11, 2022 – J.P. Morgan 40th Annual Healthcare Conference**

277. On January 11, 2022, Defendant Petras represented Sotera at the J.P. Morgan 40th Annual Healthcare Conference.

278. During the conference, an analyst asked Petras about facility upgrades:

> [**Analyst:**] And obviously, in Illinois, you're not accruing for settlements or legal payouts, right, which is encouraging, I think so. In terms of upgrading the other facilities, can you just lay out a roadmap for this coming year, which facilities will be upgraded?
>
> [**Petras:**] Although this is very important to our stakeholders, it's not always the most important, urgent matter within each of these states or local authorities.
>
> So we've got in process many of these facilities and anywhere from design or waiting on approvals or permits, or we've got the permits and we're ramping up construction and renovation efforts. So I could just tell you this will continue at least through 2022 and 2023 and possibly into 2024. It's just depending on the timing of when regulators want a final approval of these things, and it's not that they're not approving them. It's just they have other more pressing things that they maybe attending to in their local markets. ***But we feel good about how this is progressing and we feel really good about the solution we put in Atlanta and some of these other facilities. They're working really well***.

279. Following the J.P. Morgan 40th Annual Healthcare Conference securities analysts reacted favorably to management's statements at the conference. For example, on the same day, January 11, 2022, J.P. Morgan published an analyst report stating, "Management confident despite litigation uncertainty," gave Sotera stock a price target of $35.00 per share, and rated the stock "Overweight." Also on January 11, 2022, Citi Research analysts wrote that "Management stated that the company . . . has seen positive progress with respect to ongoing litigation in New Mexico, Illinois, and Georgia," rated the stock "Buy," and assigned a $30.00 price target.

280. These statements in ¶278 were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes

to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.D-F, H, *supra*.

**S. March 1, 2022 – 2021 Form 10-K**

281. On March 1, 2022, Sotera filed its annual report for 2021 on Form 10-K (the "2021 Form 10-K"), which was signed by Defendants Petras, Leffler and the Exchange Act Director Defendants.

282. The 2021 Form 10-K contained false and misleading statements substantially similar to those in the 2020 Form 10-K, set forth above at ¶¶218-223.

283. Analysts responded positively to the 2021 Form 10-K, satisfied with the Company's purported efforts to downplay the EtO emissions litigation risks. For example, in a report issued March 1, 2022 analysts at J.P. Morgan wrote that "Sterigenics is expected have another strong year." In a report issued the same day, analysts at RBC Capital markets noted in a section titled "What impact could the ongoing EO litigation have on the company?" that "management feels 'very comfortable' it is operating in a safe and compliant manner."

284. As set forth in ¶282, Sotera's 2021 Form 10-K made a number of statements that were materially false and misleading for the same reasons set forth in ¶225 and because Sotera's executives and controlling shareholders knew of the significant health risks associated with exposure to elevated levels of EtO. Despite that knowledge, Sotera chose not to employ adequate and effective emissions control systems at its sterilization facilities, and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. Over the life of the Willowbrook facility, Sotera also failed to

comply with requirements in multiple permits designed to limit and monitor EtO emissions. Even after Sotera's closure of its Illinois EtO processing plant, the Company failed to adequately enhance emissions controls and continued to operate multiple sterilization facilities that emitted dangerous levels of EtO during the Class Period and beyond. Sotera actively sought to prevent regulators and the public from learning about the carcinogenic properties of EtO. Sotera failed to disclose the true extent of those risks by withholding information from investors regarding the inadequacy or subversion of its EtO emissions control systems – which resulted in dangerous amounts of toxic EtO fumes polluting the air surrounding those facilities and exposed people living in the adjacent communities to significantly increased cancer risks – thereby omitting material facts related to its true exposure to these lawsuits. *See* Section IV.D-E, H, *supra*. In failing to employ adequate and effective emissions controls and subverting the control systems the Company did have, the Company violated regulatory emissions requirements, as evidenced by a number of actions taken against the Company by regulatory bodies. *See* Section VIII.F-H, *infra*. These regulatory violations were material and resulted in EtO levels around the Company's facilities far exceeding levels deemed safe, spreading cancer to the communities surrounding the Company's facilities and exposing the Company to a wave of litigation. Therefore, Sotera failed to disclose the potential significant risk of an adverse outcome at trial, given the evidence presented to the *Kamuda* jury and long known to the Company.

**T. March 1, 2022 – Q4 2021 Earnings Call**

285. On March 1, 2022, Sotera hosted its Q4 2021 quarterly earnings call attended by Defendants Petras and Leffler.

286. During the question-and-answer session, an analyst asked for "your visibility towards litigation progressing in Willowbrook":

> [**Analyst:**] First guys, can you talk a little bit about your visibility towards litigation progressing in Willowbrook, as expected in July, as well as your thoughts on, I know, there is a proposed rulemaking on NESHAP at some point by the end of the year?
>
> [**Petras:**] I'll actually use this as an opportunity to hit a couple points on the EO situation. First, answering your question, the trials right now are set in Illinois for July of 2022, September of 2022, and November of 2022. So there'll be three trials right now that we see on plan for the second half of the year if you will. We're anxious to get those done. ***We've got our teams very focused on our defense and we feel good about where we're positioned today***, but ultimately, it can be decided in the courts.
>
> * * *
>
> Also, another key point, ***although we've had a facility up and operating in Georgia for quite some time with improvements, which again are world leading in many aspects, we are also pleased to see that recognized by the regulators.*** And we were granted a new environmental air permit in Atlanta during ***early*** parts of 2022. So, we're very encouraged by the things that we're doing in this area and we're going to continue to move forward with that strategy.

287. As set forth in ¶286, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities including in a manner that would draw scrutiny from government agencies in Georgia; (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks, and (iii) Sotera failed to disclose the true risk of liability related to the EtO related lawsuits. *See* Section IV.D-H, *supra*.

**U. March 22, 2022 ‑ KeyBanc Capital Markets Life Sciences & MedTech Forum**

288. On March 22, 2022, Defendant Leffler presented at the KeyBanc Capital Markets Life Sciences & MedTech Forum.

289. During the conference, an analyst asked about Sotera's "list of investor concerns around litigation and regulatory in 2022 into 2023?" Leffler replied by stating that "from our standpoint, the strength of our arguments and the fundamental righteousness, I guess for lack of a better term of our position, hasn't changed from the IPO" and by again noting that "we've always said that we feel that [we] have a competitive advantage when it comes to understanding and complying with complex regulations." The Company further responded:

> [**Leffler:**] Sure. Well, from our standpoint, the strength of our arguments and the fundamental righteousness, I guess for lack of a better term of our position, hasn't changed from the IPO. I mean, we fundamentally feel that the company's arguments are strong, and we look forward to the opportunity to prove that out in the cases that are upcoming.
>
> ***But certainly, the strength of our arguments we thinks [sic] has continued -- we think continues to be a very bit as strong as it had been***. Outside of the litigation itself, I think the whole industry is looking forward to clarity in terms of the regulatory framework that EPA in terms to adopt. We certainly look forward hopefully to seeing that in the second half of this year. ***We've been hoping for literally for years because we've always said that we feel that we have a competitive advantage when it comes to understanding and complying with complex regulations***. And so as soon as they come out with it, then we'll be able to demonstrate that and we think the investments we're making across our EO facility network will certainly well position us as well as or better than anyone else in the industry to do well in the new environment.

290. As set forth in ¶289, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes

to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks; and (iii) Sotera failed to disclose the true extent of its liability risks from the EtO related lawsuits. *See* Section IV.D-H, *supra*.

**V. April 14, 2022 – 2022 Proxy Statement**

291. On April 14, 2022, Sotera filed its annual Form DEF 14A Proxy and Notice of Annual Meeting of Stockholders (the "2022 Proxy").

292. The 2022 Proxy repeatedly highlighted Sotera's purported commitment to health and safety:

> At Sotera Health, our mission is Safeguarding Global Health® . . . . Our purpose ultimately is greater than our products and services — our integrity, the safety and excellence of our people, and our customer focus are at the heart of countless healthcare experiences that touch the lives of millions across the globe.
>
> ***[W]e strive every day to live our*** commitment ***to United Nations Sustainable Development Goal #3, which is to ensure healthy lives and promote well-being for people around the world. That's why our ESG strategy is integral to our mission.***

293. The 2022 Proxy also affirmatively discussed its corporate responsibility related to the environmental impact of its facilities:

- ***We are undertaking EHS*** **[Environmental Health & Safety]** ***initiatives and tracking key EHS metrics across all Sotera Health business units and facilities, including both proactive leading metrics and lagging EHS performance metrics. Proactive metrics include safety improvement reporting and timely closure of EHS corrective actions. These initiatives and metrics are being implemented across Nelson Labs, Nordion and Sterigenics.***

- ***Nordion and Sterigenics facilities have robust EHS Management systems based on the requirements of ISO 14001 (environmental management) and/or ISO 45001 (occupational health and safety) standards.***

* * *

- ***Sterigenics is investing tens of millions of dollars in emission control enhancements at EO facilities to further reduce emissions beyond already safe levels. In addition, Sterigenics has a history of enhancing work practices and emission controls with the aim of reducing EO emissions.***

294. As set forth in ¶¶292-93, the 2022 Proxy made a number of statements representing (i) that Sotera was committed to safety and recognized its environmental responsibility, and (ii) that the Company was going above and beyond the EtO emissions requirements demanded by regulators and was proactively taking steps to further reduce EtO emissions. These statements were materially false and misleading because Sotera's executives and controlling shareholders knew of the significant health risks associated with exposure to elevated levels of EtO. Despite that knowledge, Sotera chose not to employ adequate and effective emissions control systems at its sterilization facilities, and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. Over the life of the Willowbrook facility, Sotera also failed to comply with requirements in multiple permits designed to limit and monitor EtO emissions. Even after Sotera's closure of its Illinois EtO processing plant, the Company failed to adequately enhance emissions controls and continued to operate multiple sterilization facilities that emitted dangerous levels of EtO during the Class Period and beyond. Sotera actively sought to prevent regulators and the public from learning about the carcinogenic properties of EtO. *See* Section IV.C-H, *supra.*

### W. May 5, 2022 – Q1 2022 Form 10-Q

295. On May 5, 2022, Sotera filed with the SEC its Form 10-Q for the quarter ended March 31, 2022 ("Q1 2022 Form 10-Q"), which was signed by Defendants Petras and Leffler .

296. The Q1 2022 Form 10-Q was materially false and misleading, stating the following related to its risk of exposure from the EtO emissions cases, which is similar to statements contained in prior Form 10-Qs, set forth above:

> ***We establish reserves for specific liabilities in connection with regulatory and legal actions that we determine to be both probable and reasonably estimable.*** No material amounts have been accrued in our ***consolidated*** financial statements with respect to any loss contingencies. In certain of the matters described below, ***we are not able to make a reasonable estimate of any liability because of the uncertainties related to the outcome and/or the amount or range of loss. While it is not possible to determine the ultimate disposition of each of these matters, we do not expect that the ultimate resolution of pending regulatory and legal matters in future periods, including the matters described below, will have a material effect on our financial condition or results of operations***.

297. As set forth in ¶296, the Q1 2022 Form 10-Q made a number of statements representing (i) that Sotera denied the allegations in the EtO emissions tort lawsuits against it (related to the harmful exposure of toxic EtO emissions) and emphasized that it was vigorously defending itself against these allegations, thereby downplaying the Company's risk of liability in the lawsuits, and (ii) that Sotera was not taking a contingency reserve because a loss was not probable. These statements were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Sotera failed to disclose the true extent of its litigation risks by withholding information from investors regarding the inadequacy and subversion of its EtO emissions control systems, which allowed dangerous amounts of toxic EtO fumes to pollute the air surrounding the Company's facilities and exposed people living in the adjacent communities to significantly increased cancer risks, and the fact that Sotera has long been aware of these risks. Given Sotera's awareness of these facts, it was misleading to fail to account for potential litigation losses in the Company's financial statements and to represent to investors that

"we do not expect that the ultimate resolution of pending regulatory and legal matters in future periods . . . will have a material effect on our financial condition or results of operations." *See* Section IV.C-H, *supra*.

## X. May 17, 2022 – RBC Capital Markets Healthcare Conference

298. On May 17, 2022, Defendant Leffler presented at the RBC Capital Markets Healthcare Conference.

299. During the conference, with "five minutes left," an analyst asked about Sotera's "ongoing litigation in Illinois." Specifically:

> [**Analyst:**] . . . So the next thing I want to talk about is the other area we spend a lot of time speaking with investors about. And that's the ongoing litigation in Illinois. So we've got the first -- or the trial set to begin soon. Decisions, I think you said mid to late August or when the first one will happen.
>
> [**Leffler:**] Sure.
>
> [**Analyst:**] But maybe just a little bit of background on it, and then just kind of thoughts going into those and maybe how good of an indicator that first trial is for maybe how some of the subsequent ones go.
>
> [**Leffler:**] We're making significant investments in our own infrastructure in order to ensure that we are at the forefront of deploying the best technology that's available as far as emission control system so that when the new regulations come out, ***we're better positioned than anybody to actually do even better in that environment because we believe that the capabilities we have when it comes to complying with complex and burdensome regulations are actually one of our competitive differentiators.*** And so we look forward to the opportunity to demonstrate that as the regulations unfold.
>
> ***Now as far as litigation*** . . . On a backward-looking basis, there are some claims that relate to alleged exposure around particularly our facility in Illinois. ***We absolutely feel that the company has always been in the right as far as making the appropriate efforts and investments in its operations***.

* * *

> Obviously, we feel very strongly about the strength of our position, but it is a -- each one of these is going to be a jury trial, and it's going to be up to the jury to make the final determination. But again, we feel very strongly about our positions there.

300. As set forth in ¶299, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks; and (iii) Sotera failed to disclose the true extent of its liability risks from the EtO related lawsuits. *See* Section IV.C-H, *supra*.

### Y. June 14, 2022 – Goldman Sachs 43rd Annual Global Healthcare Conference

301. On June 14, 2022, Defendant Petras presented at the Goldman Sachs 43rd Annual Global Healthcare Conference.

302. During the conference, an analyst asked Petras "what do you see as kind of a realistic downside scenario" for "EO facilities in the U.S." First, Petras answered, in part, by claiming, "We have the most advanced controls in the industry":

> [**Petras:**] I think one of the cases that could be bad is if we put all these great controls in and the EPA set the new rules would be a lot less than, but to us, it's the right thing to do. So it doesn't matter. And we're going to go sell it to our customers. We're going to tell the industry. ***We have the most advanced controls in the industry. We have been telling them***[.]

303. Next, the analyst asked Petras about "the plaintiff litigation" and to "[j]ust walk us through how you're thinking about the various scenarios that could play out as those trials gets underway?" Petras responded bluntly and unequivocally:

> [**Petras:**] ***Our facilities did not cause the cancer here***. And that's what's got to be proven in the court of law.
>
> ***At the end of the day, it's got to be proven in front of a jury that our facilities cause cancer. And I don't believe that's the case***.
>
> ***We firmly believe that we're going to defend it***. We're going to work through the county court system in Illinois. At the end of the day, if we don't get the results we want, there will be an appeal. And I'm sure, if the other side does not get the result they want, there's going to be appeal. There's going to be some time. We do not believe it's a material long-term impact to the company. ***We have a company that's multi-billions of dollars and we operate in a compliant manner***, ***follow the rules and regs***, and we feel pretty confident in our position. But again, there's risk, we've got to deal with the courts on this.
>
> [**Analyst:**] So how do you get investors to think about those risks, the bands around what the financial risks might be here?
>
> [**Petras:**] ***Yeah. We have not obviously booked any reserves or anything, yes, because we don't think there's a high probability we're going to lose and we wouldn't know what to book at this point in time***. ***What I would tell you is, we don't believe it's a material long-term impact to the company***.
>
> I would just tell you, believe our mission, of what we do day-in and day-out. ***We're going to follow the regulations, be compliant with them*** . . . . ***We don't believe it's a material long-term impact to this company***.

304. As set forth in ¶¶302-03, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks; and (iii) Sotera failed to disclose the true extent of its liability risks from the EtO related lawsuits. *See* Section IV.C-H, *supra*.

**Z. August 4, 2022 – Q2 2022 Form 10-Q**

305. On August 4, 2022, Sotera filed with the SEC its Form 10-Q for the quarter ended June 30, 2022 ("Q2 2022 Form 10-Q"), which was signed by Defendants Petras and Leffler.

306. The Q2 2022 Form 10-Q was materially false and misleading, as it contained statements substantially similar to the Form 10-Qs filed during the Class Period and set forth above in ¶¶244-45, 256, 296.

307. As set forth in ¶¶258, 297, the Q2 2022 Form 10-Q made a number of statements representing (i) that Sotera denied the allegations in the EtO emissions tort lawsuits against it (related to the harmful exposure of toxic EtO emissions) and emphasized that it was vigorously defending itself against these allegations, thereby downplaying the Company's risk of liability in the lawsuits, and (ii) that Sotera was not taking a contingency reserve because a loss was not probable. These statements were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Sotera failed to disclose the true extent of its litigation risks by withholding information from investors regarding the inadequacy and subversion of its EtO emissions control systems, which allowed dangerous amounts of toxic EtO fumes to pollute the air surrounding the Company's facilities and exposed people living in the adjacent communities to significantly increased cancer risks, and the fact that Sotera has long been aware of these risks. Given Sotera's awareness of these facts, it was misleading to fail to account for potential litigation losses in the Company's financial statements and to represent to investors that "***we do not expect that the ultimate resolution of pending regulatory and legal matters in future***

***periods . . . will have a material effect on our financial condition or results of operations.*"** *See* Section IV.C-H, *supra*.

### AA. August 4, 2022 – Q2 2022 Earnings Call

308. On August 4, 2022, Sotera hosted its Q2 2022 quarterly earnings call attended by Defendant Petras.

309. During the prepared remarks, Petras stated that "the company intends to vigorously defend itself against these claims" and reiterated that "our employees and facilities operate in a safe and compliant manner":

> [**Petras:**] Before we open it up for question-and-answer, I want to provide a brief update on our EO litigation. . . .
>
> I want to reinforce what we have stated many times, and that's the company intends to vigorously defend itself against these claims. Our company plays a critical ***role in healthcare, and our employees and facilities operate in a safe and compliant manner***[.]

310. As set forth in ¶309, these statements were materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks; and (iii) Sotera failed to disclose the true extent of its liability risks from the EtO related lawsuits. *See* Section IV.C-H, *supra*.

### BB. Sotera Made Materially False And Misleading Statements On Its Website

311. Throughout the Class Period, Defendants made public statements on Sotera's official company website stating that Sotera and Sterigenics operate safely and in compliance with

regulatory requirements, and downplaying its risk of liability in the EtO related lawsuits. As detailed below, each of the following statements published on Sotera's website was materially false or misleading because, as discussed above, Defendants knew that Sotera was not operating safely with respect to its control of EtO emissions, was not meeting (much less exceeding) regulatory standards, and therefore had no basis to categorically deny and downplay the allegations and risks of EtO related lawsuits.

**1. Sotera's "Ethylene Oxide (EO) Overview" Web Portal**

312. As alleged above, on November 11, 2021, Defendant Leffler told investors at a Credit Suisse investor conference, "I should start out by making a plug for our website and we mentioned that yesterday on the earnings call. But we went live yesterday with a portal that you can access through the Investor Relations website at Sotera Health, which is that for the first time we've tried to compile a bunch of information including background and our views on the ethylene oxide situation."

313. Thus, since at least November 11, 2021, and throughout the remainder of the Class Period, Sotera made false and misleading statements on its EtO Web Portal. Each of these statements were false and misleading or omitted material information because the Company was downplaying the potential deadly consequences of EtO exposure, and it was misleading the public regarding regulators' view of the sustainability and safety of EtO sterilization.

**a. "EO & Sterigenics"**

314. On the "EO & Sterigenics" page of the Web Portal, since at least December 8, 2021 and throughout the rest of the Class Period, Sotera states that "Sterigenics is leading the industry in recent [EtO] enhancements" and:

> ***Sterigenics has a track record of continuous improvement with control systems that go beyond regulatory requirements for EO emissions. Sterigenics is committed to best-in-class emission controls and is working with communities and regulators to establish the strongest possible control environment across its network of EO sterilization facilities.***

315. It was materially false and misleading for Sotera to proclaim that its "has a track record of continuous improvement with control systems that go beyond regulatory requirements for EO emissions," was "committed to best-in-class emissions controls," and was working "to establish the strongest possible control environment" for its "EO sterilization facilities" when, in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.C-H *supra*.

**b. "Building a World-Class Sterilization Facility"**

316. This same "EO & Sterigenics" page of Sotera's Web Portal also linked to a YouTube video, titled "Building a World-Class Sterilization Facility," which Sotera posted on its website on October 9, 2020, and which remained on its website throughout the Class Period.

317. Sotera's YouTube video stated:

> The EO Sterilization process is heavily regulated by several regulatory agencies to ensure safe operations for employees, community members, and patients. The healthcare industry, medical device and product manufactures, and pharmaceuticals industries rely upon ***companies like Sterigenics that have been safely using EO for sterilization for more than 70 years. Safety is the top priority at Sterigenics. While our facilities already operate safely today, and we do far better than environmental standards***, as part of our continuous improvement, we are implementing three major enhancements to our emission control system to further increase the capture of EO in cooperation with regulatory officials.

318. It was materially false and misleading for Sotera to proclaim that it had "been safely using EO for sterilization for more than 70 years," to "operate safely," and that "we do far better than environmental standards" when, in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.C-H, *supra*.

**c. "Ethylene Oxide Overview – Regulatory Oversight"**

319. Since at least December 8, 2021, and throughout the rest of the Class Period, the "Regulatory Oversight" page of Sotera's Web Portal[14] stated:

> The safe use of EO for medical supply sterilization is highly regulated by major regulatory agencies such as the EPA, FDA, OSHA and others. ***In 2018, ethylene oxide sterilization became the subject of regulatory and media scrutiny due to the release of a controversial and highly conservative EPA risk assessment as well as a significant misunderstanding of the facts*** . . . . ***Sterigenics operates safely and in compliance with regulatory requirements*** and continues to invest in voluntary emission controls to perform better than even the strictest of regulations.
>
> ***Sterigenics consistently complies with environmental permits issued for each of its sterilization facilities***. Sterigenics has disclosed its EO emissions for decades in federal and state filings – even when not required and when others in the industry did not – ***and has a track record of implementing leading safety practices to further perform better than regulatory requirements.***

320. It was materially false and misleading for Sotera to proclaim that (i) "regulatory and media scrutiny" of EtO was "due to the release of a controversial and highly conservative EPA risk assessment as well as a significant misunderstanding of the facts"; and (ii) Sterigenics

---

[14] *See* https://investors.soterahealth.com/ethylene-oxide-eo-overview; *see also* https://investors.soterahealth.com/regulatory-oversight.

"operates safely and in compliance with regulatory requirements" and "has a track record of implementing leading safety practices to further perform better than regulatory requirements" when, in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. It was also false or misleading to claim that Sotera "consistently complies with regulatory permits" when over the life of the Willowbrook facility, Sotera also failed to comply with requirements in multiple permits designed to limit and monitor EtO emissions. Even after Sotera's closure of its Illinois EtO processing plant, the Company failed to adequately enhance emissions controls and continued to operate multiple sterilization facilities that emitted dangerous levels of EtO during the Class Period and beyond. Sotera actively sought to prevent regulators and the public from learning about the carcinogenic properties of EtO. *See* Section IV.C-H, *supra*.

**d. "EO Environmental Exposure Litigation"**

321. On the EO Litigation page of the Web Portal,[15] Sotera stated, among other things:

> In 2018, ethylene oxide sterilization became the subject of regulatory and media scrutiny due to the release of a controversial and highly conservative EPA risk assessment as well as a significant misunderstanding of the facts. As a result, medical supply sterilization companies have been subjected to hundreds of personal injury claims and related tort lawsuits citing alleged injury due to long term, low-level environmental exposure from emissions from sterilization facilities. The litigation consists of individual claims, rather than class actions. Sterigenics has and will continue to vigorously defend against these claims. ***Sterigenics operates safely and in compliance with regulatory requirements and continues to invest in voluntary emission controls to perform better than even the strictest of regulations, as it continues to fulfill its critical role in healthcare***.

[15] *See* https://investors.soterahealth.com/eo-litigation.

* * *

Lack of evidence exists for low-level EO environmental exposure causing personal injury (Nov. 2021):

- ***No generally accepted science demonstrates that low-level EO exposure from Sterigenics' facilities cause medical conditions.***
- EO is a naturally occurring substance, unlike many other chemicals at issue in other environmental litigation.
- EO consistently occurs in the environment from natural/everyday human activity, often at levels above those to which the general public is exposed to long-term from the Sterigenics facilities.
- The EPA and others now acknowledge background levels of EO, contrary to the view the EPA took for some time after it published the IRIS EO assessment.

* * *

***Independent research does not support a connection between EO sterilization and cancer*** (Nov. 2021):

- ***A recent meta-analysis of studies regarding cancer risks among workers exposed to EO concluded that the most recent and informative studies on the topic "do not support the conclusion that exposure to EO is associated with an increased risk of lymphohematopoietic cancers (LHC) or breast cancer."***
- ***Another study reevaluated historical exposures to EO among sterilization workers in the National Institute of Occupational Safety and Health (NIOSH) study cohort that was relied upon by the EPA in its 2016 IRIS risk assessment. The review found that the trend in EO exposures during the study period was opposite to the trend indicated in the NIOSH study "suggesting that the US EPA's exclusive reliance on the NIOSH cohort to estimate EO cancer risk should be re-examined."***

* * *

***Sterigenics operates safely and in compliance with environmental regulatory requirements*** (Nov. 2021)

- ***Sterigenics consistently complies with environmental permits issued specifically for each of its sterilization facilities.***

- ***Sterigenics disclosed its EO emissions for decades in federal and state filings, even when others in the industry did not.***
- ***Sterigenics has implemented leading safety practices and continues to work with regulators and others to enhance the safety of EO sterilization.***

322. It was materially false and misleading for Sotera to proclaim, among other things, that (i) "Sterigenics operates safely and in compliance with regulatory requirements and continues to invest in voluntary emission controls to perform better than even the strictest of regulations"; (ii) "[n]o generally accepted science demonstrates that low-level EO exposure from Sterigenics' facilities cause medical conditions" when, in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.C-H, *supra*.

**e. "Santa Teresa Fact Sheet"**

323. The "Saint Teresa Fact Sheet" existed on the Sotera website since at least December 8, 2021 and continues to appear on the website. Sotera, through Sterigenics, stated on this Fact Sheet:

> ***Safely operating since opening in 1989 with rigorous environmental, health and safety protocols.***
>
> - ***Operations in accordance with New Mexico Environment Department (NMED) permit and in consistent compliance with applicable health and safety regulations governing emissions.***
>
> ***Record of enhancements to reduce ethylene oxide (EO) emissions beyond already safe, permitted levels.***

* * *

> Sterigenics will vigorously defend its essential and ***safe operations*** against this ***baseless lawsuit.***

324. These statements were materially false and misleading when made. In truth, Sotera has a long history of skirting regulations at its facilities, both domestically and abroad. The New Mexico Attorney General believed that Sotera routinely violated its facility permits and permit modifications regarding monitoring and reporting conditions, emission and environmental control parameters, and other terms. Despite knowing the dangers of EtO for decades, Sotera chose not to employ adequate and effective emissions control systems at its sterilization facilities, and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks.

**f. April 22, 2021 – Press Release: "Santa Teresa Statement and Q&A – UPDATED 4/22/21"**

325. On April 22, 2021, Sotera posted on its website a press release titled "Santa Teresa Statement and Q&A – UPDATED 4/22/21" which stated:

> Sterigenics denies the unfounded claims made in the lawsuit filed by the New Mexico Attorney General. The recent procedural decision to remand the case to state court is in no way an indication of the merits of the claims. ***We operate safely and are committed to protecting public health***. Our Santa Teresa facility sterilizes vital medical products for healthcare providers and patients who need them – including life-saving medical products that are used to respond to the Covid-19 pandemic – and ***we consistently comply with applicable laws and regulations governing the use of ethylene oxide in our operations***. We will vigorously defend our essential and ***safe operations*** against this ***baseless lawsuit***.

326. Later in the same press release, Sotera provides a Q&A section about the New Mexico litigation. Within this section, Sotera answers questions, including the below:

> 4. Is the facility regulated?

- The ***facility has consistently complied with the requirements of its Air Quality Permit***.

* * *

6. How does the company's previously announced program of general facility enhancements impact the Santa Teresa facility?

- ***Sterigenics has voluntarily installed enhancements to the Santa Teresa facility that reduced EO emissions beyond already safe, permitted levels***.

7. Is the Santa Teresa facility safe?

- ***Yes.*** The Santa Teresa facility ***operates safely and consistently complies with applicable laws and regulations governing emissions***.
- Sterigenics has voluntarily installed enhancements to the Santa Teresa facility ***to reduce EO emissions beyond already safe, permitted levels***. Sterigenics was already acting on additional emission reduction enhancements before the New Mexico Attorney General's lawsuit, and will continue to do so.
- Sterigenics remains committed to operating safe facilities that protect patients, employees and communities.

327. These statements were materially false and misleading when made because, in truth, Sotera has a long history of skirting regulations at its facilities, both domestically and abroad. Despite this knowledge, Sotera chose not to employ adequate and effective emissions control systems at its sterilization facilities, and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.C-F, *supra*.

### g. June 30, 2021 – "Santa Teresa Statement 06/30/21"

328. On the Latest Updates page of the Web Portal,[16] Sotera attaches a statement from the Company titled "Sterigenics Comments on Ruling in New Mexico Litigation as of June 29, 2021," which was published on June 30, 2021. Sotera states:

> Sterigenics, a leading provider of mission-critical sterilization services to the healthcare industry, today released the following statement in connection with the recent order issued in the lawsuit filed by the New Mexico Attorney General.
>
> ***The systems and practices at our Santa Teresa facility safely control ethylene oxide ("EO") emissions, and our operations are not putting anyone in the community at risk.*** The facility remains open and we will comply with the order while continuing to sterilize vital medical products for healthcare providers and patients who need them. Before this lawsuit was filed, Sterigenics was working to install additional emission control enhancements to further reduce EO emissions beyond already safe, permitted levels.

329. As set forth above in ¶328, these statements were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading. In truth, Sotera failed to disclose the true risks by withholding information from investors regarding the inadequacy and subversion of its EtO emissions control systems, which allowed dangerous amounts of toxic EtO fumes to pollute the air surrounding the Company's facilities and exposed people living in the adjacent communities to significantly increased cancer risks, and the fact that Sotera has long been aware of these risks. *See* Section IV.C-F, *supra*.

[16] *See* https://investors.soterahealth.com/latest-updates.

### h. December 24, 2021 – Statement Regarding New Mexico Litigation

330. On December 24, 2021, Sotera provided another statement about the New Mexico Litigation:

> On December 20, 2021, State Court in New Mexico issued an order, adopting in full a proposed order submitted by Sterigenics, in the matter involving the Sterigenics facility in Santa Teresa. Under the terms of the Order, Sterigenics' current monitoring protocols will remain in place and the facility will remain fully operational to sterilize vital medical products and devices. In addition, Sterigenics will move forward with its plans to install enhancements to the facility's emissions control system which will further reduce emissions below already safe levels.
>
> The lawsuit filed by the New Mexico Attorney General against Sterigenics remains pending and Sterigenics continues to deny the unfounded claims made in that lawsuit. ***Sterigenics operates safely and is committed to protecting public health.*** The Santa Teresa facility performs the vital sterilization of medical products for healthcare providers and patients who need them – including life-saving medical products that are used to respond to the COVID-19 pandemic – and ***we consistently comply with applicable laws and regulations governing emissions in our operations.*** Sterigenics will vigorously defend its essential and safe operations against this baseless lawsuit.

331. These statements were materially false and misleading when made because, in truth, Sotera has a long history of skirting regulations at its facilities, both domestically and abroad. Despite this knowledge, Sotera chose not to employ adequate and effective emissions control systems at its sterilization facilities, and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. Therefore, Sotera failed to disclose the potential significant risk of an adverse outcome at trial, given the evidence presented to the *Kamuda* jury and long known to the Company. *See* Section IV.C-H, *supra*.

**i. August 4, 2022 – Statement Regarding EPA's Ethylene Oxide Commercial Sterilizers List**

332. On August 4, 2022, Sotera posted another statement on its website, this time regarding EPA's Ethylene Oxide Commercial Sterilizers List.

333. In this statement, Sotera states:

> As the EPA acknowledged, the use of ethylene oxide (EO) for the sterilization of medical devices is essential to the U.S. health care system. We are pleased that the EPA is in the process of reviewing the NESHAP standard which regulates the usage of EO, and we encourage the agency to adopt new standards that are better aligned with the best EO control technologies currently available.
>
> ***Sterigenics' has consistently outperformed regulatory standards for decades*** and is committed to continuing to implement industry-leading ***emissions control enhancements across our facilities to further improve our already safe operations***.

334. This statement was false and misleading when made because, in truth, Sotera has a long history of skirting regulations at its facilities, both domestically and abroad. Despite this knowledge, Sotera chose not to employ adequate and effective emissions control systems at its sterilization facilities, and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.C-H, *supra*.

**j. "FAQs"**

335. On the FAQs page of the Web Portal,[17] Sotera responds to the question "Does Sterigenics consistently comply with all relevant rules and regulations?" by stating "***Yes.***

[17] *See* https://investors.soterahealth.com/faqs.

***Sterigenics' facilities have been industry leading, consistently outperforming environmental regulatory standards for decades***."

336. This statement was materially false and misleading when made and/or omitted material information because in truth, (i) Sotera chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities; and (ii) Sotera often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks. *See* Section IV.C-H, *supra*.

**k. "Environmental Responsibility" Statement**

337. Since at least June 27, 2022, and through the remainder of the Class Period, Sotera published on its website the following statement of "Environmental Responsibility":[18]

> Sterigenics is investing in tens of millions of dollars in emissions control enhancements at EO facilities to further reduce emissions beyond ***already safe levels. In addition, Sterigenics has a history of enhancing work practices and emission controls with the aim of reducing EO emissions.***

338. The above statement was materially false and misleading when made because, in truth, Defendants knew they were not already beyond "safe levels" of emissions of EtO. Despite this knowledge, Defendants continued to falsely represent that Defendants were in compliance with emissions and were seeking to further improve, and that EtO exposure around its facilities was safe. *See* Section IV.C-H, *supra*.

[18] *See* https://soterahealth.com/responsibility/.

### l. Global Code of Conduct

339. Sotera also published on its website a Global Code of Conduct by which the Company claims to abide by. It has been effective since December 2017 and updated November 19, 2020. It remained in effect throughout the Class Period, and remains in place to the present.

340. The Global Code of Conduct states:

> ***We are committed to respecting the environment***, providing our employees with a safe and healthy place to work and ***striving to safeguard global health*** in all that we do.
>
> Accordingly, the Company commits each one of us to:
>
> • ***Provide and maintain facilities and operations where health and safety is promoted and hazards are identified and controlled***; [and]
> • ***Manage facilities and operations such that their potential impacts on the environment are controlled and minimized***[.]

341. Sotera's Global Code of Conduct further states that "[m]any areas of [the Company's] businesses are subject to extensive governmental regulation throughout the world. ***It is the policy of Sotera Health to meet or exceed legal requirements in each of the countries in which we do business***."

342. These statements were materially false and misleading when made. In truth, Defendants knew that exposure to elevated levels of EtO could cause significant health risks to the communities in which its facilities were located. Despite this knowledge, Defendants continued to operate its facilities and falsely claim to the public that EtO was not dangerous to a person's health. *See* Section IV.C-H, *supra*.

### CC. Item 303 of Regulation S-K

343. Item 7 of Form 10-K and Item 2 of Form 10-Q requires SEC registrants to furnish the information mandated by Item 303 of Regulation S-K [17 C.F.R. § 229.303], Management's

Discussion and Analysis of Financial Condition and Results of Operations (MD&A). Among other things, Item 303 of Regulations S-K required that Sotera's Class Period Forms 10-K and 10-Q disclose certain known trends or uncertainties that had, or were reasonably likely to have, a material impact on the Company's revenues or income from continuing operations.

344. The MD&A disclosures in Sotera's Forms 10-K and 10-Q filed with the SEC during the Class Period were materially false or misleading because Defendants failed to disclose material uncertainties and trends associated with Defendants' failure to properly control EtO emissions and the true risk of liability related to the EtO related lawsuits filed against the Company, that were reasonably likely to result in significant risk of liability that would have a material effect on the Company's future operating results.

345. As explained in Section IV.C-H *supra*, Defendants were aware that Sterigenics had paid thousands of dollars in safety violations over the years regarding its EtO emissions, that the Company intentionally manipulated alarm systems at the Willowbrook facility meant to warn employees when they were being overexposed to EtO emissions, and that its employees would intentionally open the door of the facility to the outside, releasing toxic EtO gas into the community. Defendants were also aware, through regulatory reports and through allegations and discovery revealed throughout the EtO related lawsuits against the Company, that there is probable and legitimate evidence regarding the health and safety risks of EtO emissions exposure and the dangers of living in communities surrounding Defendants' facilities. *See* Section IV.C-F, *supra*. For example, despite Sotera claiming that it was managing its strict regulatory requirements safely and effectively, one employee stated on the public website Glassdoor that "[t]here is a minimum attention to quality & safety which will backfire eventually." *See supra* ¶171. These events

constituted a "trend" of quality and safety control weaknesses with its compliance with EtO emissions regulations and internal safety procedures that were likely to result in serious problems for the Company, both financial and otherwise. As such, these events were subject to disclosure under Item 303.

346. In addition, Item 1A of both Form 10-K and Form 10-Q requires SEC registrants to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. § 229.503], *Risk Factors*. Item 503 of Regulation S-K required that Sotera's Class Period Forms 10-K and 10-Q disclose the most significant matters that made an investment in Sotera risky. During the Class Period, however, Sotera's Forms 10-K and 10-Q instead contained materially false or misleading representations about ***potential*** regulatory and legal risks when, in fact, such risks were ***then existing***.

347. The risk factor disclosure included in Sotera's Forms 10-K deceptively referred to ***potential risks*** associated with EtO emissions exposure and the true risk of liability in the hundreds of EtO tort cases against Defendants, when, in fact, such risks were ***then existing*** due to Defendants' failure to maintain proper safety controls to minimize the release of EtO into the atmosphere. The Company's disclosures stated, in relevant part:

> **Risk Factor Summary**
> Our business operations are subject to numerous risks, factors and uncertainties, including those outside of our control, that could cause our actual results to be harmed, including risks regarding the following:
>
> - [H]ealth and safety risks associated with the use, transportation and disposal of potentially hazardous materials such as EO and Co-60;
>
> - [I]mpact and outcome of current and future legal proceedings and liability claims, including lawsuits alleging personal injury, property devaluation and other injuries by purported exposure to emissions of EO from our facilities in Willowbrook, Atlanta and Santa Teresa[; and]

- [C]ompliance with regulatory requirements to which we are subject[.].

* * *

***Changes in environmental, health and safety regulations or preferences may negatively impact our business.***

Additionally, certain regulators, including the FDA, have started initiatives to encourage development of sterilization alternatives to EO processing. We have taken part in some of these initiatives. We have made proactive, voluntary investments to enhance emissions controls.

***Safety risks associated with the use and disposal of potentially hazardous materials, such as EO and Co-60, may result in accidents or liabilities that materially affect our results of operations.***

* * *

We are currently the subject of lawsuits alleging that purported EO emissions from certain of our current and former facilities have resulted in toxicological or health-related impacts on the environment, the communities that surround our facility and a customer's employees. We deny these allegations and intend to vigorously defend these claims.

* * *

***Potential health risks associated with the use of EO may subject us to future liability claims and other adverse effects.***

Potential health risks associated with the exposure to EO under certain conditions subject us to the risk of liability claims being made against us by workers, contractors and others, including individuals who reside or have resided near our EO sterilization facilities and employees of our customers Assessments of the potential health risks of exposure to EO have evolved over time. . . and we expect risk assessments related to EO will continue to evolve and be examined.

We are currently the subject of tort lawsuits alleging personal injury by purported exposure to emissions and releases of EO from our facilities . . . We deny the allegations and are vigorously defending these claims . . . . It is likely that we will be subject to other claims by or on behalf of similar groups of plaintiffs in the future relating to any of our current or former facilities.

> Our liability insurance coverage may not be adequate to cover any liabilities arising out of such allegations or remain available to us at acceptable costs. A successful claim brought against us in excess of the insurance coverage then available to us could have a material adverse effect on our business, prospects, financial condition or results of operations.
>
> ***We are currently defending certain litigation, and we are likely to be subject to additional litigation in the future.***
>
> Our business exposes us to significant risk from lawsuits, investigations and other legal proceedings.
>
> We are currently the subject of tort lawsuits alleging personal injury by purported exposure to emissions and releases of EO from our facilities . . . We deny the allegations and are vigorously defending against the claims. However, one or more adverse judgments could result in significant liability for us and have a material adverse effect on our business, financial condition and results of operations.

348. Sotera's Form 10-Qs during the Class Period incorporated by reference this materially false or misleading risk factor disclosures.

349. Further, Item 9A of Form 10-K and Item 4 of Form 10-Q require SEC registrants to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. § 229.307], *Disclosure Controls and Procedures*. Item 307 of Regulation S-K required Sotera's Class Period Forms 10-K and 10-Q to disclose Defendants Petras and Leffler's conclusions about the effectiveness of Sotera's disclosure controls, defined by relevant regulations as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized, and reported.

350. The representations in the Company's Forms 10-K and 10-Q about Sotera's disclosure controls being effective were then false and misleading certified by Defendants Petras and Leffler:

I, Michael B. Petras, Jr., certify that:

1. I have reviewed this annual report on Form 10-K of Sotera Health Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

* * *

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

* * *

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

351. The Class Period Forms 10-K and 10-Q filed by the Company failed to disclose material facts required by SEC rules and regulations in connection with Defendants willfully turning a blind eye to or condoning willful conduct on the part of its workers to improperly release

EtO gas into the communities, and the resulting true risk of liability in connection with the hundreds of EtO tort lawsuits filed against it, which resulted in a single case securing a $363 million verdict against Defendants and the finding of "willful and wanton" conduct on the part of Defendants in terms of their failure to adequately safeguard the local community from the overexposure of EtO gas. Even after Sotera's closure of its Illinois EtO processing plant, the Company failed to adequately enhance emissions controls and continued to operate multiple sterilization facilities that emitted dangerous levels of EtO during the Class Period and beyond. Therefore, Sotera failed to disclose the potential significant risk of an adverse outcome at trial, given the evidence presented to the *Kamuda* jury and long known to the Company.

352. These compliance failures and systemic deficiencies were reasonably likely to result in lawsuits and regulatory actions that would have a material effect on the Company's future operating results.

## VI. THE TRUTH EMERGES

353. The truth began to emerge on September 19, 2022, when the jury in the *Kamuda* litigation—the first of hundreds of lawsuits against Sotera and Sterigenics to proceed to trial—found that dangerously high EtO emissions from Sterigenics' Willowbrook, Illinois facility caused the plaintiff, Ms. Kamuda, to develop cancer. The jury also found that Sotera's and Sterigenics' failure to prevent emissions of toxic EtO gas and to warn of this severe health hazard was "willful and wanton," demonstrating a conscious disregard for public safety. Accordingly, the jury ordered Sotera and Sterigenics to pay the plaintiff in *Kamuda* ***$38 million*** in compensatory damages and ***$325 million in punitive damages***.

354. The *Kamuda* verdict was immediately picked up and reported by the news media and financial analysts covering Sotera's stock. For example, on September 19, 2022, at 12:16 p.m. EDT, *Law360* published an article titled "Jury Awards $363M In First Sterigenics Ethylene Oxide Trial," which described the plaintiff's claims and allegations leading to the verdict:

> Kamuda claimed that ***Sterigenics, now a unit of Sotera Health knew since at least the early 1980s that ethylene oxide exposure posed significant cancer and reproductive health risks but fought the science studying the molecule and regulators' efforts to curb its emissions in a bid to put profits over public safety***. She also alleged the companies failed to study how long the chemical would stay in the Willowbrook community's air or how far it would travel before the plant opened its doors in 1984.
>
> * * *
>
> Counsel for Kamuda . . . reminded the jury that ***Sterigenics and Griffith recklessly failed to install emission controls they knew were available decades earlier***.

355. Also on September 19, 2022, at 1:19 p.m. EDT, the *Chicago Sun-Times* published an article titled "$*363 million verdict against Sterigenics in first trial over toxic gas emissions: 'It's been a long four years,' plaintiff says*," which described the trial's closing arguments:

> In closing arguments Thursday, Kamuda's lawyers argued ***Sterigenics released gas at levels thousands of times above the limits government scientists agreed were safe***. . . . "What this verdict tells us," said Kamuda's attorney Patrick Salvi Jr., "is that decisions in the boardroom matter to people in their bedroom, in their living room, at the kitchen table."

356. Illinois State Senator John Curran published a comment on the verdict on September 19, 2022, stating that "the size of ***this verdict validates the belief that the cancer cluster in the Willowbrook area is a direct result of toxins released into the atmosphere by Sterigenics***. What we suspected all along, and what has now been found by a jury, is that ***Sterigenics was a bad actor that turned a blind eye to the fact that they were slowly poisoning the residents who lived in the vicinity of their facility***."

357. *Wolfe Research* published a report on September 19, 2022 titled "*First IL EO Jury Verdict Goes Against for $363M…Oofa*." The report noted that "[Illinois] jury in Kamuda trial ruled in favor of plaintiff and against Sotera/Sterigenics. $363M damages = $38M compensatory and $325M punitive . . . [t]he compensatory award $17M more than ask." The report described the verdict's effect on investors as a "***fear cocktail right now.***" News of the Kamuda jury's verdict caused an immediate and precipitous decline in the market price of Sotera's common stock. Before 10:00 a.m. on September 19, 2022, the jury issued its verdict against Sotera and Sterigenics. By 1:49 p.m., following widespread news reports of the jury's $363 million verdict, Sotera's stock price had already dropped ***21%***. By the end of the day, the news had caused Sotera's stock price to decline by $4.90 per share, or ***33.3%***, from a closing price of $14.73 per share on September 16, 2022, to a closing price of $9.83 per share on September 19, 2022, on unusually heavy trading volume.

358. Following the close of the financial markets, additional information concerning the scope and impact of Sotera's conduct was revealed. On September 19, 2022, at 5:30 p.m., the *Motley Fool* published an article titled "*Why Sotera Health Stock Crumbled Today*," which commented, "Investors sold out of the company after a jury reached a verdict against it in a lawsuit taking place in Illinois. As a result, Sotera's stock price plummeted by more than 33% on the day."

359. Later on September 19, 2022, at 8:32 p.m., *The Chicago Tribune* published an article titled "*Jury awards Willowbrook woman $363 million, finds Sterigenics liable for exposing her to cancer-causing ethylene oxide*," detailing the jury verdict in the *Kamuda* litigation. The article discussed the "[e]mails and corporate documents" the jury considered during the trial:

> ***Emails and corporate documents*** highlighted on a courtroom screen ***showed the companies knew long ago that ethylene oxide*** [or EtO] ***is extremely dangerous.***

> But the companies ***delayed installing pollution-control equipment and attempted to undermine federal regulations that would require costly improvements*** at sterilization facilities, the documents showed**.**
>
> "***They did not treat EtO like a carcinogen, they treated it like an ATM***," Salvi said.

360. Also on September 19, 2022, at 10:38 p.m., *CBS News Chicago* reported on the *Kamuda* verdict's findings that "***the company was found to have exercised willful and wanton conduct***." The article stated that "Sue Kamuda . . . is a breast cancer survivor, who lived near the factory for three decades. ***A jury not only believed her cancer was connected to the ethylene oxide gas emitted from the plant, but also decided the company should be punished for all of its toxic emissions***." The article further noted that "[m]ost of this massive $363 million verdict was for punitive damages. A form of punishment against the company for its role here."

361. In the days immediately following the *Kamuda* jury's verdict, financial analysts and the news media continued to publish reports and articles discussing the evidence brought forth during the trial and commenting on the verdict; as a result, Sotera's stock price continued to decline. For example, on September 20, 2022, analysts at Goldman Sachs issued a report that downgraded Sotera stock from "Buy to Neutral," lowered its price target from $23.00 to $9.00 per share, and noted that "[y]esterday's verdict . . . . creates a material overhang on the stock for the foreseeable future."

362. Also on September 20, 2022, the *Chicago Daily Herald* published an article containing additional information and revelations from the trial, including:

> The outcome of this case will likely affect the rulings in the other cases. In closing arguments Thursday, ***Kamuda's lawyers argued that Sterigenics released gas at levels thousands of times above the limits government scientists agreed were safe***. But the defendants argued that ethylene oxide gas was never released at dangerous levels, and that scientific research still hasn't proven a link between the gas and cancer in humans. "We are immensely thankful to the jury for sitting through such

> a lengthy trial and for providing Sue with the justice she deserves," said Kamuda's lawyer, Lance D. Northcut. "But this verdict is about more than Sue. It's about holding these companies accountable. "There are many more cases to be tried, and we hope Sue's case sets a precedent that Sterigenics cannot distort science with money, and they should be held liable for gambling with people's lives."

363. Also on September 20, 2022, at 2:40 p.m. EST, the *National Law Review* published an article titled "Ethylene Oxide Verdict First of Its Kind, and It's Eye Opening!" which stated:

> Plaintiff Kamuda argued that the ethylene oxide utilized at the Willowbrook plant . . . caused serious cancer and reproductive health risks. Kamuda alleged that the company failed to analyze how long the chemical would stay in the air in the Willowbrook community or the distance it would travel. ***Further, Kamuda argued that Sterigenics recklessly failed to install emission controls decades earlier to reduce releases of the chemical***.

364. As a result of these and similar analyst and news reports released after the close of the financial markets on September 19, 2022, Sotera's stock price declined by an additional $1.63 per share, or ***16.6%***, from a closing price of $9.83 per share on September 19, 2022, to a closing price of $8.20 per share on September 20, 2022.

365. The next day, on September 21, 2022, J.P. Morgan analysts published a report downgrading rating of Sotera's stock from "Overweight" ("OW") to "Underweight" ("UW") and reducing the stock's price target from $26.00 to $9.00. The report noted that the $363 million verdict was the "largest individual payout in [Illinois] history" and involved "evidence from the EPA indicating surrounding the Willowbrook area was in the 99.9% percentile of cancer risk in the country":

> **Unfavorable verdict leads to ~$345M in damages to be paid.** On Monday, the first lawsuit against Sterigenics' old Willowbrook, IL EO sterilization facility (which has been shut down since 2019) reached a verdict, deeming SHC liable for ~$345M of damages to the plaintiff, Sue Kamuda, who alleged the company's reckless pollution of the facility's surrounding neighborhood caused her to develop breast cancer (her son, who developed cancer as well is a plaintiff in a separate trial). ***The Kamuda lawyers used evidence from the EPA indicating surrounding***

> ***the Willowbrook area was in the 99.9% percentile of cancer risk in the country***, per *Bloomberg*.

366. On this and similar news, Sotera's stock price declined an additional $0.88 per share, or ***10.7%***, from a closing price of $8.20 per share on September 20, 2022, to a closing price of $7.32 per share on September 21, 2022.

367. All told, the impact of the information revealed by the *Kamuda* verdict on Sotera's investors was swift and devastating. Sotera's stock price to decline by $7.41 per share—or ***50%***—from a closing price of $14.73 per share on September 16, 2022, to a closing price of $7.32 per share on September 21, 2022.

368. Measured from the prices that investors paid to participate in the IPO and the SPO, the losses are even more remarkable. In that regard, the disclosures of Sotera's true culpability and financial liability for its toxic EtO emissions caused Sotera's stock price to decline by more than 68% from the IPO price of $23.00 per share, and by 73% from the SPO price of $27.00 per share.

369. The severity of the information revealed following the *Kamuda* verdict led analysts to conclude that investors were incorporating the effect of a possible Sotera bankruptcy due to the previously undisclosed risk for massive further liability flowing from Defendants' "wanton" conduct. For example, on September 27, 2022, analysts at Barclays (one of the underwriters of Sotera's IPO and SPO) published a report noting that after the *Kamuda* verdict, Sotera's "[s]hares [were] trad[ing] close to net debt per share, ***implying the market is pricing in bankruptcy.***"

370. And Sotera's compliance and safety issues were not resolved or rectified following these disclosures. While the Company was able to reach a proposed "global" settlement of the claims arising from the Willowbrook facility in January 2023—for $408 million—the damage had already been done by the massive losses investors incurred in September 2022. But even following

that, as discussed above, the Company's EtO emissions failures continued. Most recently, forcing California regulators to close Sotera's Ontario facility in April 2023.

## VII. LOSS CAUSATION

371. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

372. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive investors. This artificially inflated the price of Sotera common stock and operated as a fraud or deceit on the Class (defined below). Later, when the prior misrepresentations and fraudulent conduct were disclosed to the market or the reflected the materialization of concealed risks, the price of Sotera common stock fell precipitously as the prior artificial inflation came out of the price. As a result of their purchases of Sotera common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

373. Specifically, the Exchange Act Defendants' materially false and misleading misstatements and omissions misrepresented that while long knowing that EtO was carcinogenic and could cause the death of those exposed to it, they downplayed its dangerousness, delayed installing appropriate pollution control equipment, failed to follow safety procedures, and misled the public regarding Sotera's true risk exposure to the EtO related lawsuits. They did this while touting the Company's devotion to safety and health and withholding relevant information regarding the ongoing EtO related lawsuits from investors. When those materially false and misleading misstatements and omissions were corrected and the risk concealed by them materialized, investors suffered losses as the price of Sotera common stock declined net of industry

and market movements on the dates set forth in the chart below. As a result of the disclosure of the truth of Defendants' fraud, Sotera common shares stock declined from a closing price of $14.73 on September 16, 2022 to a closing price of $7.32 on September 21, 2022, a decline of 50% with a market capitalization loss of $2.10 billion.

374. Below is a chart indicating the price and trading volume of Sotera stock throughout the Class Period and the price of Sotera common stock compared with the S&P Health Care (HC) Index as the truth was revealed. As demonstrated below, the key drops coincided with unusually high trading volume and the S&P HC Index actually rose while Sotera's stock was declining during September 19 to September 21, 2022. Therefore, Sotera cannot attribute this steep decline to market forces.




375. The price drops of Sotera common stock occurred over three consecutive days. The first drop followed the result of the first jury trial against Sotera (and its subsidiary Sterigenics)

related to EtO, in which the jury found that the emissions from Sotera's Illinois facility were dangerously high and caused the plaintiff's cancer. The jury also found that the emissions and failure to warn of the severe health hazard was "willful and wanton," demonstrating a conscious disregard for people's safety. The drop on the second day followed a *Chicago Tribune* article and analyst downgrades. The article reported that corporate documents presented in court showed Sotera and Sterigenics "knew long ago that EO is extremely dangerous. But the companies delayed installing pollution-control equipment and attempted to undermine federal regulations that would require costly improvements at sterilization facilities[.]" The drop on the third day followed additional analyst downgrades due to the analysts revising their estimates of total liability related to the hundreds of cases filed against the companies.

376. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate or maintain the price of Sotera common stock. It was also foreseeable to Defendants that the revelation of the truth that there ***was*** actually evidence "to suggest that the ethylene oxide storage containers at the Willowbrook facility present[ed] an 'imminent and substantial endangerment to public health or welfare,'" would cause the price of the Company's stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. Furthermore, Defendants repeatedly touted Sotera's "competitive and comparative advantage" when it came to not only complying with but going above and beyond "burdensome" EtO regulations. Thus, the stock price declines described above were directly and proximately caused by the Exchange Act Defendants' materially false and misleading statements and omissions and Defendants' scheme to deceive the market.

## VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

### A. Defendants Spoke Frequently And In Detail Concerning Sotera's Approach To Safety, Compliance And The Attendant Liability And Business Risks

377. As detailed in the preceding sections setting forth Defendants' false and misleading statements, Defendants Petras and Leffler made a plethora of public statements concerning Sotera's safety, and compliance, and even spoke in detail about the lack of liability from the litigation concerning EtO exposure from the Willowbrook facility. In making these numerous and detailed statements, Petras and Leffler made clear to investors that they were fully aware of, and were in fact responsible for, the Company's safety operations, and that they had clear knowledge of underlying issues related to the EtO operations and ensuing risks. Indeed, these Defendants were fully aware that their statements were extraordinarily important to investors and analysts throughout the Class Period. Moreover, during virtually every interaction with investors or securities analysts Petras and Leffler were asked about and provided detailed statements concerning safety, compliance and liability issues.

378. Significantly, investors relied heavily on Leffler and Petras's repeated public statements in this regard. These Defendants' false public statements repeatedly emphasized the purported history of safety and lack of risk from the Willowbrook litigation, which belied the Company's true lack of commitment to safety and the obvious and massive potential liability posed by the EtO litigation. Those statements were either knowingly false, or were recklessly made without any care or investigation of the underlying true facts. In either case, these repeated, detailed statements are strongly probative of Defendants' scienter.

379. In addition, both Petras and Leffler and the other Exchange Act Defendants made repeated statements about Sotera's compliance with its regulatory requirements, which leads to an

inference that those Defendants closely monitored the Company's system of controls connected to emissions controls, knew or should have known that they were not complying with these regulations and that there were quality control deficiencies that plagued its facilities.

380. As noted in Sotera's 2021 and 2022 Form 10-Ks filed with the SEC during the Class Period, the Company is "subject to extensive regulatory requirements and routine regulatory audits in all of [its] operations" and its "EO plants and the EO sterilization process are subject to specific regulatory requirements under federal laws in the United States as well as many of the countries in which [Sotera] operate[s]." In these same filings, Sotera acknowledged that "failure to comply with the regulatory requirements" is a risk to the Company that could result in "administratively or judicially imposed sanctions" and "may hurt our revenues, profitability, financial condition or value." *See* Section VIII.G *infra*.

381. Given the centrality of regulatory compliance to Sotera's core operations Petras, Leffler and the Exchange Act Defendants' regularly spoke about how Sotera was meeting and exceeding these regulatory requirements. For example, the Company said that "***[w]e consistently meet and outperform regulatory emissions control requirements***"; "***Sterigenics' has consistently outperformed regulatory standards for decades and is committed*** to continuing to implement industry-leading emissions control enhancements across our facilities to ***further improve our already safe operations***"; "just give us the rules and ***we will play and abide and far exceed any of the expectations from the regulators. We've done this for the history of our company***"; and "***just tell us what the guidelines are [and we] will exceed them. That's what we've done for our history were [*sic*] complying with our laws and regs at the state, and the federal level*** . . . ."

382. Given the extensive and rigorous nature of the government regulations in question, and these Defendants' repeated and strident commentary claiming to have met—and "***exceeded***"—those regulations for the Company's entire "***history***," it can readily be inferred that, during the Class Period, Petras and Leffler and the Exchange Act Defendants either closely monitored Sotera's system of EtO emissions controls and therefore knew, or should have known, that the Company was not complying with these regulations given the long-standing, pervasive, and serious EtO emissions and quality-control deficiencies that plagued Sotera's facilities, or were grossly reckless in making those statements without any reasonable basis.

383. These Defendants' false public statements addressing the very nature of the fraud clearly supports a strong inference of scienter.

### B. The *Kamuda* Action's Verdict Further Demonstrates That Defendants Have Long Known About The Harms Caused By The Company's Toxic EtO Emissions And The Related Risks

384. Since September 2018, more than 800 personal injury lawsuits have been filed against Sotera and Sterigenics in Illinois state court by individuals who allegedly suffered cancer and other diseases due to toxic EtO emissions from Sterigenics' Willowbrook, Illinois sterilization facility. Of this, the first-filed action came to be known as the *Kamuda* Action.

385. These lawsuits were later consolidated under the *Kamuda* Action, which resulted in a jury verdict on September 19, 2022. Ms. Kamuda's lawsuit alleged that the residents of Willowbrook unknowingly inhaled EtO, a carcinogen, and that Sterigenics had not informed her and other residents that the Company was regularly releasing EtO into the air. Ms. Kamuda was diagnosed with breast cancer in 2007. The jury found that dangerously high EtO emissions from the Willowbrook facility caused Ms. Kamuda to develop this cancer, and also found that Sotera

and Sterigenics' failure to prevent these toxic emissions, and their failure to warn the public of this severe health hazard, was "wanton and willful" and demonstrated a conscious disregard for public safety. Given the Defendants' knowledge, the jury ordered Sotera and Sterigenics to pay Ms. Kamuda $363 million, close to 90% of which—$325 million—was for *punitive* damages. In connection with these punitive damages the jury also found that the conduct was "willful and wanton." To succeed on a claim for willful and wanton conduct, Kamuda had to establish that Sotera's conduct "***show[s] actual or deliberate intention to harm***," or conduct "which, ***if not intentional, shows an under indifference to or conscious disregard for" Plaintiff's safety***." Punitive damages are appropriate "only when the conduct in issue approaches the ***degree of moral blame attached to intentional wrongdoing***." News reports focused on this revelation by reporting on how the jury's verdict was supported by "[e]mails and corporate documents" that showed that Sotera and Sterigenics "knew long ago" about the toxic effects of EtO. Despite that knowledge, Sotera and Sterigenics "delayed installing pollution-control equipment and attempted to undermine federal regulations that would require costly improvements at sterilization facilities." ¶359.

386. This litigation and the jury and court's findings show how Defendants have known for years that Sotera chose not to employ effective emission-control systems to prevent the release of excessive amounts of toxic EtO gas from its sterilization facilities. This "willful and wanton" conduct exposed individuals living in the surrounding communities to a significantly increased risk of cancer and has subjected the Company to an increased risk of liability from hundreds of EtO related lawsuits. The willful and wanton conduct found in the *Kamuda* Action coupled with Defendants' knowledge of hundreds of other similar lawsuits against the Company (*see* ¶189)—

and the incriminating facts revealed as a result—further support a strong inference of Defendants' scienter.

### C. The Criminal Prosecution Of Sterigenics Executives In The Hague Put Sotera On Notice Of Sterigenics' Pattern Of Ineffective EtO Emissions Controls

387. As noted above, and well known to Defendants, beginning in 2004, Sterigenics Holland B.V. operated a sterilization facility in Zoetermeer, a city in the western Netherlands. This facility was located in an area with residential housing and numerous small businesses. The Zoetermeer facility became the subject of a criminal investigation in 2009 and in 2010, the Dutch Public Prosecution Service started criminal proceedings against Sterigenics HBV that ultimately resulted in a criminal court concluding that Sterigenics had knowledge of "the excess of the maximum permitted emission of ethylene oxide from the washing plant" and that the "court is therefore of the opinion that it has been legally and convincingly proven that Sterigenics ***intentionally*** violated" one of the regulations. The court also concluded "that it has been legally and convincingly proven that Sterigenics ***deliberately*** acted in violation of regulation 4.1, namely that the emission of ethylene oxide from the sterilisers did not take place via the afterburner." The former Zoetermeer facility was later shut down and then moved.

388. The litigation over the criminal charges has lingered for over a decade and is still ongoing.

389. The indictment, criminal investigation, and court findings related to the former Zoetermeer facility put Defendants on early and ongoing notice of its failures with respect to regulatory EtO emission compliance and the harm that can be caused to the surrounding community.

**D. The New Mexico Attorney General's Lawsuit Against Sotera Put The Company's Executives On Notice Of Its Release Of Toxic EtO Emissions**

390. As also detailed above, on December 22, 2020, the New Mexico Attorney General filed a lawsuit against the Company and its subsidiary Sterigenics alleging that emissions of EtO from Sterigenics' sterilization facility in Santa Teresa, New Mexico, constituted a public nuisance and deteriorated the air quality in Santa Teresa and surrounding communities and materially contributed to increased health risks suffered by residents of those communities. ¶191. The New Mexico Complaint contains detailed allegations reflecting violation of various regulatory requirements over several years, which stands in sharp contrast with Defendants' Class Period statements.

391. This substantial and reliable evidence that Sotera's EtO emissions were harmful to the surrounding communities of yet another facility shows that Defendants acted knowingly or severely recklessly in denying and downplaying the "baseless" allegations in the EtO related lawsuits and by repeatedly attesting to the Company's behavior that "exceeded" applicable regulations.

392. The New Mexico Complaint provided a map and index to the "willful and wanton" conduct discovered in the *Kamuda* Litigation as well—that Sotera was deliberately releasing excess harmful EtO into the atmosphere, contributing to the cancer and deaths of nearby residents. Defendants knew of these allegations and were, at a minimum, severely reckless in hiding the true risk of liability from investors of the EtO related lawsuits against it in general and this action specifically. Sotera's failure to acknowledge the undeniable risks of EtO exposure and to the related EtO litigation, gives rise—at a minimum—to a strong inference of scienter.

### E. Various Governmental Agencies Repeatedly Put Defendants On Notice Of Sotera's Pattern Of Ineffective EtO Emissions Controls

393. Repeated and long-standing enforcement actions and findings by various government agencies have put Defendants on notice of Sotera's pattern of ineffective EtO emissions controls and the associated risks.

394. In 2004, Sterigenics' Ontario, California facility experienced an EtO-related explosion that injured four employees, forced the evacuation of the plant, and rendered the facility unusable.[19] *See* Section IV.F.2, *infra*. The CSB concluded that Sterigenics had failed to properly train employees, which resulted in employees manually overriding safety devices, resulting in the explosion. The CSB concluded that Sterigenics management failed to implement "company-wide engineering control recommendations that could have prevented this explosion." The investigation by CSB of the 2004 explosion at the Ontario facility also faulted Sterigenics for failing to follow recommendations on EtO concentrations disseminated by NIOSH.

395. In 2006, OSHA fined Sterigenics for eight separate violations at the Willowbrook, Illinois facility—of which five were classified as "[s]erious"—all of which concerned Sterigenics' "[p]rocess safety management of highly hazardous chemicals."[20]

396. In August 2018, the U.S. EPA released a risk assessment that demonstrated people living near Sotera's Willowbrook, Illinois facility were at an elevated risk of cancer. The assessment concluded, among other things, that "the maximum lifetime (residential) ***individual***

---

[19] *See* https://www.csb.gov/sterigenics-ethylene-oxide-explosion/#:~:text=At%20approximately%203%3A00%20p.m.,the%20facility%20was%20rendered%20unusable.

[20] *See* https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717; *see also* https://www.osha.gov/ords/imis/establishment.violation_detail?id=308153717&citation_id=01001.

***cancer risk*** is 1,000-in-1 million." This ***was ten times the upper limit of what the EPA deems as the acceptable cancer risk for airborne toxins***.[21]

397. On August 21, 2018, the U.S. Department of Health and Human Services ("DHHS") released a Letter Health Consultation titled "Evaluation of Potential Health Impacts from Ethylene Oxide Emissions" written in response to a request by the EPA. In the letter, DHHS concluded, among other things, that "[i]f measured and modeled data represent typical EtO ambient concentrations in ambient air, ***an elevated cancer risk exists for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility***. These elevated risks ***present a public health hazard to these populations***," and ***recommended that "Sterigenics take immediate action*** to reduce EtO emissions at this facility."

398. In February of 2019, the Illinois EPA ordered a shutdown of operations at the Willowbrook Illinois facility. The order states that Sotera's EtO "emissions are continuing to contribute to ambient levels of ethylene oxide in the atmosphere. ***This impact creates an imminent and substantial endangerment to public health or welfare***."

399. Furthermore, according to the EPA, Sterigenics even provided the numbers relevant for assessing how much EtO was being emitted, including for "fugitive" emissions, and took into account highly specific variables such as "the exact location, release height above ground, exit velocity, temperature, and other parameters" of EtO emissions. This means that Sterigenics not only had the capacity to measure EtO emissions, but was keenly aware of the dangerous levels of EtO being released from its facilities.

[21] *See* https://www.epa.gov/AirToxScreen/airtoxscreen-frequent-questions.

400. In 2022 the South Coast AQMD issued a Notice of Violation ("NOV") to Sterigenics for emitting elevated levels of EtO at its Vernon, California facility at a quantity known to "cause injury, detriment, nuisance, or annoyance . . . which endanger[s] the comfort, repose, health, or safety of any such persons or the public." The South Coast AQMD issued additional NOVs to Sterigenics regarding safety lapses at its Ontario, California facility in January, April, June, and October of 2022 and April 2023. The April 2023 action ordered Sterigenics to close its facility in Ontario, Calif., due to elevated EtO readings near the plant.

401. These statements, orders, and actions by governmental bodies across the country put Sotera executives on notice of Sotera's pattern of illegally releasing toxic EtO emissions and the staggeringly disproportionate cancer rates this caused in the communities surrounding its facilities. The recent actions of the South Coast AQMD reinforces that Defendants' knowing actions continue despite decades of reprimands and the recent EtO litigation.

### F. Employees And Former Employees Confirm That Sotera's EtO Emissions Control Failures Were Pervasive And Widespread

402. Defendants have a long history of cutting corners and failing to implement Company-wide safety controls that demonstrates the Company's lack of concern for the welfare and safety of the individuals working in and around its facilities. This history and pattern of behavior further bolsters the strong inference that Defendants' misstatements during the Class Period were knowingly, or at least recklessly, made. These allegations are detailed above (*see* Section IV.E.1 – F.3) and cut across numerous Sterigenics facilities for a period of years predating the IPO and continuing through the present.

403. The safety violations at Sotera's facilities endangered, and at times severely injured, employees and the surrounding communities, and bolsters the strong inference that Defendants

have been aware of the Company's pattern of neglecting to properly implement safeguards related to EtO. Taken together, these statements by individuals who have worked at the Company demonstrate a pattern of Defendants consistently and knowingly failing to implement companywide safety and compliance measures across all its facilities, despite lawsuits, regulatory interventions, and criminal indictments.

### G. Effectively Controlling EtO Emissions And Complying With Regulations Are Core Operations of Sotera

404. A strong inference of Defendants' scienter is further evidenced by the fact that effectively controlling EtO emissions and complying with environmental regulations were critical to the operation of the Company.

405. EtO sterilization was a significant component of the Company's operations. As Sterigenics' former CEO testified, approximately half of that company's sterilization operations were conducted using EtO. Sterigenics, one of three Sotera segments, makes up more than half of Sotera's overall operations. Given the importance of EtO operations, key executives at the Company could not have remained in the dark.

406. EtO is a known carcinogen and thus companies that use EtO are subject to various federal, state, and local regulations regarding emissions. Failure to comply with applicable safety and environmental regulations can result in companies being forced to cease operations by regulatory bodies. Companies are also aware of the potential for private litigation to materially impact their business should they fail to effectively control emissions. Put simply: effectively controlling emissions and complying with regulations are critical to, and thus core operations of, any company that utilizes EtO in a core segment of its business.

407. That effective control of EtO emissions and regulatory compliance constitute "core operations" at Sotera is readily apparent from Defendants' own statements. Defendant Petras, in a presentation to investors on January 11, 2021 at the J.P. Morgan 39th Annual Healthcare Virtual Conference, described regulatory compliance as a "***core capability***" of Sotera and went on to add that Sotera's "***deep technical expertise and domain expertise really helps differentiate us in this space***." Furthermore, Sotera stated in annual reports during the Class Period (filed with the SEC as Form 10-Ks on March 9, 2021 and March 1, 2022) that "***[w]e operate across two core businesses: sterilization services and lab services. Each of our businesses has a longstanding record and is a leader in its respective market, supported and connected by our core capabilities including . . . regulatory . . . expertise***." Sotera has also repeatedly noted in SEC filings that EtO related litigation has the potential to "result in significant liability for us and have a material adverse effect on our business, financial condition and results of operations."

408. On February 24, 2021, in a presentation to investors at the Citi 2021 Healthcare Services, Medtech, Tools, & HCIT Virtual Conference, Defendant Leffler stated "***we have a competitive and comparative advantage when it comes to complying with complex and burdensome regulations***. And so, as the regulatory environment out there becomes more difficult, then we believe that should be helpful for service providers like us that are comfortable operating in that complex space." In the same presentation, Defendant Leffler also stated "I think one of the things that we've always said is that ***we have a high degree of confidence in our ability to comply with any regulatory requirement. We have a successful record of doing that for many decades***. I mean, just bear in mind, when you think about the history of the company, Sterigenics' predecessor began sterilizing products using ethylene oxide literally back in the 1930s. And so,

whether you're talking about different political administrations or any other moving pieces out there in the regulatory or other landscape, I think we've proven over the years our ability to comply with any new regulatory requirements. ***We believe that we're an industry leader and have a competitive advantage in that area***."

409. Moreover, effectively controlling EtO emissions so as to avoid regulatory violations and adverse judgments was material to Sotera's financial results. In 2021, medical sterilization services accounted for approximately 60% of the Company's total net revenues of $931 million. On September 19, 2022, the jury in Kamuda found Sotera liable for causing cancer due to the Company's failure to effectively control EtO emissions and awarded plaintiff $363 million in damages, which constitutes nearly 40% of Sotera's total net revenues for 2021 and over 63% of its net revenues from the Company's medical sterilization business for 2021.

410. As noted in SEC filings during the Class Period, Sotera's "industry is characterized by evolving regulations, and our operations are subject to extensive regulation in the United States and other countries where [Sotera does] business. [Sotera is] regulated by national and local agencies with jurisdiction over a number of areas directly or indirectly related to our businesses" and, specifically, "[i]n addition to general environmental laws and regulations, EO plants and the EO sterilization process are subject to specific regulatory requirements under federal laws in the United States as well as many of the countries in which [Sotera] operate[s]." Given the "extensive" and "specific" nature of the government regulations in question, it can be readily inferred that during the Class Period, the Officer Defendants closely monitored the Company's system of controls connected to EtO emissions. Moreover, given Sotera's ***"core capability" of regulatory compliance that "support[s] and connect[s]" its status as a "leader" in the "sterilization***

***services"*** market, it belies common sense that the Company's top-level management, including the Officer Defendants, did not know of the long-standing, pervasive, and serious violations of regulations and the resulting dangerous emissions of toxic EtO fumes that plagued its EtO sterilization facilities and the surrounding communities.

411. The misrepresented and undisclosed facts concern Sotera's core operations—effectively controlling EtO emissions and regulatory compliance—and, as such, the Company and its key officers knew or were at least reckless in not knowing that the statements identified herein were false and/or misleading.

**H. Petras' $21 Million In Insider Sales Support His Motive And Scienter**

412. As part of the November 24, 2020 IPO, the Company agreed to, and did, purchase from Petras 1,383,923 shares of Sotera stock at the offering price for proceeds to Petras of $31,830,229 (less underwriting discounts and commissions).[22] Following this transaction, Petras held 7,194,624 shares of Sotera common stock. As a part of the IPO, Petras and other Sotera insiders also entered into a 180-day lock-up agreement with the underwriter that prevented them from selling or transferring their remaining holdings until May 18, 2021, at the earliest.[23] Nevertheless, on March 15, 2021, Sotera filed a Form S-1 with the SEC disclosing Petras' intention to sell an additional 817,439 shares in a secondary offering to take place just four months after the IPO.

---

[22] *See* Form 424B4, Nov. 23, 2020, at 158.

[23] *See* Form 10-K, Mar. 9, 2021, at 40.

413. To make these sales possible, Petras and other insiders had to obtain a waiver of the 180-day lock-up agreement from the underwriter.[24] In the secondary offering on March 22, 2021, Petras sold 817,439 shares of Sotera common stock at $26.1225 per share for proceeds of $21,353,550. Following this transaction, Petras held 6,377,185 shares of Sotera common stock. This suspiciously-timed and substantial stock sale further bolsters the inference of scienter.

### I. The Selling Shareholders And Exchange Act Director Defendants Had Actual Knowledge

414. As detailed above, both GTCR and Warburg, and their designees on Sotera's Board—the Exchange Act Director Defendants—had deep knowledge of the Company's long history and ongoing failure to operate safely, comply with applicable regulations, and address the attendant liability, business and reputational risks that Sotera faced. As noted above, this knowledge is clear from testimony provided in the *Kamuda* litigation, from the detailed due diligence that GTCR and Warburg undertook in connection with buying majority stakes in Sotera, and based on their close operational oversight of Company in the years preceding the IPO and throughout the Class Period.

415. For example, GTCR's Cunningham testified in the *Kamuda* litigation that GTCR performed an extensive due diligence investigation of Sterigenics. During this testimony, Cunningham repeatedly admitted that GTCR had longstanding knowledge of regulatory violations the Company had been alleged to have committed in other countries and in the United States.

[24] *See* Form S-1, Mar. 15, 2021, at 44 ("In connection with this offering, J.P. Morgan Securities LLC has waived certain lock-up restrictions applicable to the selling stockholders in this offering and certain restrictions applicable to us to permit the filing of the registration statement of which this prospectus forms a part.").

Cunningham summed up these alleged violations as "at least one explosion, two criminal investigations and a public prosecutor who had filed charges for safety violations in Belgium[.]"

416. Moreover, Cunningham identified in a deposition that "regulatory consultants" had flagged for GTCR prior to its acquisition of the Company that management could "do a better job in directing/enforcing the company's compliance efforts" with regulatory standards. Cunningham admitted that GTCR had also received a report which informed it that the Company had "has historically lagged regulatory changes[.]"

417. Similar to GTCR's approach to due diligence, Warburg stated in a brochure describing its services that before making investments, it conducts an extensive due diligence process. This process entails "evaluation of important and complex business, financial, tax, accounting, environmental, and legal issues." Warburg stated that they selected companies for investment only "after conducting due diligence and developing a detailed investment thesis." Furthermore, Warburg would "typically take an active role on the boards of directors of [its] companies – either by designating our employees to such boards of directors or, as deemed appropriate, through non-Warburg Pincus designees[.]"

418. Following both GTCR's and Warburg's due diligence of the Company, they made sure that their representatives comprised a majority on Sotera's Board of Directors and used their control over the Company to borrow $1.1 billion to fund cash dividends paid to the affiliates of GTCR and Warburg. Given their knowledge, control and roles on the Board of Sotera, the Exchange Act Director Defendants acted with scienter, and their scienter is imputed to GTCR and Warburg.

**J. The Scienter Of The Officer Defendants Is Imputed Against Sotera**

419. As alleged above, numerous Sotera executives had substantial knowledge of the conduct belying Defendants' alleged false and misleading statements and scheme to defraud. That knowledge and scienter is imputed to Sotera. For example, as noted above, Defendants Petras and Leffler made repeated statements conveying, or purporting to convey, their detailed knowledge of Sotera's compliance, safety and liability risks. Defendant Petras also demonstrates a clear motive to commit fraud based on his insider sales.

420. In addition, Defendant Hoffman was an active, critical participant in the acts underlying Defendants misrepresentations and scheme. Her knowledge and acts reflect both her own participation in that scheme, and must be imputed to Sotera for purposes of scienter. For example, Hoffman confirmed that the Company could not have been in the dark about EtO operations, admitting that it is "absolutely" the responsibility of a company that uses EtO to understand the risks that EtO poses.

421. Emails in 2004 reveal knowledge by Company executives, including Defendant Hoffman, that Willowbrook, which did not control back vent emissions, had higher emissions than at plants with such controls. Defendant Hoffman asserted that the Company only tried to control emissions when "required" to do so. However, as other emails from that year reveal, Defendant Hoffman and others at Sterigenics learned that federal regulations ***did*** require emissions to be controlled, and that the plant had been out of compliance for four years prior to that email.

422. Even as Sotera claimed to meet or exceed regulatory requirements, communications with Defendant Hoffman and others at Sotera over the course of nearly a decade

revealed that the Company was doing everything it could to browbeat the EPA into not classifying EtO as a carcinogen.

423. Defendant Hoffman, as the head of Environmental, Health, and Safety at Sotera, was the primary person responsible for the Company's actions at issue in this case. Hoffman is a control person whose knowledge should be imputed to the Company. Defendant Petras, Sotera's CEO, referenced her key role at the Company on multiple occasions, and Hoffman was a direct report to Defendant Petras from no later than September 2019.

424. At the January 11, 2021 JP Morgan Healthcare Conference (discussed above in ¶¶209-11), Defendant Petras specifically referenced Defendant Hoffman, referring to her as "our Global EHS leader which is ***so important in this highly regulated business*** that we have [in] Sotera Health."

425. Defendant Petras made similar remarks at the March 10, 2021 Barclays Global Healthcare Conference. He referred to Defendant Hoffman as a person with "deep domain expertise . . . who runs our environmental health and safety, which is ***so critical to the company***."

426. On September 21, 2021, Defendant Petras explained that Defendant Hoffman's place in the Company hierarchy was such that she was a "direct report" to him, and had been for the prior two years. He told attendees of the JP Morgan All Stars Conference "Kathy Hoffman runs environmental health and safety for us. She's an outstanding leader. I told her to ***directly report to me over two years ago,*** because I didn't want that buried within the businesses."

427. At summary judgment in the *Kamuda* Action, the court made similar findings regarding Defendant Hoffman's important role at the Company. The court specifically reached the following conclusions:

- "There is evidence to support that Hoffman . . . and others on the executive team participated on the facility operations level in Willowbrook" and "were aware of the dangerous nature of the Sterigenics sterilization business and associated potential health risks to the community."

- "Ms. Hoffman became the top environmental health and safety official for Sotera. She was given the authority to take any action necessary to assure the Willowbrook facility was operating safely and in compliance with regulations and permits. Ms. Hoffman was in charge of controlling EtO-related policies and procedures, audit preparations and verifying the accuracy of information about Willowbrook that was submitted to state and federal regulators."

- "Plaintiffs' [sic] have presented evidence showing that Kathy Hoffman was responsible for employee training at the Willowbrook facility. The plaintiffs' have presented deposition testimony from a former General Manager of the Willowbrook facility regarding negligent training and supervision."

- "There is evidence that Kathy Hoffman, a vice president at Sotera, an employee of Sterigenics since 1997, had extensive institutional knowledge of the carcinogenic danger of EtO."

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE

428. At all relevant times, the market for Sotera common stock was an efficient market for the following reasons, among others:

a) Sotera common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market, with an average daily trading volume of over 1,014,000 shares;

b) As a regulated issuer, Sotera filed periodic public reports with the SEC and NASDAQ;

c) Sotera regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Sotera was followed by several securities analysts employed by major brokerage firm(s), including but not limited to Goldman Sachs, RBC Capital Markets, J.P. Morgan, Barclays, Credit Suisse, Jefferies, and Wolfe Research, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

429. As a result of the foregoing, the market for Sotera common stock promptly digested current information regarding Sotera from all publicly available sources and reflected such information in the price of Sotera common stock. Under these circumstances, all purchasers of Sotera common stock during the Class Period suffered similar injury through their purchase of Sotera common stock at artificially inflated prices and the presumption of reliance applies.

430. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on material omissions. Because this action involves a failure to disclose material adverse information regarding Sotera's business and operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the significance of Sotera's exposure to significant liability risk from the Company's excessive EtO emissions and the impact it could have on the Company's business, that requirement is satisfied here.

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

431. Sotera's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

432. Sotera and the Officer Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Sotera who knew that the statement was false.

433. None of the historic or present tense statements made by Sotera and the Officer Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Sotera and the Officer Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against Sotera, Petras, Leffler and the Exchange Act Director Defendants**

434. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

435. This Count is asserted on behalf of all members of the class against Defendants Sotera, Petras, Leffler and the Exchange Act Director Defendants for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in connection with the statements each such Defendant made, as identified above.

436. During the Class Period, Defendants Sotera, Petras, Leffler and the Exchange Act Director Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other

Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Sotera common stock at artificially inflated prices.

437. Defendants Sotera, Petras, Leffler and the Exchange Act Director Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Sotera common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

438. Defendants Sotera, Petras, Leffler and the Exchange Act Director Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

439. During the Class Period, Defendants Sotera, Petras, Leffler and the Exchange Act Director Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

440. Defendants Sotera, Petras, Leffler and the Exchange Act Director Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants Sotera, Petras, Leffler

and the Exchange Act Director Defendants engaged in this misconduct to conceal Sotera's true condition from the investing public and to support the artificially inflated prices of Sotera common stock. As Demonstrated by these Defendants' omissions and misstatements, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discovery whether those statements were false or misleading.

441. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Sotera stock was artificially inflated. In ignorance of the fact that market price of Sotera stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, by these Defendants, but not disclosed in public statements by Defendants, Plaintiffs and other members of the Class acquired Sotera stock at artificially high prices.

442. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sotera common stock. Plaintiffs and the Class would not have purchased Sotera common stock at the prices they paid, or at all, had they been aware that the market prices for Sotera common stock had been artificially inflated by these defendants' fraudulent course of conduct. It was also foreseeable to these Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Sotera's securities and that the ultimate disclosure of this information, or the

materialization of the risks concealed by their material misstatements and omissions would cause the price of Sotera securities to decline.

443. By virtue of the foregoing, Defendants Sotera, Petras, Leffler and the Exchange Act Director Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

444. As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

445. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT II

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Against Sotera and the Officer Defendants

446. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

447. This Count is asserted on behalf of all members of the Class against the Exchange Act Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5.

448. Sotera and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they: (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and others similarly situated in connection with their purchases of Sotera common stock

during the Class Period in an effort to maintain artificially high market prices for Sotera common stock.

449. Sotera and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class in connection with the purchase and sale of Sotera common stock; which did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, Sotera's commitment to safety and compliance with regulatory requirements in its ETO sterilization operations; (ii) artificially inflate and maintain the market price of Sotera common stock; and (iii) cause Plaintiffs and other members of the Class to purchase Sotera common stock at artificially inflated prices and suffer losses when the true facts became known.

450. As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), the Sotera and the Officer Defendants engaged in the following course of business conduct, as revealed by internal Sotera documents introduced as exhibits during the *Kamuda* trial, materials obtained from public dockets and from FOIA requests, and from the reports for former employees as described above:

451. Concealing the carcinogenic risks posed by EtO, which Defendants had been aware of for decades, from the public by denying the merits of the EtO litigation and claiming that the Company had been using EtO "safely" since the 1930s;

452. Choosing not to employ available EtO emissions controls, despite claiming during the Class Period that the Company employed a "proactive environmental health and safety . . . program" and a "culture" dedicated to safety;

453. Failing to comply with requirements imposed in permits or regulations issued by state and federal and international regulators;

454. Misrepresenting crucial information about EtO emissions to regulators, and failing to disclose other information to regulatory authorities; and

455. Actively fighting to prevent the publication of EPA reports which would have informed the public of EtO's carcinogenic risks.

456. These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Plaintiffs and others similarly situated in connection with their purchases of Sotera common stock during the Class Period in an effort to maintain artificially high market prices for Sotera common stock.

457. As described above, the Sotera and the Officer Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Sotera and the Officer Defendants engaged in this misconduct to conceal Sotera's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

458. Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Sotera common stock, which artificial inflation was removed from the stock when true facts became known. Plaintiffs and the Class would not have purchased Sotera common stock at the prices they paid, or at all, had they been aware that the market prices for Sotera common stock had been artificially inflated by the Exchange Act Defendants' fraudulent course of conduct. It was also foreseeable to these Defendants that misrepresenting and concealing these material facts from the public would

artificially inflate the price of Sotera's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by their material misstatements and omissions, would cause the price of Sotera securities to decline.

459. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Company's common stock.

460. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), promulgated thereunder.

## COUNT III

### For Violations of Section 20(a) of the Exchange Act Against the Officer Defendants and the Selling Shareholders

461. Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

462. The Officer Defendants acted as controlling persons of Sotera within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Officer Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to have been misleading prior to, and/or shortly after, these

statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

463. As set forth above, the Exchange Act Defendants violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this Complaint.

464. By virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the class suffered damages in connection with their purchases of the Company's securities.

465. In addition, by virtue of their ownership stake, the Selling Shareholders had the power to control or influence Sotera and the particular actions giving rise to the securities violations, as alleged herein, and exercised the same. Investment funds and entities affiliated with Warburg owned shares in Sotera. Those investment funds and affiliated entities include: Warburg Pincus Private Equity XI, L.P., Warburg Pincus Private Equity XI-B, L.P., Warburg Pincus Private Equity XI-C, L.P., WP XI Partners, L.P., Warburg Pincus XI Partners, L.P., and Bull Co-Invest L.P. Investment funds and entities affiliated with GTCR also owned shares in Sotera. Those investment funds and affiliated entities include: GTCR Fund XI/A LP, GTCR Fund XI/C LP, and GTCR Co-Invest XI LP.

466. By virtue of their position as controlling persons, the Selling Shareholders are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities.

467. The Officer Defendants and the Selling Shareholders are liable pursuant to Section 20(a) of the Exchange Act.

468. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchase of securities giving rise to the cause of action.

# THE SECURITIES ACT CLAIMS

## XII. PRELIMINARY STATEMENT

469. Plaintiffs specifically disavow any allegations or averments of fraud in connection with the claims pleaded below under the Securities Act.

470. Sotera conducted its IPO on November 19, 2020, and became a public company. The registration statement and prospectus issued as part of the IPO (the "IPO Offering Materials"), assured investors that the Company was in compliance with applicable regulations and that litigation, including based on the claims made in connection the Company's Willowbrook, Illinois facility, posed no threat to the Company. The IPO Offering Materials represented that Sotera took the safety of surrounding communities seriously, with a "proactive" environmental health and safety program and a "culture of safety and quality across all business units." Specifically with regard to requirements put in place by the EPA and other regulators, the IPO Offering Materials claimed that Sotera "consistently m[e]t and outperform[ed] regulatory emissions control requirements." Given these assurances, it is no surprise that the IPO Offering Materials "den[ied] the allegations" in litigation arising from the Company's use of EtO, and vowed that Sotera would "vigorously defend[]" the litigation. On or around March 18, 2021, Sotera conducted a secondary public offering (the "SPO"); the registration statement and prospectus in the SPO (the "SPO Offering Materials") repeated the same claims found in the IPO Offering Materials.

471. These statements, set forth further below, contained untrue statements of material fact, and omitted to disclose material facts, that were either required to be disclosed or that needed to be disclosed to make the statements not misleading. The statements in the IPO and SPO Offering Materials were materially untrue and misleading because they misrepresented or concealed that,

for years prior to the IPO, Sotera and its predecessors had prioritized profit over safety and allowed ethylene oxide ("EO" or "EtO") to escape from numerous of their facilities, in violation of applicable regulations, rules and safety standards. These longstanding violations were inconsistent with the Defendants' disclosures concerning safety and regulatory compliance and grossly understated the then-known risks of financial liability, and regulatory scrutiny, reputational, and business risks.

472. The falsity of these statements became known as a result of a jury verdict, and subsequent reporting, awarding a woman named Susan Kamuda ("Ms. Kamuda") ***$325 million in punitive damages*** and $38 million in compensatory damages for causing Ms. Kamuda's breast cancer. This verdict, against Sotera and its medical equipment sterilization subsidiary, Sterigenics U.S., LLC ("Sterigenics"), was for their conduct in causing Ms. Kamuda's cancer by releasing EtO into the atmosphere around its Willowbrook, Illinois facilities. The verdict in *Kamuda v. Sterigenics U.S., LLC*, No. 18 L 10475 (Ill. Cir. Ct.) (the "*Kamuda* verdict") revealed a truth that Sotera had not handled EtO in a manner that was consistent with its representations to investors. In contrast, public reports indicated the years of corporate-level efforts by Sotera to minimize EtO mitigation, fight regulations to control EtO and fight the declaration that EtO was in fact a harmful carcinogen.

473. Only with the *Kamuda* verdict did investors learn that the IPO Offering Materials and the SPO Offering Materials contained untrue statements of material fact: Sotera did not have a "culture" dedicated to safety and quality, it did not meet, let alone outperform, regulatory requirements, and the lawsuits whose allegations Sotera vigorously denied were meritorious.

## XIII. JURISDICTION AND VENUE

474. The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v because this is a civil action arising under the laws of the United States and Section 22 of the Securities Act grants jurisdiction to claims under the Securities Act to Courts of the United States.

475. Venue is proper in this District under Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b). Sotera maintains its headquarters in Broadview Heights, Ohio, which is situated in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information in the IPO Offering Materials and SPO Offering Materials, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## XIV. THE SECURITIES ACT PARTIES

### A. Plaintiffs

476. Lead Plaintiffs each purchased shares of Sotera common stock traceable to the IPO and SPO, and were damaged thereby.

477. Plaintiff City of North Miami Beach General Employees' Retirement Plan ("NMB GE") is a public pension system organized for the benefit of current and retired employees of North Miami Beach and their beneficiaries. Plaintiff NMB GE manages approximately $100 million in

assets. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff NMB GE purchased Sotera common stock in or traceable to the IPO and SPO, during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged below

478. Plaintiff City of North Miami Beach Police Officers & Firefighters' Retirement Plan ("NMB Police & FF") is a public pension system organized for the benefit of current and retired North Miami Beach sworn police officers and certain retired North Miami Beach firefighters. Plaintiff NMB Police & FF manages approximately $126 million in assets. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff NMB Police & FF purchased Sotera common stock in or traceable to the IPO and SPO, during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B. Corporate Defendant**

479. Defendant Sotera is incorporated in Delaware and maintains its corporate headquarters at 9100 South Hills Blvd, Suite 300, Broadview Heights, Ohio. The Company's common stock trades on NASDAQ under the ticker symbol "SHC." As of October 25, 2022, Sotera had over 282 million shares of common stock outstanding, owned by hundreds or thousands of investors.

**C. Securities Act Officer Defendants**

480. Defendant Michael B. Petras, Jr. ("Petras") is, and was at all relevant times, Sotera's Chairman and Chief Executive Officer ("CEO"). Defendant Petras signed the IPO Registration Statement (defined below) and the SPO Registration Statement (defined below) and

is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

481. Defendant Scott J. Leffler ("Leffler") served as Sotera's Chief Financial Officer and Treasurer from April 2017 until July 20, 2022. Defendant Leffler signed the IPO Registration Statement and the SPO Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

**D. Director Defendants**

482. Defendant Ruoxi Chen ("Chen") is, and was at all relevant times, a Director of Sotera. Chen reviewed the IPO Registration Statement and the SPO Registration Statement. Chen signed the SPO Registration Statement, and authorized Defendant Petras to sign the IPO Registration Statement on Chen's behalf as Attorney-in-Fact. Chen is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings. Defendant Chen also serves as a managing director at Defendant Warburg.

483. Defendant Sean L. Cunningham ("Cunningham") is, and was at all relevant times, a Director of Sotera. Cunningham reviewed the IPO Registration Statement and the SPO Registration Statement. Cunningham signed the SPO Registration Statement, and authorized Defendant Petras to sign the IPO Registration Statement on Cunningham's behalf as Attorney-in-Fact. Cunningham is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings. Defendant Cunningham also serves as a managing director at Defendant GTCR.

484. Defendant David A. Donnini ("Donnini") is, and was at all relevant times, a Director of Sotera. Defendant Donnini reviewed the IPO Registration Statement and the SPO

Registration Statement. Defendant Donnini signed the SPO Registration Statement, and authorized Defendant Petras to sign the IPO Registration Statement on Defendant Donnini's behalf as Attorney-in-Fact. Defendant Donnini is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings. Defendant Donnini also serves as a managing director at Defendant GTCR.

485. Defendant Stephanie M. Geveda ("Geveda") served as a Director of Sotera from October 2020 until October 7, 2022. Geveda reviewed the IPO Registration Statement and the SPO Registration Statement. Geveda signed the SPO Registration Statement, and authorized Defendant Petras to sign the IPO Registration Statement on Geveda's behalf as Attorney-in-Fact. Geveda is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings. Defendant Geveda also served as a managing director at Defendant Warburg until September 2022.

486. Defendant Ann R. Klee ("Klee") is, and was at all relevant times, a Director of Sotera. Klee reviewed the IPO Registration Statement and the SPO Registration Statement. Klee signed the SPO Registration Statement, and authorized Defendant Petras to sign the IPO Registration Statement on Klee's behalf as Attorney-in-Fact. Defendant Klee is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

487. Defendant Constantine S. Mihas ("Mihas") is, and was at all relevant times, a Director of Sotera. Mihas reviewed the IPO Registration Statement and the SPO Registration Statement. Mihas signed the SPO Registration Statement, and authorized Defendant Petras to sign the IPO Registration Statement on Mihas's behalf as Attorney-in-Fact. Mihas is therefore liable

under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings. Defendant Mihas also serves as a managing director at Defendant GTCR.

488. Defendant James C. Neary ("Neary") is, and was at all relevant times, a Director of Sotera. Neary reviewed the IPO Registration Statement and the SPO Registration Statement. Neary signed the SPO Registration Statement, and authorized Defendant Petras to sign the IPO Registration Statement on Neary's behalf as Attorney-in-Fact. Neary is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings. Defendant Neary also serves as a managing director and partner at Defendant Warburg.

489. Defendant Vincent K. Petrella ("Petrella") is, and was at all relevant times, a Director of Sotera. Petrella reviewed the IPO Registration Statement and the SPO Registration Statement. Petrella signed the SPO Registration Statement, and authorized Defendant Petras to sign the IPO Registration Statement on Petrella's behalf as Attorney-in-Fact. Defendant Petrella is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

490. Defendants Petras, Chen, Cunningham, Donnini, Geveda, Klee, Mihas, Neary, and Petrella are collectively referred to herein as the "Director Defendants." The Director Defendants and Defendant Leffler are collectively referred to herein as the "Offering Materials Signatory Defendants." Each of the Offering Materials Signatory Defendants signed or authorized the signing of the IPO Registration Statement and the SPO Registration Statement. In addition, as directors and/or executive officers of the Company, the Offering Materials Signatory Defendants

participated in the solicitation and sale of Sotera shares to investors in the IPO and the SPO. The Offering Materials Signatory Defendants, because of their positions with Sotera, possessed the power and authority to control the contents of the Offering Materials for the Offerings. Sotera and the Offering Materials Signatory Defendants are collectively referred to herein as the "Securities Act Defendants."

**E. Selling Shareholder Defendants**

491. Defendant Warburg Pincus LLC ("Warburg") is a New York City-based private equity firm. Investment funds and entities affiliated with Warburg sold Sotera shares offered in the SPO. Those investment funds and affiliated entities include: Warburg Pincus Private Equity XI, L.P., Warburg Pincus Private Equity XI-B, L.P., Warburg Pincus Private Equity XI-C, L.P., WP XI Partners, L.P., Warburg Pincus XI Partners, L.P., and Bull Co-Invest L.P. At the time of the IPO, Warburg Pincus, though its investment funds and affiliated entities, beneficially owned approximately 42% of Sotera's outstanding common stock. Following the SPO, Warburg, though its investment funds and affiliated entities, beneficially owned approximately 37% of Sotera's outstanding common stock. Warburg, through Sotera shares beneficially owned by its investment funds and affiliated entities, had the power to control, and did control Sotera throughout the Class Period.

492. Defendant GTCR LLC ("GTCR") is a Chicago-based private equity firm. Investment funds and entities affiliated with GTCR sold Sotera shares in the SPO. Those investment funds and affiliated entities include: GTCR Fund XI/A LP, GTCR Fund XI/C LP, and GTCR Co-Invest XI LP. Following the IPO, GTCR, through its investment funds and affiliated entities, beneficially owned approximately 28% of Sotera's outstanding common stock. Following

the SPO, GTCR, through its investment funds and affiliated entities, beneficially owned approximately 25% of Sotera's outstanding common stock. GTCR, through Sotera shares beneficially owned by its investment funds and affiliated entities, had the power to control, and did control Sotera, throughout the Class Period.

493. Defendants Warburg and GTCR are collectively referred to herein as the "Selling Shareholders." The Selling Shareholders, through Sotera shares beneficially owned by their investment funds and affiliated entities, controlled Sotera before, during and immediately after both the IPO and the SPO. Representatives of the Selling Shareholders comprise a majority of the members on Sotera's Board of Directors, and the Selling Shareholders exerted control and influence over the Company throughout the Class Period.

**F. Underwriter Defendants**

494. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter and joint lead book-running manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

495. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter and joint lead book-running manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

496. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter and joint lead book-running manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

497. Defendant Jefferies LLC ("Jefferies") served as an underwriter and joint lead book-running manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Jefferies was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

498. Defendant Barclays Capital Inc. ("Barclays Capital") served as an underwriter and joint book-running manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Barclays Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

499. Defendant Citigroup Global Markets Inc. ("Citigroup Global") served as an underwriter and joint book-running manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Citigroup Global was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

500. Defendant RBC Capital Markets, LLC ("RBC Capital Markets") served as an underwriter and joint book-running manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, RBC Capital Markets was responsible for ensuring the truthfulness and accuracy

of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

501. Defendant BNP Paribas Securities Corp. ("BNP Paribas") served as an underwriter and co-manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, BNP Paribas was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

502. Defendant KeyBanc Capital Markets Inc. ("KeyBanc Capital") served as an underwriter and co-manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, KeyBanc Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

503. Defendant Citizens Capital Markets, Inc. ("Citizens Capital") served as an underwriter and co-manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Citizens Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

504. Defendant ING Financial Markets LLC ("ING Financial") served as an underwriter and co-manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, ING Financial was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

505. Defendant Academy Securities, Inc. ("Academy Securities") served as an underwriter and co-manager for the IPO and the SPO. As an underwriter of the IPO and the SPO,

Academy Securities was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

506. Defendant Loop Capital Markets LLC ("Loop Capital") served as an underwriter and co-manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Loop Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

507. Defendant Penserra Securities LLC ("Penserra Securities") served as an underwriter and co-manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Penserra Securities was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

508. Defendant Siebert Williams Shank & Co., LLC ("Siebert Williams") served as an underwriter and co-manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Siebert Williams was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

509. Defendant Tigress Financial Partners LLC ("Tigress Financial") served as an underwriter and co-manager for the IPO and the SPO. As an underwriter of the IPO and the SPO, Tigress Financial was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

510. Defendants J.P. Morgan, Credit Suisse, Goldman Sachs, Jefferies, Barclays Capital, Citigroup Global, RBC Capital Markets, BNP Paribas, KeyBanc Capital, Citizens Capital, ING Financial, Academy Securities, Loop Capital, Penserra Securities, Siebert Williams, and Tigress Financial are collectively referred to herein as the "Underwriter Defendants."

## XV. ACTIONABLE STATEMENTS AND OMISSIONS IN THE IPO OFFERING MATERIALS AND SPO OFFERING MATERIALS

### A. November 19-23, 2020 – IPO Offering Materials

511. The Registration Statement was originally filed with the SEC on October 23, 2020, and which, after four amendments—filed on Form S-1/A on November 2, 12, 13, and 18—was declared effective by the SEC after the market closed on November 19, 2020 (the "IPO Registration Statement"). The Class Period begins on November 19, 2020, the effective date of Sotera's IPO. On November 23, 2020, Sotera filed a final prospectus for the IPO with the SEC on Form 424B4 (the "IPO Prospectus"), which formed part of the Registration Statement (together, the "IPO Offering Materials").[25] By means of the IPO Offering Materials, Sotera offered and sold 53.59 million shares of common stock (which included the underwriters' exercise in full of their option to purchase an additional 6.99 million shares of common stock) at $23.00 per share, generating more than $1.2 billion in gross proceeds for the Company.[26]

512. The IPO Offering Materials contained untrue statements of material fact and omitted material facts necessary to make the statements contained therein not false or misleading.

---

[25] Each of the alleged untrue statements made in the Registration Statement were also made—and appeared word-for-word—in the Prospectus (and vice versa).

[26] As noted above, each of the Director Defendants signed the IPO Registration Statement and was named as a "Director" in both the IPO Registration Statement and the Prospectus. *See* Section XIV.D, *infra*. Similarly, each of the Underwriter Defendants was listed as an underwriter in both the Registration Statement and the Prospectus. *See* Section XIV.F , *infra*.

Among other things, the IPO Offering Materials falsely (i) touted the effectiveness of Sotera's EtO emissions control systems; (ii) touted Sotera's ability to comply with environmental regulations; and (iii) unequivocally denied (and downplayed) Sotera's liability risks from the EtO related lawsuits.

513. The untrue statements in the IPO Offering Materials regarding the effectiveness of Sotera's EtO emissions control systems and its ability to comply with environmental regulations (often interwoven together) include the below:

a. ***First***, the IPO Offering Materials stated that Sotera's "***significant technical expertise***" and "***highly trained and skilled workforce.***" Specifically:

> All of the services we provide are highly regulated and require ***significant technical expertise***. ***To manage these strict regulatory requirements safely and effectively, we have a highly trained and skilled workforce that creates, implements and manages complex quality assurance and environmental health and safety programs, procedures and control systems***. We coordinate and communicate with numerous regulatory agencies globally across our businesses on an ongoing and regular basis.

b. ***Second***, the IPO Offering Materials touted Sotera's "***[e]xpertise and strong track record in highly regulated markets***" and "***operational discipline.***" Specifically:

> ***Expertise and strong track record in highly regulated markets***
>
> We and our customers operate in highly complex and regulated markets that require deep knowledge and technical expertise. We believe that ***the operational discipline that we employ to manage intricate quality assurance and EH&S programs in our own operations gives our customers confidence that we are the best partner to support them in their businesses***. For example, ***we design and install emission controls in our EO facilities that often outperform the regulatory standards that we are required to meet.*** We also have a skilled team which has developed trusted relationships with numerous regulatory bodies around the world. For example, in 2019 we were selected by the FDA as one of eight participants to move to the next stage of a public innovation challenge to encourage the development of new approaches to medical device sterilization and new strategies to reduce EO emissions. ***We work closely with our customers, the FDA and others to consider***

> ***enhanced EO cycle design and processes that would reduce EO emissions from the EO sterilization process to as close to zero as reasonably possible.*** Our relationships, combined with our thought leadership that is recognized by regulators and customers alike, enable us to inform the process of creating, interpreting and advising on safety standards. They also allow us to educate and advise our customers on current and newly evolving standards and requirements.

c. ***Third***, the IPO Offering Materials claimed that "***[w]e consistently meet and outperform regulatory emissions control requirements, although we have experienced instances of emissions exceeding applicable standards, none of which we believe were material. We expect to be able to satisfy any changes to applicable regulatory requirements as they evolve***." Specifically:

> Our EO sterilization facilities evacuate EO from the sterilization chambers and aeration rooms. Most countries in which we operate have varying emission control requirements for EO emissions from our facilities. ***We are investing in additional voluntary controls on EO emissions at our facilities to outperform current and expected future regulatory requirements and further reduce facility emissions***. . . . ***Each of our EO sterilization facilities utilizes a variety of control technologies (including wet scrubbers, catalytic oxidizers and dry bed scrubbers) to control these emissions, and we are investing in additional control features to further reduce emissions. We consistently meet and outperform regulatory emissions control requirements, although we have experienced instances of emissions exceeding applicable standards, none of which we believe were material. We expect to be able to satisfy any changes to applicable regulatory requirements as they evolve***.

d. ***Fourth***, the IPO Offering Materials stated that the Company ***"employ[s] engineering and procedural controls and pollution control equipment***." Specifically:

> While we strive to comply with these regulatory requirements, we may not at all times be in full compliance and, as a result, could be subject to significant civil and criminal fines and penalties. ***To reduce the risk of noncompliance, we employ engineering and procedural controls and pollution control equipment, and undertake internal and external regulatory compliance audits at our facilities. We have a proactive EH&S program and a culture of safety and quality across all business units***, and employ a Senior Vice President of Environmental, Health and Safety that reports directly to the Chief Executive Officer and has a team of more than 30 employees.

514. The statements in ¶513 above were untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of the Securities Act. It was untrue and misleading to state that Sotera had "significant technical expertise," "[e]xpertise and [a] strong track record in highly regulated markets," that it could "manage these strict regulatory requirements safely and effectively," that it "consistently me[t] and outperform[ed] regulatory emissions control requirements," that it had "a proactive EH&S [i.e., environmental health and safety] program and a culture of safety and quality across all business units," that its employees were universally "dedicated to safety and quality," and that it "made proactive, voluntary investments to enhance emissions controls." In truth, Sotera and its predecessors were aware of the carcinogenic risk that EtO posed to the surrounding communities since at least the early 1980s, yet chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks and the Company to an increased headline risk, risk of regulatory scrutiny, and liability from hundreds of EtO related lawsuits. Sotera also failed to comply with the terms of several of the permits it received from state and federal regulators designed to monitor and decrease emissions, and instead of being "proactive" regarding environmental safety actively sought to suppress regulator and public knowledge of EtO's carcinogenic properties. Finally, rather than focusing on compliance, health, or safety, for years prior to and throughout the Class Period, Defendants actively engaged in efforts to minimize, reduce and evade the regulation and regulatory impact of EtO.

515. The IPO Prospectus contains the following untrue and misleading statement regarding its perceived risk of liability related to the EtO emissions cases and Willowbrook in particular:

> ***We establish reserves for specific liabilities in connection with regulatory and legal actions that we determine to be probable*** and reasonably estimable . . . . While it is not possible to determine the ultimate disposition of each of these matters, ***we do not expect that the ultimate resolution of pending regulatory and legal matters in future periods, including the matters described below, will have a material effect on our financial condition or results of operations***.
>
> * * *
>
> ***We have not provided for a contingency reserve in connection with these claims.*** While we intend to vigorously defend the Willowbrook proceedings, there can be no assurance that we will be successful.

516. As set forth in ¶515, the IPO Prospectus contained untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of the Securities Act. In truth, Sotera failed to disclose the true extent of its litigation risks by withholding information regarding the inadequacy and subversion of its EtO emissions control systems, which allowed dangerous amounts of toxic EtO fumes to pollute the air surrounding the Company's facilities and exposed people living in the adjacent communities to significantly increased cancer risks, and the fact that Sotera has long been aware of these risks. Given Sotera's awareness of these facts and the substantial record of its approach to health and safety, it was misleading to fail to account for potential litigation losses in the Company's financial statements and to represent to investors that a loss was not deemed probable to the Company.

517. The IPO Offering Materials similarly made untrue and misleading statements of material fact regarding the hundreds of EtO emissions lawsuits filed against the Company.

Specifically, Sotera downplayed the liability risk it faced from "lawsuits alleging that purported EO emissions from certain of [Sotera's] current and former facilities have resulted in toxicological or health-related impact on the environment, the communities that surround [Sotera's] facility and a customer[']s employees," repeatedly (and unequivocally) stating that ***"[w]e deny these allegations and are vigorously defending against these claims***."

518. Sotera's above statements that it "den[ied] th[e] allegations" in the "Ethylene Oxide Tort Litigation" were untrue statements of material fact and/or omitted material facts required to be stated in order to make the statements contained therein not misleading because the "allegations" in the "Ethylene Oxide Tort Litigation" concerned the underlying facts that Sotera was aware of the carcinogenic properties of EtO, but chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks and the Company to an increased risk of regulatory scrutiny and liability from hundreds of EtO related lawsuits. Thus, it was materially false and misleading for the IPO Offering Materials to deny that Sotera's EtO emissions control systems were inadequate and ineffective and had been subverted by denying those same allegations as made in the EtO related lawsuits.

**B. March 15-18, 2021 – SPO Offering Materials**

519. On March 18, 2021, Sotera conducted the SPO, where Warburg Pincus and GTCR, as well as Sotera's CEO, collectively sold 25 million shares of Sotera common stock at $27.00 per share for $675 million in gross proceeds. The SPO was conducted pursuant to a registration

statement that the Company filed with the SEC on March 15, 2021 and which the SEC declared effective on March 17, 2021 (the "SPO Registration Statement"). On March 18, 2021, Sotera filed a prospectus for the SPO on Form 424B4 (the "SPO Prospectus"), which incorporated and formed part of the SPO Registration Statement (collectively, the "SPO Offering Materials").[27]

520. The SPO Offering Materials contained nearly identical statements to those referenced in ¶¶513, 515 contained in the IPO Offering Materials regarding Sotera's safety and emissions control systems, including that Sotera had "significant technical expertise," "[e]xpertise and [a] strong track record in highly regulated markets," could "manage these strict regulatory requirements safely and effectively," had "[e]xpertise and [a] strong track record in highly regulated markets," "employees who are dedicated to safety and quality," and "[w]e consistently meet and outperform regulatory control requirements."

521. The SPO Offering Materials also incorporated by reference Sotera's false and misleading representations in its 2020 Form 10-K regarding the Company's safety and emissions control systems, which included representations that Sotera "drive[s] operational excellence across our network of facilities in order to achieve high levels of safety, quality, operating efficiency and customer satisfaction," that it has "a proactive environmental health and safety ("EH&S") program and a culture of safety and quality across all business units," that it "consistently meet[s] and outperform[s] regulatory emissions control requirements," that it was "investing in additional voluntary controls on EO emissions at [its] facilities to outperform current and expected future

[27] As noted above, each of the Director Defendants signed the SPO Registration Statement and was named as a "Director" in both the SPO Registration Statement and the Prospectus. *See* Section XIV.D, *infra*. Similarly, each of the Underwriter Defendants was listed as an underwriter in both the SPO Registration Statement and the Prospectus. *See* Section XIV.F, *infra*.

regulatory requirements and further reduce facility emissions," and that it had "made proactive, voluntary investments to enhance emission controls."

522. The statements in ¶¶520-21 above were untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of the Securities Act. It was untrue and misleading to state that Sotera had "significant technical expertise," could "manage these strict regulatory requirements safely and effectively," had "[e]xpertise and [a] strong track record in highly regulated markets," that it "consistently me[t] and outperform[ed] regulatory emissions control requirements," that it had "a proactive EH&S [i.e., environmental health and safety] program and a culture of safety and quality across all business units," that its employees were universally "dedicated to safety and quality," and that it "made proactive, voluntary investments to enhance emissions controls." In truth, Sotera and its predecessors were aware of the carcinogenic risk that EtO posed to the surrounding communities since at least the early 1980s, yet chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks and the Company to an increased headline risk, risk of regulatory scrutiny, and liability from hundreds of EtO related lawsuits. Sotera also failed to comply with the terms of several of the permits it received from state and federal regulators designed to monitor and decrease emissions, and instead of being "proactive" regarding environmental safety actively sought to suppress regulator and public knowledge of EtO's carcinogenic properties. Finally, rather than focusing on compliance, health, or safety, for years

prior to and throughout the Class Period, Defendants actively engaged in efforts to minimize, reduce and evade the regulation and regulatory impact of EtO.

523. The SPO Offering Materials further incorporated by reference Sotera's untrue and misleading statement in its 2020 Form 10-K regarding its perceived risk of liability related to the EtO emissions cases and Willowbrook in particular:

> ***We establish reserves for specific liabilities in connection with regulatory and legal actions that we determine to be probable*** and reasonably estimable . . . . While it is not possible to determine the ultimate disposition of each of these matters, ***we do not expect that the ultimate resolution of pending regulatory and legal matters in future periods, including the matters described below, will have a material effect on our financial condition or results of operations***.
>
> * * *
>
> ***We have not provided for a contingency reserve in connection with these claims.*** While we intend to vigorously defend the [Willowbrook] proceedings, there can be no assurance that we will be successful.

524. As set forth in ¶523, the SPO Prospectus contained untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of the Securities Act. In truth, Sotera failed to disclose the true extent of its litigation risks by withholding information regarding the inadequacy and subversion of its EtO emissions control systems, which allowed dangerous amounts of toxic EtO fumes to pollute the air surrounding the Company's facilities and exposed people living in the adjacent communities to significantly increased cancer risks, and the fact that Sotera has long been aware of these risks. Given Sotera's awareness of these facts and the substantial record of its approach to health and safety, it was misleading to fail to account for potential litigation losses in the Company's financial statements and to represent to investors that a loss was not deemed probable to the Company.

525. The SPO Offering Materials further incorporated by reference Sotera's representations in its 2020 Form 10-K regarding the hundreds of EtO emissions lawsuits filed against the Company, which included acknowledgements that it was the subject of lawsuits and claims including "alleg[ations] that purported EO emissions from certain of [its] current and former facilities have resulted in toxicological or health-related impacts on the environment, the communities that surround [its] facility and a customer's employees," "a lawsuit brought by the State of New Mexico . . . alleging that emissions of EO from [its] Santa Teresa facility constitute a public nuisance, have materially contributed to increased health risks suffered by residents in the area, and that injunctive relief should be awarded," and various tort claims, including the "Ethylene Oxide Tort Litigation" in Illinois and tort claims in Atlanta. In connection with these acknowledgments, the Company repeatedly and unequivocally stated that "[w]e deny these allegations," and intended to vigorously defend against them.

526. Sotera's above statements that it "den[ied] th[e] allegations" in the "Ethylene Oxide Tort Litigation" were untrue statements of material fact and/or omitted material facts required to be stated in order to make the statements contained therein not misleading because the "allegations" in the "Ethylene Oxide Tort Litigation" concerned the underlying facts that Sotera was aware of the carcinogenic properties of EtO, but chose not to employ adequate and effective EtO emissions control systems at its sterilization facilities and often subverted whatever control systems the Company did have, allowing dangerous amounts of toxic EtO fumes to pollute the air surrounding those facilities and exposing people living in the adjacent communities to significantly increased cancer risks and the Company to an increased risk of regulatory scrutiny and liability from hundreds of EtO related lawsuits. Thus, it was untrue and misleading for the SPO Offering

Materials to deny that Sotera's EtO emissions control systems were inadequate and ineffective and had been subverted by denying those same allegations as made in the EtO related lawsuits.

## XVI. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT IV

**For Violations of Section 11 of the Securities Act
Against the Securities Act Defendants and the Underwriter Defendants**

527. Plaintiffs repeat, incorporate, and reallege only those paragraphs applicable to the Securities Act as if fully set forth herein. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and negligence under the Securities Act.

528. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Sotera common stock sold in and/or traceable to the IPO and/or the SPO, and who were damaged thereby and does not sound in fraud.

529. This Count is based on Sotera and the Underwriter Defendants' statutory liability for untrue and materially misleading statements or omissions in the IPO Offering Materials and SPO Offering Materials. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

530. The IPO Offering Materials and the SPO Offering Materials were false and misleading, contained untrue statements of material facts, omitted other facts necessary to make

the statements not misleading, and concealed and failed to adequately disclose material facts as disclosed above.

531. The defendants named herein were responsible for the contents and dissemination of the IPO Offering Materials and the SPO Offering Materials.

532. Sotera is the registrant for the IPO and the SPO. As the issuer of the shares, Sotera is strictly liable to Plaintiffs and the Class for the materially untrue statements and omissions that appeared in or were omitted from the IPO Offering Materials and the SPO Offering Materials.

533. The Offering Materials Signatory Defendants, as directors of Sotera at the time of the IPO and SPO and/or as signatories of the IPO Offering Materials and SPO Offering Materials, are liable under Section 11 of the Securities Act, 15 U.S.C. § 77k. The Offering Materials Signatory Defendants are unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Offering Documents. These Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in IPO Offering Materials and SPO Offering Materials were true, without omissions of any material facts, or not misleading. Accordingly, the Offering Materials Signatory Defendants acted negligently, and are liable to Plaintiffs and the Class for the materially untrue statements and omissions that appeared in or were omitted from the IPO Offering Materials and SPO Offering Materials.

534. The Underwriter Defendants served as the underwriters for the IPO and SPO and qualify as such according to the definition contained in Section 12(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the

securities to the investing public pursuant to the IPO Offering Materials and SPO Offering Materials.

535. The Defendants in this claim issued, caused to be issued and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the IPO Offering Materials and SPO Offering Materials, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reason of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

536. Class members within the scope of this Count acquired Sotera shares pursuant to, or traceable to, the defective IPO Offering Materials and/or SPO Offering Materials. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Materials contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased Sotera common stock.

537. Plaintiffs and the Class have suffered damages. The value of Sotera common stock has declined substantially as a result of the Securities Act Defendants' and the Underwriter Defendants' violations.

538. Less than one year has elapsed since the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

539. By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class pursuant to Section 11(e).

**COUNT V**

**For Violations of Section 12(a)(2) of the Securities Act Against Sotera, The Selling Shareholders, And The Underwriter Defendants**

540. Plaintiffs repeat, incorporate, and reallege only those paragraphs above applicable to the Securities Act contained above as if fully set forth herein. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For the purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

541. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Sotera common stock in and/or traceable to the IPO and/or the SPO, and who were damaged thereby.

542. This Count is based on Sotera, the Selling Shareholders and the Underwriter Defendants' statutory liability for untrue and materially misleading statements or omissions in the IPO Offering Materials and SPO Offering Materials. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that defendants named in this count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

543. Sotera and the Underwriter Defendants were sellers, offerors, or solicitors of the purchasers of the shares offered pursuant to the IPO Offering Materials and SPO Offering Materials.

544. In addition, the Selling Shareholders were sellers, offerors, or solicitors of the purchases of the shares offered pursuant to the SPO Offering Materials through affiliated entities. Investment funds and entities affiliated with Warburg sold Sotera shares offered in the SPO. Those investment funds and affiliated entities include: Warburg Pincus Private Equity XI, L.P., Warburg Pincus Private Equity XI-B, L.P., Warburg Pincus Private Equity XI-C, L.P., WP XI Partners, L.P., Warburg Pincus XI Partners, L.P., and Bull Co-Invest L.P. Investment funds and entities affiliated with GTCR sold Sotera shares in the SPO. Those investment funds and affiliated entities include: GTCR Fund XI/A LP, GTCR Fund XI/C LP, and GTCR Co-Invest XI LP.

545. By means of the IPO Offering Materials and SPO Offering Materials as well as instruments of transportation and communication in interstate commerce and the mails, the Defendants named in this Count, through the IPO and SPO, which were public offerings, solicited and sold Sotera common stock to members of the class.

546. The IPO Offering Materials and the SPO Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading.

547. As the issuer of the registered securities, Sotera is strictly liable for the untrue statements and omissions of material facts.

548. The Underwriter Defendants and the Selling Shareholders were statutory sellers of Sotera shares that were registered in the IPO and the SPO pursuant to the IPO Registration

Statement and the SPO Registration Statement and sold by means of the IPO Offering Materials and the SPO Offering Materials. By means of the IPO Offering Materials and the SPO Offering Materials, the Underwriter Defendants and the Selling Shareholders sold millions of Sotera shares through the IPO and the SPO to members of the Class. The Underwriter Defendants and the Selling Shareholders were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants and the Selling Shareholders were sellers, offerors, and/or solicitors of sales of the stock that was sold in the IPO and the SPO by means of the materially false and misleading IPO Offering Materials and SPO Offering Materials.

549. None of the Underwriter Defendants or the Selling Shareholders made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Offering Materials or SPO Offering Materials were accurate and complete in all material respects. Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions.

550. Class members within the scope of this Count acquired Sotera shares pursuant to the defective IPO Offering Materials and/or SPO Offering Materials. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Materials contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased Sotera stock.

551. Plaintiffs and the Class have suffered damages. The value of Sotera common stock has declined substantially as a result of the Defendants' violations.

552. Plaintiffs and the Class hereby tender their Sotera common stock purchased in or traceable to the IPO and SPO for purposes of rescission or rescissory damages pursuant to 15 U.S.C. § 77l.

553. Less than one year has elapsed since the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

554. By reason of the foregoing, the Underwriter Defendants and the Selling Shareholders are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Sotera common stock in and/or traceable to the IPO and/or SPO, and who were damaged thereby in an amount equal to the consideration paid for such security with interest thereon, less the amount of any income received thereon, or for damages if they no longer own the security.

## COUNT VI

### For Violations of Section 15 of the Securities Act Against the Offering Materials Signatory Defendants and the Selling Shareholders

555. Plaintiffs repeat, incorporate, and reallege only those paragraphs above applicable to the Securities Act contained above as if fully set forth herein. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

556. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Sotera common stock in and/or traceable to the IPO and/or the SPO, and who were damaged thereby.

557. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

558. As set forth in Count One above, Sotera is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the IPO Offering Materials and the SPO Offering Materials.

559. The Offering Materials Signatory Defendants, by virtue of their positions, voting power, ownership, rights as against Sotera, and/or specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Sotera within the meaning of Section 15 of the Securities Act. These defendants also had the power and influence, and exercised the same, to cause Sotera to engage in the acts described herein, including by causing Sotera to conduct the IPO and the SPO pursuant to the IPO Offering Materials and the SPO Offering Materials.

560. The Selling Shareholders were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Sotera within the meaning of Section 15 of the Securities Act. The Selling Shareholders collectively owned a majority of Sotera's common stock and controlled the Company before, during and after the IPO and the SPO. In addition to controlling a majority

of Sotera's voting shares, the Selling Shareholders also appointed and had significant influence over Sotera's management and members of its Board of Directors.

561. By reason of the foregoing, the defendants named herein each were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged in Counts Four and Five above, based on their having signed or authorized the signing of the IPO Registration Statement and/or the SPO Registration Statement, selling Sotera common stock in the IPO and/or the SPO, and/or having otherwise participated in the process that allowed both the IPO and the SPO to be successfully completed. The defendants named herein are liable for the aforesaid wrongful conduct and are liable, to the same extent Sotera is liable under Section 11 of the Securities Act, to members of the Class who purchased or otherwise acquired Sotera common stock pursuant and/or traceable to the IPO and/or the SPO, and who were damaged thereby.

**THE FOLLOWING SECTIONS APPLY TO BOTH THE EXCHANGE ACT AND SECURITIES ACT CLAIMS**

## XVII. CLASS ACTION ALLEGATIONS (EXCHANGE ACT AND SECURITIES ACT CLAIMS)

562. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Sotera common stock: (i) pursuant and/or traceable to the Company's IPO; (ii) pursuant and/or traceable to the Company's SPO; and/or (iii) during the Class Period (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

563. The members of the Class are so numerous that joinder of all members is impracticable. Following the IPO, Sotera common shares were actively traded on the NASDAQ. As of February 28, 2023, Sotera had approximately 280 million shares of Sotera common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sotera, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

564. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a) Whether Defendants violated the Securities Act;

b) Whether Defendants violated the Exchange Act;

c) Whether the IPO Offering Materials and the SPO Offering Materials were negligently prepared and contained inaccurate statements of material fact, omitted other facts necessary to make the statements made therein not misleading, and omitted material information required to be stated therein;

d) Whether Sotera and the Officer Defendants omitted and/or misrepresented material facts;

e) Whether statements made by Sotera and the Officer Defendants omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

f) Whether the Offering Materials Signatory Defendants and the Selling Shareholders are personally liable for the alleged untrue statements of material fact and omissions of material fact described herein;

g) Whether the Director Defendants and the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

h) Whether Sotera and the Officer Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

i) Whether Defendants' conduct impacted the price of Sotera common stock;

j) Whether Defendants' conduct caused the members of the Class to sustain damages; and

k) The extent of damage sustained by Class members and the appropriate measure of damages.

565. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct in violation of federal law complained of herein.

566. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

567. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVIII. PRAYER FOR RELIEF (EXCHANGE ACT AND SECURITIES ACT CLAIMS)

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory, rescissory or statutory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIX. JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: June 1, 2023

Respectfully submitted

*/s/ Scott D. Simpkins*
Scott D. Simpkins, SBN 66775
**CLIMACO, WILCOX, PECA & GAROFOLI CO., LPA**
55 Public Square
Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
sdsimp@climacolaw.com

*Liaison Counsel for Lead Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association, and Wayne County Employees' Retirement System*

Hannah Ross (*pro hac vice motion pending*)
James A. Harrod (*pro hac vice*)
Timothy Fleming (*pro hac vice*)
Stephen Boscolo (*pro hac vice*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
jim.harrod@blbglaw.com
timothy.fleming@blbglaw.com
stephen.boscolo@blbglaw.com

*Co-Lead Counsel and Counsel for Lead Plaintiffs Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association*

Serena P. Hallowell (*pro hac vice*)
**MOTLEY RICE LLC**
777 Third Ave., 27th Floor
New York, NY 10017
Telephone: (212) 577.0040
Facsimile: (212) 577.0054
shallowell@motleyrice.com

William S. Norton (*pro hac vice*)
Meredith B. Weatherby (*pro hac vice*)
Shade (Ridge) Mazingo (*pro hac vice*)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Tel: (843) 216-9000
bnorton@motleyrice.com
mweatherby@motleyrice.com
rmazingo@motleyrice.com

*Co-Lead Counsel and Counsel for Lead Plaintiff Wayne County Employees' Retirement System*

Aaron L. Castle (*pro hac vice* forthcoming)
Robert Abb (*pro hac vice* forthcoming)
**VANOVERBEKE MICHAUD & TIMMONY P.C.**
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com
rabb@vmtlaw.com

*Additional Counsel for Lead Plaintiffs Oakland County Employees' Retirement System, Oakland County Voluntary Employees' Beneficiary Association, and Wayne County Employees' Retirement System*

Adam T Savett
Robert C. Finkel (*pro hac vice* forthcoming)
Joshua W. Ruthizer (*pro hac vice* forthcoming)
**WOLF POPPER LLP**
845 Third Avenue

New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093
asavett@wolfpopper.com
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com

*Additional Counsel for Plaintiffs City of North Miami Beach General Employees' Retirement Plan, and City of North Miami Beach Police Officers' and Firefighters' Retirement Plan*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants.

*/s/ Scott D. Simpkins*
Scott D. Simpkins
*Liaison Counsel for Plaintiffs*

**CERTIFICATION OF CITY OF NORTH MIAMI BEACH GENERAL EMPLOYEES' RETIREMENT PLAN PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Eloine Cox-Haughton, on behalf of the City of North Miami Beach General Employees' Retirement Plan ("NMBGE"), declare the following as to the claims asserted or to be asserted under the federal securities laws:

1. I am the Chairwoman of the City of North Miami Beach General Employees Retirement Committee (the "Committee"). I am authorized to execute this certification on behalf of NMBGE and authorized to initiate this litigation on behalf of NMBGE.

2. NMBGE has reviewed the class action complaint against Sotera Health Company ("Sotera) and the other defendants in *Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association v. Sotera Health Company*, No. 1:23-cv-143 (N.D. Ohio) (the "Action"). NMBGE has authorized Lead Counsel and Wolf Popper LLP to include NMBGE as a named plaintiff in the Action.

3. NMBGE did not engage in transactions in the securities that are the subject of the Action at the direction of its counsel or in order to participate in any private action arising under the federal securities laws.

4. NMBGE is willing to serve as a representative party on behalf of the class alleged in the Action, including providing testimony at deposition and trial, if necessary.

5. NMBGE fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the Action for the Class.

6. A list of NMBGE's transactions in Sotera common stock that are the subject of the Action are attached as Exhibit 1.

7. During the three year period preceding the date of signing of this certification, NMBGE has sought to serve or has been appointed as a lead plaintiff or representative party on behalf of an asserted class in the following actions:

*Das v. Unity Software Inc.*, No. 5:22-cv-3962-EJD (N.D. Cal. Sept. 6, 2022)

*In re Barclays PLC Securities Litigation*, No. 1:22-cv-08172 (S.D.N.Y. Sept. 23, 2022)

9. NMBGE will not accept any payment for serving as a representative party on behalf of the Class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30 day of May, 2023

By: Eloine Cox-Haughton

Eloine Cox-Haughton
Chairwoman
City of North Miami Beach General
Employees Retirement Committee

On behalf of City of North Miami Beach
General Employees' Retirement Plan

Sotera Health Co. (SHC)
Class Period: 11/20/2020 - 9/19/2022

NORTH MIAMI BEACH GE

| | | Purchases | | | Sales | | |
|---|---|---|---|---|---|---|---|
| Trade Type | Date | Quantity | Price | Cost | Quantity | Price | Proceeds |
| Buy | 11/20/2020 | 199 | $24.63 | $4,902 | | | |
| Buy | 11/20/2020 | 584 | $23.00 | $13,432 | | | |
| Sell | 12/9/2020 | | | | 8 | $25.55 | $204 |
| Sell | 2/5/2021 | | | | 13 | $27.24 | $354 |
| Sell | 2/24/2021 | | | | 77 | $26.65 | $2,052 |
| Sell | 3/8/2021 | | | | 6 | $25.52 | $153 |
| Buy | 3/18/2021 | 408 | $27.00 | $11,016 | | | |
| Sell | 3/31/2021 | | | | 4 | $25.09 | $100 |
| Sell | 4/26/2021 | | | | 14 | $26.21 | $367 |
| Buy | 5/13/2021 | 132 | $21.97 | $2,900 | | | |
| Buy | 5/13/2021 | 259 | $22.03 | $5,705 | | | |
| Sell | 5/26/2021 | | | | 63 | $24.16 | $1,522 |
| Sell | 7/16/2021 | | | | 3 | $22.63 | $68 |
| Buy | 8/12/2021 | 176 | $24.48 | $4,309 | | | |
| Buy | 8/13/2021 | 424 | $24.73 | $10,487 | | | |
| Sell | 10/7/2021 | | | | 36 | $26.14 | $941 |
| Buy | 10/25/2021 | 56 | $25.97 | $1,454 | | | |
| Sell | 12/8/2021 | | | | 8 | $22.69 | $181 |
| Sell | 1/11/2022 | | | | 15 | $22.41 | $336 |
| Sell | 2/14/2022 | | | | 27 | $21.84 | $590 |
| Sell | 2/24/2022 | | | | 51 | $21.39 | $1,091 |
| Sell | 4/27/2022 | | | | 21 | $20.77 | $436 |
| Sell | 5/26/2022 | | | | 41 | $20.40 | $836 |
| Sell | 6/28/2022 | | | | 93 | $20.28 | $1,886 |
| Buy | 7/22/2022 | 3 | $18.71 | $56 | | | |
| Buy | 7/22/2022 | 134 | $18.71 | $2,507 | | | |
| Buy | 7/25/2022 | 126 | $19.01 | $2,395 | | | |
| Sell | 7/27/2022 | | | | 41 | $18.95 | $777 |
| Sell | 8/29/2022 | | | | 31 | $17.17 | $532 |
| Buy | 9/19/2022 | 117 | $9.92 | $1,161 | | | |
| Buy | 9/19/2022 | 314 | $10.42 | $3,271 | | | |

**CERTIFICATION OF CITY OF NORTH MIAMI BEACH POLICE OFFICERS' AND FIREFIGHTERS' RETIREMENT PLAN PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Captain Mohammad Asim, on behalf of City of North Miami Beach Police Officers' and Firefighters' Retirement Plan ("NMBPF"), declares the following as to the claims asserted or to be asserted under the federal securities laws:

1. I am the Chairman of the City of North Miami Beach Police & Fire Retirement Committee (the "Committee"). I am authorized to execute this certification on behalf of NMBPF and authorized to initiate this litigation on behalf of NMBPF.

2. NMBPF has reviewed the class action complaint against Sotera Health Company ("Sotera) and the other defendants in *Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association v. Sotera Health Company*, No. 1:23-cv-143 (N.D. Ohio) (the "Action"). NMBPF has authorized Lead Counsel and Wolf Popper LLP to include NMBPF as a named plaintiff in the Action.

3. NMBPF did not engage in transactions in the securities that are the subject of the Action at the direction of its counsel or in order to participate in any private action arising under the federal securities laws.

4. NMBPF is willing to serve as a representative party on behalf of the class alleged in the Action, including providing testimony at deposition and trial, if necessary.

5. NMBPF fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the Action for the Class.

6. A list of NMBPF's transactions in Sotera common stock that are the subject of the Action are attached as Exhibit 1.

7. During the three year period preceding the date of signing of this certification, NMBPF has sought to serve or has been appointed as a lead plaintiff or representative party on behalf of an asserted class in the following actions:

*Das v. Unity Software Inc.*, No. 5:22-cv-3962-EJD (N.D. Cal. Sept. 6, 2022)

*In re Barclays PLC Securities Litigation*, No. 1:22-cv-08172 (S.D.N.Y. Sept. 23, 2022)

9. NMBPF will not accept any payment for serving as a representative party on behalf of the Class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30 day of May, 2023

By: [signature] #182

Captain Mohammad Asim
Chairman
City of North Miami Beach Police & Fire
Retirement Committee

On behalf of the City of North Miami Beach
Police Officers' and Firefighters' Retirement
Plan

**Sotera Health Co. (SHC)**
**Class Period: 11/20/2020 - 9/19/2022**

## NORTH MIAMI BEACH P&F

| | | Purchases | | | Sales | | |
|---|---|---|---|---|---|---|---|
| Trade Type | Date | Quantity | Price | Cost | Quantity | Price | Proceeds |
| Buy | 11/20/2020 | 253 | $24.63 | $6,232 | | | |
| Buy | 11/20/2020 | 743 | $23.00 | $17,089 | | | |
| Sell | 12/9/2020 | | | | 10 | $25.55 | $255 |
| Sell | 2/5/2021 | | | | 20 | $27.24 | $545 |
| Sell | 2/24/2021 | | | | 54 | $26.65 | $1,439 |
| Sell | 3/8/2021 | | | | 8 | $25.52 | $204 |
| Buy | 3/18/2021 | 543 | $27.00 | $14,661 | | | |
| Sell | 3/25/2021 | | | | 145 | $24.84 | $3,602 |
| Sell | 4/26/2021 | | | | 15 | $26.21 | $393 |
| Buy | 5/13/2021 | 159 | $21.97 | $3,494 | | | |
| Buy | 5/13/2021 | 313 | $22.03 | $6,895 | | | |
| Sell | 5/26/2021 | | | | 66 | $24.16 | $1,595 |
| Sell | 7/16/2021 | | | | 16 | $22.63 | $362 |
| Buy | 8/12/2021 | 212 | $24.48 | $5,190 | | | |
| Buy | 8/13/2021 | 512 | $24.73 | $12,663 | | | |
| Sell | 10/7/2021 | | | | 40 | $26.14 | $1,045 |
| Buy | 10/25/2021 | 162 | $25.97 | $4,207 | | | |
| Sell | 12/8/2021 | | | | 12 | $22.69 | $272 |
| Sell | 1/11/2022 | | | | 19 | $22.41 | $426 |
| Sell | 2/14/2022 | | | | 32 | $21.84 | $699 |
| Sell | 2/24/2022 | | | | 63 | $21.39 | $1,347 |
| Sell | 2/25/2022 | | | | 21 | $22.09 | $464 |
| Sell | 4/27/2022 | | | | 104 | $20.77 | $2,160 |
| Sell | 5/26/2022 | | | | 91 | $20.40 | $1,856 |
| Buy | 7/22/2022 | 4 | $18.71 | $75 | | | |
| Buy | 7/22/2022 | 167 | $18.71 | $3,124 | | | |
| Buy | 7/25/2022 | 156 | $19.01 | $2,965 | | | |
| Sell | 7/27/2022 | | | | 41 | $18.95 | $777 |
| Sell | 8/29/2022 | | | | 111 | $17.17 | $1,906 |
| Buy | 9/19/2022 | 142 | $9.92 | $1,409 | | | |
| Buy | 9/19/2022 | 379 | $10.42 | $3,949 | | | |